## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONNA J. ALSTON                                :

        Plaintiff                        :

v.                                             :          Civil No. 07-00122 (ESH)

WASHINGTON METROPOLITAN                         :
AREA TRANSIT AUTHORITY
                                               :
        Defendant

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
### AND IN OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Plaintiff DONNA ALSTON, by and through counsel, AXELSON, WILLIAMOWSKY, BENDER & FISHMAN, P.C., and moves for Summary Judgment and opposes Defendant's Motion for Summary Judgment and in support thereof states as follows:

1.  Plaintiff is a long time employee of the Washington Metropolitan Area Transit Authority.

2.  Plaintiff became substantially limited in the major life activity of breathing and thus "disabled" or "handicapped" as a result of exposure to toxic chemicals on the job.  There is no dispute that the Plaintiff is "handicapped" under the Rehabilitation Act of 1973.

3.  In April 2006, Plaintiff became medically disqualified from her job as a bus cleaner by WMATA and therefore the employer also "regarded" her as being handicapped.

4.  Beginning in May 2005, the Plaintiff repeatedly requested a transfer to a vacant

position as a reasonable accommodation to avoid exposure to fumes but has been denied the reasonable accommodation of mandatory re-assignment which she is entitled to under the Rehabilitation Act of 1973.

5.    There are no disputes as to any material facts that the Plaintiff was qualified for two positions, a Job Access Information Assistant and a Receptionist position but was forced to compete with other individuals and not provided a re-assignment to either of these positions.

6.    Under the Rehabilitation Act of 1973 and the D.C. Circuit's opinion in <u>Aka v. Washington Hospital Center</u>, 156 F. 3d 1284 (D.C. Cir. 1998)(<u>en</u> <u>banc</u>), mandatory re-assignment is required and Defendant violated the provisions of the Rehabilitation Act by failing to re-assign the Plaintiff.

7.    Plaintiff's Motion for Summary Judgment must be granted as to liability and Defendant's Motion for Summary Judgment be denied.  Plaintiff requests also a hearing on the issue of damages in this case.

8.    Plaintiff respectfully refers this honorable court to her Memorandum in Support of Plaintiff's Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment.

WHEREFORE, Plaintiff respectfully requests that her Motion for Summary Judgment be granted and that she be granted injunctive relief ordering the Defendant to re-assign her to one of the two vacant positions; in addition, Plaintiff respectfully requests that the Defendant's Motion for Summary Judgment be denied.

Respectfully submitted,

**AXELSON, WILLIAMOWSKY,**
**BENDER & FISHMAN, P.C.**

**THE GOLDSMITH LAW FIRM, LLC**

/S/_____
Bruce M. Bender, Bar # 381319
401 N. Washington St., Suite 550
Rockville, MD 20850
(301) 738-7660
Attorneys for Plaintiff

/S/_____
Leizer Goldsmith, Bar # 419544
5335 Wisconsin Avenue, NW, #440
Washington, D.C. 20015
(202) 895-1506
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June 2008, a copy of the foregoing was mailed, postage prepaid to:

Kathleen A. Carey, Esq.
Assistant General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001

/S/_____
Bruce M. Bender

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONNA J. ALSTON                              :

        Plaintiff                :

v.                                           :     Civil No. 07-00122 (ESH)

WASHINGTON METROPOLITAN                      :
AREA TRANSIT AUTHORITY
                                             :
        Defendant

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.    Plaintiff has been an employee of WMATA since August 16, 1999.

2.    She has worked as a bus cleaner/shifter since June 26, 2000.

3.    Plaintiff was exposed to toxic bus fumes over many years and was eventually

    diagnosed with asthma.

4.    Plaintiff has had breathing problems since October 11, 2002 when she went to

    Suburban Hospital. She informed her supervisor of her medical diagnosis at that

    time and requested a mask repeatedly thereafter.

5.    She developed pneumonia in April 2005 and saw WMATa's medical doctor Gina

    Pervall-Walker, M.D..At that time Plaintiff's treating doctor recommended she not

    be exposed to toxic fumes. Plaintiff requested reasonable accommodation at that

    time by way of a transfer to a vacant position that did not require exposure to

    fumes. Despite this request, Dr. Pervall-Walker released her to her full duty job.

6.    Thereafter, Plaintiff suffered acute symptoms again on December 22, 2005 and

    was hospitalized at George Washington University. She was placed on an inhaler

    by her doctors and her doctor, Dr. Paul Silver issued a report on January 28,

2006 that she should not be in an environment that exposes her to toxic fumes.

7.     Plaintiff hand delivered this report to WMATA and again asked for a reasonable accommodation by way of a transfer to a vacant position that did not expose her to toxic fumes.

8.     On April 25, 2006, Plaintiff was medically disqualified from her prior job as a bus cleaner by WMATA's doctor, Dr. Pervall-Walker.

9.     Thereafter, Plaintiff was not provided a job reassignment or transfer to vacant available positions for which she was qualified including a Job Access Information Assistant position and a receptionist position.

10.     She was qualified for the Job Access Information Assistant position and applied for this position after WMATA was on notice of her disability and request for reasonable accommodation, but it was provided to a more qualified candidate. Union seniority did not play a role in her failure to be selected for this position.

11.     Plaintiff was also qualified for a receptionist position which became available in May 2007. She was never sent the job vacancy announcement for this job and did not know about the vacancy. WMATA made no effort to inform her of this vacancy. If she had known of the vacancy, she would have applied for it.

12.     Plaintiff has never been provided a reasonable accommodation by way of a job reassignment despite requesting this on numerous occasions and despite applying for over 70 vacant jobs at WMATA.

Respectfully submitted,

**AXELSON, WILLIAMOWSKY,**   **THE GOLDSMITH LAW FIRM, LLC**
**BENDER & FISHMAN, P.C.**


/S/              /S/          
Bruce M. Bender, Bar # 381319   Leizer Goldsmith, Bar # 419544
401 N. Washington St., Suite 550   5335 Wisconsin Avenue, NW, #440
Rockville, MD 20850       Washington, D.C. 20015
(301) 738-7660         (202) 895-1506
Attorneys for Plaintiff       Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of June 2008, a copy of the foregoing was mailed, postage prepaid to:

Kathleen A. Carey, Esq.
Assistant General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001


/S/              
Bruce M. Bender

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DONNA J. ALSTON                          :

              Plaintiff              :

v.                                            :      Civil No. 07-00122 (ESH)

WASHINGTON METROPOLITAN          :
AREA TRANSIT AUTHORITY

                                              :
              Defendant

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Plaintiff Donna Alston, a longtime employee of the Washington Metropolitan Area

Transit Authority (hereinafter "WMATA"), became substantially limited in the major life

activity of breathing, and thus "disabled" or "handicapped" as a result of exposure to

toxic chemicals on the job. Thereafter she was medically disqualified from her job as a

bus cleaner by WMATA. She has brought this case because despite the existence of

appropriate job openings, she has been denied the reasonable accommodation of

mandatory reassignment to which she is definitely entitled under the Rehabilitation Act

of 1973, (hereinafter "Rehabilitation Act") 29 U.S. C. §794 and the D.C. Circuit's en

banc decision in Aka v. Washington Hospital Center, 156 F. 3d 1284 (D.C. Cir. 1998)

(en banc).

It is undisputed that Ms. Alston is a "disabled" or "handicapped" person under the

Rehabilitation Act, who has been qualified for two job openings for which she was not

reassigned. Since as we show below, WMATA was required to offer such reassignment

under the Rehabilitation Act, but has failed to do so, summary judgment must be granted to Ms. Alston as to liability. Additionally Defendant's Motion for Summary Judgment must be denied.

## II.    FACTS AND PROCEDURAL HISTORY

### A.    Plaintiff Worked As A Bus Cleaner For Many Years And Was Exposed To Toxic Bus Fumes

Plaintiff agrees that she has been an employee with the Defendant since August 16, 1999. She originally was hired as a bus operator trainee but then left that position and was rehired as a bus cleaner/shifter on June 26, 2000.

During the course of this employment, Plaintiff had to clean buses both in enclosed garages, and outside, whereby she was exposed to toxic bus fumes over many years.  Eventually she was diagnosed with asthma. (Ex. 1, transcript of hearing at Maryland Workers Compensation Commission, pp. 5-7) (Ex. 2, Report of Jeff Hales, M.D., dated March 2, 2007, who specializes in pulmonary medicine).

Specifically, Plaintiff testified that she had to remove graffiti from the bus along with dirt, and trash. Further, she had to wash the windows, sweep the bus and clean the bus.  She was constantly going in and out of buses and exposed to exhaust fumes from the buses because the buses are not turned off when she was doing this work. (Ex. 1, pp. 6-7).

### B.    Plaintiff Developed Severe Symptoms Of Asthma And Sought Medical Treatment Since 2002

Plaintiff first had medical treatment when she went to the emergency room of Suburban Hospital on October 11, 2002. She reported feeling dizzy and had symptoms

of vertigo because she had smelled a chemical at work. (Ex. 1, p. 8) (Medical Report of Suburban Hospital, Ex. 3 dated October 11, 2002). Thereafter in 2004, Plaintiff went to the emergency room at George Washington University hospital on a couple of occasions – June 24, 2004 and July 3, 2004.  She reported symptoms of lightheadedness, drowsiness and slurred speech. (Ex. 1, p. 8)   Ms. Alston developed these symptoms because of her exposure to toxic fumes. (Ex. 1, p. 8) Plaintiff developed pneumonia in April 2005 and saw WMATA's medical doctor, Gina Pervall-Walker, M.D. on May 5th and 19, 2005. (Ex. 4, Medical Records of Dr. Pervall-Walker dated May 5th and 19, 2005) At that time, Plaintiff's treating doctor recommended she not be exposed to fumes and Ms. Alston requested a reasonable accommodation by way of a job transfer where she could avoid fumes. (Alston aff., Ex. 9) However, Dr. Pervall-Walker nonetheless released her to go back to full duty work.

She then saw a doctor on December 7, 2005 at Georgetown University and complained of shortness of breath. (Ex. 1, p. 9) Plaintiff kept working throughout this time despite being exposed to toxic fumes and chemicals. Then on December 22, 2005 she went to the emergency room at George Washington University again with complaints of shortness of breath, chest tightness, lightheadedness and wheezing. (Ex. 1, p. 9)(Ex. 5, Records of George Washington Emergency Room, December 22, 2005)

Plaintiff saw Dr. Paul Silver at George Washington University who placed her on an inhaler, Advair, and opined that she should not be in an environment that exposes her to toxic fumes. (Ex. 1, p. 9, Ex. 6, Report of Dr. Silver dated January 28, 2006 and May 3, 2006) Plaintiff has not worked as a bus cleaner since January 28, 2006.

Thereafter, Plaintiff completed pulmonary function studies which showed she had

a diminished vital capacity of 69% predicted, which is only partially reversible with bronchodilators.  (Ex. 2, Report of Dr. Hales). Accordingly, in Dr. Hales' opinion, Plaintiff has a 25% permanent impairment of the whole person based upon her pulmonary condition. (Ex. 2).

### C.    Plaintiff Placed WMATA On Notice Of Her Disability Starting In 2002

Plaintiff placed WMATA on notice of her disability as early as her first hospitalization in October 2002. At that time, she showed her supervisor medical documentation to come back to work. Further, her supervisor signed papers for her health insurance company setting forth why she was ill and what her diagnosis was. (Alston dep. Ex. 7, pp. 94-95)(Alston aff., Ex. 9)  Thereafter, she repeatedly asked her supervisors for a mask to wear. (Alston dep. Ex. 7, p. 202) (Alston aff., Ex. 9)

It is critical to note that WMATA's physician, Gina Pervall-Walker, M.D. admitted in deposition that she first saw Ms. Alston for a pulmonary condition on May 5, 2005. On this date, Dr. Pervall-Walker noted that she had a diagnosis of pneumonia and chronic lung disease and that she was released by her doctor to work but he recommended avoidance of exposure to solvents and bus fumes. (Alston aff., Ex. 9)  (Ex. 8, Dep. Pervall-Walker, pp. 23-24, 26) Plaintiff requested a job transfer at this time so she did not have to be exposed to fumes.  Thereafter she saw Dr. Pervall-Walker on May 19, 2005 and Dr. Pervall-Walker released her to full duty despite Ms. Alston's request for accommodation. (Ex. 8, pp. 27-28)  Plaintiff was supposed to get additional pulmonary function study tests done at that time. Id.

Thereafter, when she went to the George Washington University Emergency Room on December 22, 2005, she was hospitalized and was off work for two weeks.

(Alston dep. Ex. 7, p. 190)  She provided her supervisor again notice of her medical condition and diagnosis and requested transfer to a vacant position that did not require exposure to fumes. (Alston aff. Ex. 9)

Her treating physician Dr. Silver issued a report dated January 28, 2006 notifying WMATA that she had a pulmonary condition and that she needed to work in an area free from noxious fumes. (Ex. 6)  Ms. Alston hand delivered this note to WMATA the same day it was issued. (Alston aff. Ex. 9)  After this note was issued, she did not return to her bus cleaning job again. (Alston aff. Ex. 9)

Thus WMATA's contention that it did not have notice of her disability or handicap until February 17, 2006 is simply not accurate based upon the above facts. Ms. Alston provided notice to WMATA through her supervisor since her first hospitalization in October 2002 that she had a disability causing her breathing problems and repeatedly requested masks thereafter. Further, she saw WMATA's doctor in May 2005 for a pulmonary problem and requested reasonable accommodation by way of a job transfer to a job where she could avoid exposure to fumes but she was released to return to work by Dr. Pervall-Walker despite her doctor's recommendation to refrain from being exposed to fumes.  Finally, her treating physician, Dr. Silver issued a report on January 28, 2006, formally documenting that she had a pulmonary problem and should not be exposed to fumes in the workplace.  Again, she requested reasonable accommodation by way of a job transfer.  Thus, WMATA knew she had a disability and requested a job transfer since May 2005.

**D.    Defendant's Own Physician Medically Disqualified Plaintiff From Her Position As A Bus Cleaner**

WMATA's treating physician, Gina Pervall-Walker, M.D., testified in deposition that as of April 25, 2006, she issued a form finding that Donna Alston was medically disqualified from being a bus cleaner based upon the medical information she had on hand on a permanent basis. (Ex. 8, Dep. Pervall-Walker, p. 56-57)  Dr. Pervall-Walker issued a memo to this effect on April 25, 2006 medically disqualifying the Plaintiff from her job as a bus cleaner. (Ex. 10, Memo of April 25, 2006)  As of the date of Dr. Pervall-Walker's deposition, the doctor felt that Ms. Alston was still precluded  from performing the job of a bus cleaner. (Ex. 8, p. 60)

**E.    Plaintiff Is Disabled Because She Is Substantially Limited In the Major Life Activity of Breathing and WMATA Has Not Disputed This Fact**

As noted above, since October 2002, Plaintiff has suffered symptoms from her occupational asthma such as shortness of breath, lightheadedness, dizziness and an inability to walk for more than a few steps without having shortness of breath and becoming slumped over. (Alston dep. Ex. 7, pp. 209,  226-29)(Alston aff., Ex. 9)  In fact, currently she uses a walker because of her shortness of breath. (Alston dep. Ex. 7, p. 206)  Plaintiff further testified that she has trouble doing basic tasks such as grocery shopping washing clothes and cooking. When going grocery shopping, she has to lean on the cart and the whole time she is bent over gasping for breath. (Ex. 7, p. 229)(Alston aff., Ex. 9)  When washing clothes, she has trouble breathing just going down a few steps in her house. (Ex. 7, p. 206)  When cooking, she is unable to stand on her feet so she uses a microwave and sits in a chair. (Ex. 7, p. 207)  Plaintiff has

particular trouble breathing when exposed to crowds and people wearing perfume because it causes her to get dizzy and experience vertigo or problems with balance. She gets lightheaded and has to sit down. (Ex. 7, pp. 225-27)

WMATA's physician Dr. Pervall-Walker agreed that WMATA defines disability under its policies as someone having "a physical or a mental impairment that substantially limits the condition, manner or duration in which the individual can perform one or more major life activities." (Ex. 8, p. 66) Dr. Pervall-Walker could not state one way or the other whether Ms. Alston met the definition of disability as WMATA defines it in its policies. (Ex. 8, pp. 67-68).

Accordingly, WMATA has not disputed that Plaintiff is legally disabled because its own policy definition of disability tracks the definition in the Rehabilitation Act of 1973 and its own witness does not dispute that Ms. Alston is disabled.

### F.   Defendant's Section 124 Program Requires Plaintiff to Compete With Other Non Disabled Employees And She Is Not Given Any Priority

Section 124 of the Agreement between Local 689 of the Amalgated Transit Union and WMATA states as follows:

> §124 - Physically Disqualified Employees
>
> "An employee who becomes physically disqualified (other than temporary) from performing the work of the employee's class shall be offered the first permanent vacancy or new job in the bargaining unit which pays not less than seventy-eight percent (78%) of the rate of the employee's job class for which the employee is qualified." (Ex. 11)

It is clear that this collective bargaining agreement imposes the same requirements as the Rehabilitation Act – mandatory reassignment to a handicapped individual who is seeking a job transfer as a reasonable accommodation. Yet WMATA

-7-

has interpreted this provision of the collective bargaining agreement to not require
mandatory reassignment at all but to only allow the handicapped individual to compete
with all other employees for job vacancies. As will be set forth below, WMATA's
interpretation of this provision violates not only the Rehabilitation Act but the language
of this contractual provision itself.

In the present case, after becoming medically disqualified by Dr. Pervall-Walker,
Plaintiff was referred to the human resources department at WMATA to see if a job
transfer or alternative job could be found for her. (Ex. 8, p. 61)  Plaintiff was then
contacted by Ms. Roslyn Rikard, an employee program specialist, who is in charge of
implementing WMATA's Section 124 program for medically disqualified individuals.
(Rikard dep. Ex. 12, p. 8)  Under this program, Ms. Rikard sends the employee a letter
letting them know that they can apply for vacancies that they feel they are qualified for.
(Ex. 12, p. 14)  Contrary to the actual language of the union contract, WMATA interprets
Section 124 to mean that  the employee must compete with whoever applies for the job
and be selected as the best qualified applicant. Medically disqualified individuals are not
given any priority because of their disabled status. (Ex. 12, pp.15-16, 37)  Ms. Rikard
had meetings with Ms. Alston whereby Ms. Alston told her she had applied for a number
of jobs at WMATA but Ms. Rikard did not provide any assistance to help find available
jobs. (Ex. 12, pp. 20-21)  Further, Ms. Rikard did not make recommendations as to what
vacancies to apply for. (Ex. 12, p. 22, 24)  Finally Ms. Rikard admitted that in the year
2007, there was about a six  month period of time from the Summer of 2007 until
Christmas time of 2007 when WMATA did not send out job vacancy postings because
of internal problems. (Ex. 12, pp. 26-28)  As will be demonstrated below this was the

exact time frame when a receptionist job for which Ms. Alston was qualified for was posted. Ms. Alston did not know about this job and would have applied for it if she had knowledge of the opening. (Alston Aff. Ex. 9)  Yet she was not informed about this job and WMATA's Ms. Rikard made no effort to offer her any assistance to help her find jobs. This failure to provide assistance to get a job transfer is in violation of the Rehabilitation Act as will be set forth below.

### G. Plaintiff Applied For Numerous Jobs Both Before And After The Medical Disqualification For Which She Was Qualified But Not Selected

Defendant has admitted Plaintiff applied for over 70 job positions before and after becoming medically disqualified. (Ex. 13, List of jobs Plaintiff applied for)  Plaintiff's vocational expert, Lee Mintz, a certified rehabilitation counselor has reviewed all of the job descriptions for these jobs and reached the opinion that Plaintiff was qualified for six of these jobs. (Mintz reports, Ex. 14)  These include the following jobs: (1) Garage Clerk; (2) Facilities Maintenance Clerk; (3) Bus Communications Specialist; (4) Job Access Information Assistant; (5) Receptionist; and (6) Customer Information Agent. The job descriptions for these positions are attached as Ex. 15.

WMATA's Corporate Designee, Steven Godbey, admitted in his deposition that Ms. Alston applied for the Facilities Maintenance Clerk position. (Godbey dep. Ex. 16, pp. 10-11)  Mr. Godbey did not dispute whether or not Ms. Alston had the qualifications for this job; he could not state she was or was not qualified, one way or the other. (Ex. 16, p. 15)  She was not hired for this job because of lack of seniority. (Ex. 16, p. 17) Ms. Alston also applied for the Job Access Information Assistant position. (Ex. 16, p. 23) Mr. Godbey admitted Plaintiff met the minimum qualifications for this job. (Ex. 16, p. 24)

The successful applicant was Ms. Keisha White, who allegedly was more qualified. Mr. Godbey did not know if Ms. White was disabled or not. (Ex. 16, pp. 29-31)  Seniority did not play a part in the hiring of Ms. White. (Ex. 16, p. 28)  This particular job is a direct example of the fact that WMATA's discriminatory policy required Ms. Alston to compete with other non-disabled employees instead of being given priority for a job transfer. As will be discussed more fully below, the failure to transfer Ms. Alston to this job position violates the Rehabilitation Act and the ADA as set forth in <u>Aka v. Washington Hospital Center</u>, 156 F. 3d 1284 (D.C. Cir. 1998) (<u>en</u> <u>banc</u>).

With respect to the receptionist position, there were two openings in September 2006 and May 2007. (Ex. 16, pp. 31-33)   Mr. Godbey did not know if Ms. Alston met the minimum qualifications for this job but did not dispute that she did. (Ex. 16, p. 33-34)  At least one person was hired for this job in October 2007. (Ex. 16, p. 35)   Ms. Alston did not apply for this job because she did not know that it was open.  During the time it was posted, she was not being sent copies of vacancy announcements. (Alston aff. Ex. 9).

If she had known about the vacancy, she would have applied for it. <u>Id</u>.  The receptionist was a full time permanent position. (Ex. 16, p. 48). Again, the failure of WMATA to transfer Plaintiff to this job, violates the Rehabilitation Act per <u>Aka</u>, <u>supra</u> because WMATA had an obligation to identify job vacancies to help her apply for them and by Ms. Rikard's admission she offered no such help at all and did not even send the vacancy announcement for this position.

## II.    THE LAW

### A.    Plaintiff Has Presented Sufficient Evidence To Show She Is A Disabled Person Under The Rehabilitation Act and the ADA

1.    <u>Legal Principles To Establish A Violation Of the Rehabilitation Act of 1973</u>

The Rehabilitation Act of 1973, similar to the Americans With Disabilities Act (hereinafter ADA) prohibits discrimination of an employee based upon a disability. 29 U.S.C. §794;  42 U.S.C. §121112 (a) (1994).

a.    <u>Definition of Disability</u>

The Rehabilitation Act, through its regulations, similar to the ADA defines an individual with a "handicap" (the ADA uses the term"disability") as <u>inter</u> <u>alia</u>, one who has:

> "1. A physical or mental impairment that substantially limits one or more  major life activities;
> 2. Has a record of such an impairment, or;
> 3. Is regarded as having such an impairment;
>
> (Definition contained in regulations interpreting Rehabilitation Act at 45 C.F.R §84.3(j)(1). For the ADA, definition, see  42 U.S. C. §12102(2)(a)").

A comparison of the two definitions shows that they are virtually identical. Further, the Rehabilitation Act itself states in no uncertain terms that the standards to determine a violation of the Rehabilitation Act are the same standards used to determine whether there has been a violation of the ADA. 29 U.S.C. §794 (4)(D) and 29 U.S.C. §791(g). Thus "cases decided under §504 of the Rehabilitation Act are therefore applicable to cases brought under the ADA and vice versa, except to the extent the ADA expressly states otherwise." <u>Woodman v. Runyon</u>, 132 F. 3d 1330, 1330 (10th Cir.

1997).[1]

With respect to the term major life activities, both the Rehabilitation Act and the ADA do not further define these terms but the regulations issued by the EEOC do. See 45 C.F.R. §84.3(j) (2)(ii) and 29 C.F.R. §1630.2(I), which both provide that major life activities include "breathing." "working"and "performance of manual tasks." The regulations interpreting the ADA further state that substantial limitations are those that render someone to be either:

> "(i) unable to perform a major life activity that the average person in the general population can perform; or;
> (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."

29 C.F. R. §1630.2(j)(1)

Several federal courts have held that Plaintiffs similar to Ms. Alston have presented sufficient evidence to show that they suffered a substantial limitation in the major life activity of breathing under the ADA. Selenke v. Medical Imaging of Colorado, 248 F. 3d 1249, 1258-59, n.5 (10th Cir. 2003)(Plaintiff who suffered shortness of breath, especially when exposed to chemical smells and from colognes, perfumes and smoke presented sufficient evidence to show was substantially limited in breathing); Homeyer v. Stanley Tulchin Associates, Inc., 91 F.3d 959, 962 (7th Cir. 1996)(Plaintiff who suffered from chronic severe allergic rhinitis and sinusitis presented sufficient evidence

---

[1] Defendant has admitted in its brief at p. 6, that cases interpreting the Rehabilitation Act and the ADA are "interchangeable" citing, Gorman v. Bartch, 152 F. 3d 907, 912 (8th Cir. 1998) rev'd on other grounds, Barnes v. Gorman, 536 U.S. 181 (2002); Woodruff v. Peters, 482 F. 3d 521, 526 (D.C. Cir. 2007)

to show a substantial limitation in breathing).

Although the above cases with similar facts only held that Plaintiff had created a factual question for a jury on this issue, Plaintiff contends herein that since the Defendant has not disputed her evidence that she has chronic shortness of breath, can only walk a few steps without breathing problems, has major problems performing such basic household activities such as cooking, cleaning, shopping, etc , this Court must grant summary judgment and hold as a matter of law that Plaintiff is substantially limited in the major life activities of breathing and performing manual tasks.

Alternatively, Plaintiff contends that there are no disputes as to any material facts that Defendant regarded Plaintiff as having a handicap under the Rehabilitation Act because she was substantially limited in the major life activity of working. There is absolutely no dispute from the record evidence that Defendant's own witnesses testified that Plaintiff was medically disqualified from her job as a bus cleaner and any jobs requiring exposure to toxic fumes. The Fourth Circuit, in a Rehabilitation Act case, held that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved. <u>Forrisi v. Bowen</u>, 794 F.2d 931, 935 (4th Cir. 1986). This is exactly the case herein.

**B.    Defendant Failed To Accommodate Plaintiff By Failing To Transfer Her To A Vacant Position Within Her Medical Restrictions But Instead Forced Her To Compete With Other Non-Disabled Workers**

1.    <u>Standard To Establish A Failure To Accommodate Claim</u>

To establish a failure to accommodate claim under the Rehabilitation Act and the ADA, the Plaintiff must prove: (1) that he/she was an individual who had a disability

-13-

within the meaning of the statute; (2) that the employer had notice of his/her disability; (3) that with reasonable accommodation he/she could perform the essential functions of the positions she held or desired to hold; and (4) that the employer refused to make such accommodations. <u>Scarborough v. Natsius</u>, 190 F. Supp. 2d 5, 18,( D.D.C. 2002); <u>May v. Roadway Express, Inc.</u>, 221 F. Supp. 2d 623, 628 (D. Md. 2002) <u>citing</u> <u>Rhoads v. Federal Deposit Ins.</u>, 257 F.3d 373,387,n. 11 (4th Cir. 2001).

Plaintiff has established all of these elements based upon the undisputed facts. First, as set forth above in Section A , Plaintiff has established that she has a disability; she is substantially limited in the major life activity of breathing and manual tasks. Alternatively, the Employer regarded her as being substantially limited in the major life activity of working. Second, the employer clearly had notice of her disability because she was examined periodically by WMATA's doctor, Dr. Pervall-Walker who medically disqualified her from operating a bus. Third, Plaintiff has presented expert vocational evidence from Lee Mintz, CRC that she could perform the essential functions of six vacant jobs at WMATA. Fourth, the employer refused to provide her any of these six vacant available jobs but forced her to compete for jobs she was qualified for with non-disabled individuals and gave her no priority to get the job. As will be discussed below, this is directly in violation of the Rehabilitation Act and ADA as interpreted by this Circuit.

2.    <u>A Reasonable Accommodation Under the ADA Per The Law of This Circuit Requires An Employer To Reassign An Employee To A Vacant Position And Not Just Allow The Employee To Compete With All Other Applicants</u>

The regulations interpreting the Rehabilitation Act and the ADA itself include in the definition of "Reasonable Accommodation" a "reassignment to a vacant position," as one of the ways one can be reasonably accommodated. Rehabilitation Act - 29 U.S.C. §§791(g), 794(d) incorporating standards of ADA into Rehabilitation Act; 29 CFR §1614.203(g)(1996); ADA - 42 U.S.C. §12111(9)(B), "The term 'reasonable accommodation' may include reassignment to a vacant position.'" See also, <u>Woodman v. Runyon</u>, 132 F.3d 1330, 1339-40 (10th Cir. 1997)(Rehabilitation Act requires a duty to reassign a disabled employee to another job after 1992 amendments to statute and regulations).

The D.C. Circuit in <u>Aka</u>, <u>supra</u>, 156 F.3d at 1300, consistent with several other circuits, has held that under the ADA an employee who seeks reassignment must be given the reassignment if he/she is qualified and not just be allowed to compete with other applicants. <u>Id</u>. at 1304-05. Specifically, in <u>Aka</u>, Judge Patricia Wald, speaking for the majority of the en banc court when addressing this issue stated:

> "To begin with the statutory text, the word 'reassign' must mean more than allowing an employee to apply for a job on the same basis as anyone else. An employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been 'reassigned'; the core word 'assign' implies some active effort on the part of the employer. Indeed the ADA's reference to reassignment would be redundant if permission to apply were all it meant; the ADA already prohibit discrimination 'against a qualified individual with a disability because of the disability of such individual in regard to job

application procedures." (Other citations omitted).

"Although the ADA's legislative history does warn against 'preferences' for disabled applicants, see H.R. REP. No. 485 (II), 101st Cong., 2d Sess., at 56 (1990), reprinted in 1990 U.S.C.C.A.N. 267,338, it also makes clear that reasonable accommodations for existing employees who become disabled on the job do not fall within that ban. See H.R. REP. No. 485(II),101st Cong., 2d Sess. At 63 (1990)..."

Judge Wald continued:

"Had Congress intended that disabled employees be treated exactly like other job applicants, there would have been no need for the report to go on to explain that 'bumping' another employee out of a position to create a vacancy is not required,' and that 'if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to the job,' id.; there would have been no danger that an employee would be 'bumped' or that a job would go to a disabled employee with less seniority."   Id. at 1304-05.

Finally, Judge Wald, when addressing the issue of what obligations an employee and employer have when an employee can not perform her prior job and is seeking reassignment states:

"Under the applicable case law, it is true that Aka had an obligation to demonstrate that there existed some vacant position to which he could have been reassigned...On the other hand, WHC had a corresponding obligation to help him identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies). See e.g., Dalton v. Subaru-Isuzu Automotive, Inc., 141 F.3d 667,677 (7th Cir 1998)("[T]he ADA places a duty on the employer to 'ascertain whether he has some job that the employee might be able to fill,'") Id. at 1304, n.7, (other citations omitted). (emphasis added)

-16-

Both the Tenth and Seventh Circuits have also followed these principles. Smith v. Midland Brake, 180 F.3d 1154 (10th Cir. 1999)(en banc); Gile v. United Airlines, Inc., 95 F.3d 492 (7th Cir. 1996).[2] In fact, the en banc Court in the Tenth Circuit in Midland Brake noted that this holding is confirmed in the latest version of the EEOC Interpretive Guidelines that interprets the ADA. The Tenth Circuit, referencing these guidelines states:

> "The EEOC asked the question: Does reassignment mean that the employee is permitted to compete for a vacant position? EEOC Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act ("EEOC Guidance") at 44 (1999) (emphasis in original) It answered that question, No. Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended." Midland Brake, supra at 1055.

The Tenth Circuit concludes that: "any other reading of 'considered' in the EEOC Interpretive Guidelines is not only contextually indefensible, it is illogical."

### 3.    Applying Aka to the Present Case, WMATA Has Failed To Reasonably Accommodate the Plaintiff As A Matter of Law

As set forth above, Plaintiff has presented uncontradicted evidence that there

---

[2]  The United States Supreme Court actually granted certiorari in a case holding to the contrary of the D.C. Circuit's holding in Aka in Huber v. Wal Mart Stores, Inc. 486 F. 3d 480(8th Cir. 2007)(cert. Granted, granted in part 169 Ed. 2d 579, 128 S.Ct. 742 (2007)). However, the parties in Huber resolved the case before the Supreme Court decided the issue and the case was dismissed. (128 S.Ct. 1116 L.Ed. 2d 801 (2008)) Thus Aka, stands as the applicable law in this Circuit on this issue. Finally, please note that the judges who dissented from denial of en banc rehearing correctly observed that the Eighth Circuit's ruling in Huber, "renders a statutory provision in the ADA superfluous, overlooks EEOC guidance, and is contrary to the Supreme Court's admonition in US Airways, Inc. v. Barnett, 535 U.S. 391 (2002) that preferences are a valid means to achieve the statutory goals." Huber v. Walmart Stores, Inc., No. 04-2145, slip op. at 7 (W.D. Ark. Dec. 7, 2005).

were six vacant positions that she could have been reassigned to that she was qualified for based upon Plaintiff's vocational rehabilitation expert. Defendant has spent almost its entire Motion for Summary Judgment arguing that Plaintiff was not provided these positions because of union seniority, because she failed to apply, because she was not qualified, or that more highly qualified applicants were selected. Plaintiff is not going to dispute Defendant's analysis as to four of the positions.[3]

However, as to two of the positions, the Job Access Information Assistant position and the Receptionist Position, Plaintiff was qualified for each of these, there was no union seniority issue in either of these positions and she should have been reassigned to the position per the applicable law in this Circuit under Aka.

      a)     <u>Plaintiff Was Qualified And Should Have Been Re-Assigned To The Job Access Information Assistant Job</u>

With respect the Job Access Information Assistant position, Plaintiff did actually apply for this position in the fall of 2005 and was denied the position on January 30, 2006 when it was filled. The applicant who was selected was deemed more qualified. (Godbey dep., Ex. 16, pp. 24-30) Therefore, the only reason Ms. Alston was not reassigned to this position was because she was forced to compete for this position with all applicants in contravention of Aka, supra.[4]

---

[3] Plaintiff is not going to contest Defendant's analysis as to the positions of Facilities Maintenance Clerk, Garage Clerk, Customer Information Agent and Bus Communications Specialist.

[4] Defendant tries to confuse the court by stating that the Defendant was precluded from providing this position to Ms. Alston because other Local 2 union members applied who had seniority over her since she was a member of Local 689. However, the Defendant in its own brief admits that no internal candidate (i.e. any of these members of local 2) was qualified for this job and an external candidate was hired

Defendant cites numerous cases at pp. 12-13 of its brief contending that it had "unfettered discretion... to choose among qualified applicants for a position," and that courts can not second guess such employment decisions. These cases are totally inapplicable because they all involve an allegation of discrimination regarding a failure to promote an individual in a particular protected class. They have nothing to do with a disabled employee's request for reasonable accommodation by way of a job transfer. Thus Defendant's citations of Fischbach v. Department of Corrections, 86 F. 3d 1180 (D.C. Cir. 1996) and other authority in its brief at pp. 12-13 are totally unavailing. WMATA has simply ignored the Aka decision but cited irrelevant case law on this point that should be disregarded by this court. Therefore, Plaintiff should have been re-assigned to this position.

Plaintiff's Motion must be granted regarding this position and Defendant's Motion must be denied.

b) Plaintiff Was Qualified And Should Have Been Re-Assigned To The Receptionist Position

The other position that Plaintiff contends she should have been reassigned to was the receptionist position. As noted above the job was posted twice, once in 2006 and once in 2007. It was never filled after the 2006 posting but was re-posted in May 2007. The position was filled in October 2007. (Godbey dep. Ex. 16, pp. 33,35) The only defense WMATA has raised regarding this position is that Ms. Alston did not apply for it. As noted in the undisputed testimony, even from WMATA's own witness Ms.

---

for the job – Ms. Keisha White. (Def.'s Brief at 12) Thus union seniority rules did not play any role in the selection of Ms. White and Mr. Godbey admitted as such. (Ex. 17, p. 28).

Rikard, she never made suggestions to Ms. Alston to apply for any particular jobs. She only sent her vacancy announcements. However, during the time this job was posted, WMATA had internal problems and Ms. Alston was not sent vacancy announcements. That is the reason she did not apply for this job. (Alston aff., Ex. 9)  Thus her lack of an application is of no moment because as Judge Wald stated in Aka, "WHC had a corresponding obligation to help him [her] identify appropriate job vacancies (since Plaintiffs can hardly be expected to hire detectives to look for vacancies)." Aka, supra at 1304, n.7.  Here, WMATA did not identify the receptionist vacancy and if they did, Ms. Alston would have applied for it because it would have been a perfect position for her to perform as it did not require standing, walking or any exposure to toxic fumes. Accordingly, WMATA failed in its responsibility under the Rehabilitation Act by not identifying this job and allowing the Plaintiff to apply for it and be re-assigned to it.

Plaintiff's Motion must be granted with respect to this particular job and Defendant's Motion must be denied.

## C.    Defendant's Motion for Summary Judgment Must Be Denied

### 1.    Defendant's Argument That It Was Not On Notice of Plaintiff's Disability Prior to February 17, 2006 is unavailing

Defendant also argues that it was not on notice of Plaintiff's disability prior to February 17, 2006 with respect to her pulmonary problems and that therefore, any job applications before that date should be disregarded because of its lack of notice. This is only pertinent to the Job Access Information System position which became vacant in the winter of 2005 and was not filled until January 30, 2006. Plaintiff contends that Defendant was on notice of her disability as early as October 2002.

-20-

At that time, Ms. Alston has testified she informed her supervisor of her emergency room visit and problems with breathing. He was made aware of her diagnosis and she repeatedly asked for oxygen masks thereafter. (Alston aff. Ex. 9) Further, WMATA's treating physician Dr. Pervall-Walker examined the Plaintiff for pulmonary problems relating to a diagnosis of pneumonia in May 2005. (Ex. 4) At that time her doctor had recommended avoidance of exposure to fumes. Ms. Alston asked for this reasonable accommodation but nonetheless Dr. Pervall-Walker forced her to return to work. (Alston aff., Ex. 9) Thereafter, Plaintiff provided her supervisor information about her hospitalization in December 2005 and finally Plaintiff provided Dr. Silver's note of January 28, 2006 to be placed in a work environment free of fumes. Ms. Alston has stated in her affidavit that she provided this note to her supervisor the day it was written and reiterated her request for accommodation that had been made in May 2005.

This is strong evidence that she requested accommodation and that WMATA had knowledge of her disability long before February 17, 2006. Plaintiff contends that the important date for purposes of this motion is January 30, 2006 because the Job Access Information System position was not filled according to Mr. Godbey until this date. (Godbey dep. Ex. 16, p. 25) Thus WMATA's argument fails with respect to this position as Ms. Alston had placed WMATA supervisors on notice of her disability in 2002 and WMATA's doctor by May 2005.

Said argument does not apply to the receptionist job because it was not filled until August 2007.

-21-

III.    **CONCLUSION**

For all of above reasons, this Court must grant summary judgment as to liability because of WMATA's failure to transfer Ms. Alston to one of these two vacant positions. Further, Defendant's Motion for Summary Judgment must be denied.

Plaintiff requests that this Court enter injunctive relief and Order the Defendant to transfer Plaintiff to one of these positions.  Further, Plaintiff requests a hearing on damages in this case.

Respectfully submitted,

**AXELSON, WILLLIAMOWSKY,**      **THE GOLDSMITH LAW FIRM, LLC**
**BENDER & FISHMAN, P.C.**


/S/_____      /S/_____
Bruce M. Bender, Bar # 381319      Leizer Goldsmith, Bar # 419544
401 N. Washington St., Suite 550      5335 Wisconsin Avenue, NW, #440
Rockville, MD 20850      Washington, D.C. 20015
(301) 738-7660      (202) 895-1506
Attorneys for Plaintiff      Attorneys for Plaintiff

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 11th day of June 2008, a copy of the foregoing was mailed, postage prepaid to:

Kathleen A. Carey, Esq.
Assistant General Counsel
Washington Metropolitan Area Transit Authority
600 Fifth Street, N.W.
Washington, D.C. 20001


/S/_____
Bruce M. Bender

-22-

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DONNA J. ALSTON                              :

          Plaintiff                 :

v.                                                      :        Civil No. 07-00122 (ESH)

WASHINGTON METROPOLITAN          :
AREA TRANSIT AUTHORITY

                             :

          Defendant

**<u>ORDER</u>**

UPON CONSIDERATION of Plaintiff's Motion for Summary Judgment and

Opposition to Defendant's Motion for Summary Judgment, it is this _____ day of

_____, 2008, by the United States District Court for the District of

Columbia,

ORDERED:  that Plaintiff's Motion for Summary Judgment is granted as to

liability and a hearing shall be set on damages; and it is further,

ORDERED:  that Defendant's Motion for Summary Judgment is denied.


_____
Honorable Ellen Segal Huvelle

| | |
|---|---|
| DONNA J. ALSTON | *      BEFORE THE |
|      Claimant | * |
| | *      MARYLAND |
|    vs | * |
| | *      WORKERS' |
| WASHINGTON METRO AREA TRANSIT AUTH. | * |
|      Employer | *      COMPENSATION |
|       and | * |
|     Self Insurer | *      COMMISSION |
| | * |
| | *      CLAIM NO. W-000072 |
| | * |
| | * |
| | *** |

BELTSVILLE, MARYLAND

MARCH 19, 2007

BEFORE:    COMMISSIONER JEFFREY C. HERWIG

APPEARANCES:

       BRUCE M. BENDER, Esquire
          On behalf of the Claimant

       DONNA J. HENDERSON, Esquire
          On behalf of the Employer and Self-Insurer

REPORTED BY:

DEBRA E. WUNNER
CERTIFIED COURT REPORTER

PLAINTIFF'S EXHIBIT

1      THE COMMISSION:  Okay  All right, any other

2  issues, Miss Henderson?

3      MS. HENDERSON:  {No response}

4      THE COMMISSION:  Miss Henderson?

5      MS. HENDERSON:  None, your Honor.

6      THE COMMISSION:  I'll take whatever exhibits you

7  have.

8      MR. BENDER:  They've been submitted.

9      MS. HENDERSON:  Submitted, your Honor.

10      {Claimant's Exhibit No. 1 and Employer and Self

11  Insurer's Exhibit No. 1 were marked into evidence.}

12      THE COMMISSION:  Okay, Mr. Bender, you may

13  proceed.

14      MR. BENDER:  Thank you, your Honor.

15  **DIRECT EXAMINATION**

16  **BY MR. BENDER:**

17      Q    Miss Alston, you started work for Metro in about

18  June of 2000 as a bus cleaner; is that accurate?

19      A    Yes.

20      Q    And you performed your job at various different

21  garages, the Montgomery garage, Bladensburg, 4-Mile, and

22  then the Southern Avenue garage; is that accurate?

23      A    Yes.

24      Q    In the last two years you worked at Metro, what

25  -- Between '03 and '05, you were working at the Southern

1    Avenue garage?

2          A    Yes.

3          Q    And at the Southern Avenue Garage, about how many

4    buses were there that you had to work on as a bus cleaner?

5          A    Um, two a night.

6          Q    Well, how many total were in the --

7          A    One hundred.

8          Q    -- garage?  And sometimes you worked on buses

9    inside the garage, and sometimes they were outside; is that

10   correct?

11         A    Correct.

12         Q    And whether you were in or outside, were the

13   buses always turned on, and the exhaust always coming out

14   of the back of the bus?

15         A    Yes.

16         Q    And tell the commissioner, if you could, what you

17   did as a bus cleaner?

18         A    Um, I took graffiti off of the bus, dirt, trash.

19   I washed the windows.  I swept.  And I got gum up off of

20   the floor.

21         Q    And were you constantly going in and out of

22   buses?

23         A    Yes.

24         Q    And would you have to go behind the buses when

25   the exhaust was coming out the back of the bus when you

1  were doing this cleaning?

2      A    Yes, behind the bus, in front of the buss.

3      Q    And --

4      THE COMMISSION:  The buses are not turned off

5  while you're doing this work?

6      THE WITNESS:  No, they're on.

7      Q    {by Mr. Bender}  Okay.  And so, how many hours a

8  day were you exposed to these fumes when you were doing the

9  cleaning?

10      A    Well, um, I was on the job for eight hours, and

11  you would clean a bus for four hours.  So, four hours

12  apiece.

13      Q    So . . . Let's see, did, did you ask for a mask

14  because the bus fumes were so bad at one point?

15      A    Yes, sir.

16      Q    And was a mask ever supplied to you?

17      A    Not all the time.  If they were in stock.

18      THE COMMISSION:  What kind of mask were you

19  given?

20      THE WITNESS:  Oh, just regular, you know, the

21  white mask.

22      THE COMMISSION:  Okay.

23      Q    {by Mr. Bender}  So, why was it that you were

24  asking for a mask?

25      A    Um, because it's so, um, the fumes and the

1  exhaust, and I was coughing.

2       Q    So, the medical records that we've submitted to

3  the commissioner show that you first had medical treatment

4  when you went to the emergency room of Suburban Hospital on

5  October 11, 2002, and you reported feeling dizzy, and you

6  had vertigo because you smelled something at work.  Do you

7  remember that?

8       A    Yes.

9       Q    And what was it that you had smelled that caused

10 you to feel this way?

11      A    Um, I smelled a chemical that it caused me to

12 feel dizzy, and I was sent by ambulance to Suburban

13 Hospital.

14      Q    So, you worked with chemicals also?

15      A    Yes, I use chemicals to clean the buses.

16      Q    And then in the year 2004, you went to the George

17 Washington University emergency room on a couple of

18 occasions, June 24, 2004 when you felt chest pain and

19 numbness, and then July 3, 2004 when you were lightheaded,

20 drowsy, and you had slurred speech.  Do you remember all

21 that?

22      A    Yes.

23      Q    And was that all because of the fumes that you

24 were getting exposed to?

25      A    Yes, sir.

1    Q    And you then in the year 2005 saw a doctor at

2    Georgetown University on December 7, 2005, and you

3    complained of occasional shortness of breath; is that

4    correct?

5    A    Yes, sir.

6    Q    And you kept working throughout all this time --

7    correct? --

8    A    Yes.

9    Q    -- 3, 4, 5; is that correct?

10    A    Yes.

11    Q    And then on December 22, 2005, you went to the

12    George Washington University emergency room, and you

13    complained of shortness of breath, chest tightness,

14    lightheadedness, and wheezing, and they thought you had

15    some kind of carbon monoxide poisoning; is that correct?

16    A    Correct.

17    MR. BENDER:  And that was the allegation of the

18    A.I. claim.

19    THE COMMISSION:  I understand.

20    Q    {by Mr. Bender}  You saw a pulmonologist at G.W.,

21    put you on Advair, and as of June 29, '06, he wrote that

22    you should not be put in an environment that exposes you to

23    bus fumes; do you recall all that?

24    A    Yes.

25    Q    And you had pulmonary function studies at George

Steven M. Zimmet, M.D.
M. Anthony Casolaro, M.D.
Robert M. Kruger, M.D.
Jeff B. Hales, M.D.
Khalid Puthawala, M.D.

Michael L. Sydoriak, R.C.P., C.P.P.T.
Administrator

**PULMONARY AND MEDICAL ASSOCIATES**
OF NORTHERN VIRGINIA, LTD.
1400 SOUTH JOYCE STREET
SUITE 126
ARLINGTON, VIRGINIA 22202-1898

703-521-6662
FAX 703-521-5991
www.pmaofnova.com

Wilson L. Coudon, M.D.
Lawrence M. Stein, M.D.
David R. Duhamel, M.D.
Michael D. Jacobson, PA-C

Ann Imperial
Practice Manager

March 2, 2007


Bruce M. Bender
Vangrack, Axelson, Williamowsky, Bender, and Fishman, P.C.
401 North Washington Street, Suite #550
Rockville, MD 20850


**Re: Donna J. Alston**
**DOB: 06/21/1965**

Dear Mr. Bender:

This letter documents an Independent Medical Evaluation of Ms. Donna Alston, which I performed at your request on 03/02/07. I did explain to Ms. Alston the process of an Independent Medical Evaluation, specifically that no physician-patient relationship exists regarding advice and treatment, and that a report delineating my findings would be sent to your office.

I had received prior records including George Washington University Hospital stays from 06/24/04, 09/29/04, 12/12/04, 07/03/04, Suburban Hospital records dated 10/11/02, and medical records from Dr. Paul Silver from 08/19/05 through 08/24/06.

History from Ms. Alston indicates that she is a 41-year-old female, who worked for the Washington Metropolitan Area Transit Authority, which she had done from early 2000. She notes that she mainly worked in the garage setting, where she was cleaning buses, and had recurrent episodes of becoming ill from exhaust fumes. She developed shortness of breath, lightheadedness, and dizziness. She also notes significant stress related to this job, apparently causing her to eat and increase her weight.

She notes that she does wheeze occasionally, and notes particular trigger irritants include solvents fumes, chemical smells, exertion by walking up one flight of stairs, and emotionally stressful outburst.

Her past history includes morbid obesity, laparoscopic surgery for gynecologic issues, asthma since at least February of 2005, and one episode of carbon monoxide poisoning when her $CO_2$ level measured 1.8%, the normal range for nonsmokers being less than 1.5%.



PLAINTIFF'S
EXHIBIT
2

Donna J. Alston
March 2, 2007
Page 2

She is a nonsmoker and claims to be a lifelong never smoker. She has no pets. There is no evidence of lung problems in her family's medical history.

Pulmonary function tests reveal a combined obstructive and restrictive defect with a diminished gas transfer and significant improvement to bronchodilators.

A polysomnography report dated 10/18/06 from George Washington University Sleep Disorder Center reveals mild obstructive sleep apnea with an AHI index of 10.8 events per hour, and moderate oxygen desaturation. This was markedly worse in REM sleep.

My assessment with regards to your specific questions, follows:

(1) What is the diagnosis of Ms. Alston's pulmonary condition? -- I believe Ms. Alston has asthma and mild obstructive sleep apnea.

(2) Is she permanently precluded from working as a bus cleaner and if so what restrictions do you place on her related to her walking, standing, etc? -- Based on her history, there are several irritating chemicals that cause exacerbation of her symptoms and worsening of her asthma; therefore, I would recommend that she avoid working in enclosed spaces without proper ventilation and in particular avoiding working as a bus cleaner.

(3) Is she substantially limited in the majority of her life activity in regards to breathing? -- I believe Ms. Alston does indeed have some pulmonary limitations. This is combined from her obesity and her asthma.

(4) Did exposure to bus fumes from her job as a bus cleaner over the years cause permanent pulmonary condition and/or sleep apnea to a reasonable degree of medical certainty? -- I believe the bus fumes acted as an airway irritant and exacerbated an underlying predisposed condition of asthma. Recurrent exposure over time to airway irritants can cause persistent inflammation and damage, and I would recommend she avoid this in the future. With regards to her sleep apnea, her morbid obesity and overweight status have most likely contributed to it. I do not believe her work as a bus cleaner contributed to development of sleep apnea.

(5) What is her permanent partial disability per AMA Guidelines Fourth Edition regarding her pulmonary condition? -- I believe that Ms. Alston is class II approximately 25% impairment of the whole person based on her diminished vital capacity of 69% predicted, which is only partially reversible with bronchodilators. She also has a mildly diminished diffusing capacity.

Please let me know if there are questions or concerns.

Sincerely,

Jeff B. Hales, M.D.

JBH/prn:mbm.sh

2

# PATIENT INFORMATION RECORD



Acct: 027950252

| PATIENT NAME/ADDRESS | ACCOUNT NO. | ROOM/BED | TYPE | LOCATION/SERVICE | MEDICAL RECORD NO. |
|---|---|---|---|---|---|
| ALSTON, DONNA<br>724 LANGSTON TERR NE<br>WASHINGTON, DC 20002 | 027950252 | | ER | ER | 1616521 |

| | DATE OF BIRTH | AGE | SEX | M.S. | RELIGION | RACE | PRIORITY |
|---|---|---|---|---|---|---|---|
| | 06/21/65 | 37 | F | UNK | NON | B | |

PHONE  202-388-4439
SOCIAL SECURITY NUMBER  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
EMPLOYER  UNKNOWN

PERSON TO NOTIFY/ADDRESS  MS, SABRINA
, ' ' ' '
HOME PHONE  301-248-4167    OTHER PHONE    RELATIONSHIP SIS

GUARANTOR/ADDRESS
ALSTON, DONNA
724 LANGSTON TERR NE
WASHINGTON, DC 20002
PHONE  202-388-4439
RELATIONSHIP  SELF INSURED FEMALE
GUAR. EMPLOY.  UNKNOWN
FINANCIAL CLASS  BC

NEXT OF KIN ADDRESS  MS, SABRINA
, ' ' ' '
HOME PHONE  301-248-4167    OTHER PHONE    RELATIONSHIP SIS

| ACCIDENT INFORMATION<br>ONSET OF SYMPTO | REASON FOR VISIT<br>DIZZY/WEAKNESS | |
|---|---|---|
| ACCIDENT DATE/TIME<br>10/11/02 | PRIMARY CARE PHYSICIAN<br>PRIMARY CARE/OTHER PHYSICIAN | TELEPHONE NUMBER | | USER |
| ADMIT DATE/TIME<br>10/11/02 1031 | ADMITTING PHYSICIAN | ATTENDING PHYSICIAN<br>ER, PHYSICIAN | |
| DISCHARGE DATE/TIME | TELEPHONE NUMBER | TELEPHONE NUMBER | |

CARRIER, ADDRESS, PLAN#, POLICY#, ORGANIZATION#, NAME, SUBSCRIBER, UB92 RELATIONSHIP, COMMENT

INS #1
BLUE CHOICE
CLAIMS DIVISION
P.O. BOX 804
OWINGS MILLS, MD 21117-9998

POL# XIC577963198    COV#
SUB: ALSTON, DONNA         REL: SELF INS
CO:                    CO# PK69

INS #2

INS #3

INS #4

| ADV DIR | IF YES | IF NO. | COPIES | Infection Control Hx: |
|---|---|---|---|---|

COMMENTS

HOSPITAL PROPERTY DO NOT REMOVE    Date/Time Printed: 10/11/02-1038



**SUBURBAN HOSPITAL**
*Healthcare System*
8600 Old Georgetown Road ♦ Bethesda, Maryland 20814
(301) 896-3100
PATIENT INFORMATION RECORD
FORM No. 4 – 1020 R(12/01) ovl




PLAINTIFF'S
EXHIBIT
3



# SUBURBAN HOSPITAL

ALSTON, DONNA
Acct#      027950252
Unit# 1616521
06/21/65   37        F
ER,PHYSICIAN



Acct: 027950252

**CONSENT TO TREAT, ASSIGNMENT OF INSURANCE BENEFITS, ASSIGNMENT OF MEDICARE BENEFITS, RELEASE OF RESPONSIBILITY FOR PROPERTY, FINANCIAL RESPONSIBILITY AGREEMENT, AND SEPARATE PHYSICIAN BILLING.**

1. **CONSENT:** The undersigned consents to x-ray examinations, Laboratory procedures, Anesthesia, Medical or Surgical treatment, or other Hospital services rendered the patient under general and special instructions of the attending physician or consulting physician. The patient is under control of his/her attending physicians, their assistants, or designees, who are in charge of the care and treatment of the patient. The hospital is not responsible for acts of care and treatment ordered by the physician which are properly performed pursuant to his/her instructions. The undersigned understands that each physician will bill and collect for his/her professional services, separate and apart from the hospitals billing and collections. The undersigned understands that all doctors furnishing services to the patient, including the Radiologist, Pathologist, Anesthesiologist, Intensive care and the like, are independent contractors and are not employees or agents of the hospital. The undersigned further acknowledges that the patient's admission and discharge are arranged by the attending physician and that the patient is obligated to leave the hospital upon release by his/her physician.

2. **GENERAL DUTY NURSING:** The hospital provides general and duty nursing care. Under this system, nurses are called to the bedside of an awake patient by a signal system. If the patient is in such condition as to need continuous or special duty nursing care, it is agreed that such must be arranged by the patient, his/her legal representative, or his/her physicians, and hospital shall in no way be responsible to provide such care.

3. **HOSPITAL SERVICES:** The undersigned recognizes that the practice of medicine and surgery is not an exact science, and acknowledges that no guarantees have been made as to the results which may be obtained from hospital care and treatment and the rendition of medical services by the attending physician.

4. **PERSONAL VALUABLES:** It is understood and agreed that the hospital maintains a safety deposit box for the safekeeping of money and valuables. Valuables must not be kept in your room. Such articles include, but are not limited to: Money, Jewelry, Rings, or other articles of value. The hospital shall not be liable for loss or damage to any of your personal property and cannot guarantee you against the loss of such valuables. If you place them in this safety deposit box we can provide you some protection in accordance with an agreement and receipt for the storage of personal property which will be signed by you. The hospital, also, does not take responsibility for personal property or dentures.

5. **RELEASE OF INFORMATION:** It is agreed upon that all records concerning the patient's hospitalization remain the property of the hospital. The undersigned agrees that to the extent necessary to determine liability for payment and to obtain reimbursement, the hospital may disclose all or part of the patient's record to any person or entity which is or may be liable for all or any portion of the hospitals charges, including but not limited to insurance companies, workers compensation carriers, health-care service plans, welfare funds, or the patient's employer. The hospital will obtain written authorization to otherwise release information concerning the patient, except in those circumstances when the hospital is permitted or required by law to release information upon inquiry, the hospital may make available to the public, certain basic information, including the patient's name, address, age, sex, general description of reason for treatment, and general condition. If the patient or the patient's legal representative does not want such information to be released, the undersigned must make a written request for such information to be withheld.

6. **ASSIGNMENT OF INSURANCE BENEFITS:** In the event that the patient or the undersigned is entitled to benefits arising out of any policy of insurance insuring the patient, those benefits are hereby assigned to the hospital for application to the patient's bill. Said insurance company is directed to make insurance payments to the hospital.

7. **AGREEMENT TO PAY FOR SERVICES:** I (we) accept responsibility for payment of hospital and physician services covering hospitalization or treatment of the below named patient. If payment is not made and additional collections efforts are required, I hereby agree to pay all bills rendered for said patient together with all collection costs, interest fees, and reasonable attorney's fees of 35% of the balance due. I understand that all bills are payable and become due upon presentation.

8. **MEDICARE OR MEDICAID BENEFITS:** See Attached

9. **FAILURE TO NOTIFY HOSPITAL OF INSURANCE COVERAGE/SERVICE OUTSIDE OF INSURANCE PLAN:** "If at the time of the patient's admission the Hospital is not advised that the patient is or may be covered by insurance, the patient agrees to make payment in full for all services rendered, regardless of whether the patient was actually covered by insurance at the time of admission. In addition, if the patient receives services that are outside of the patient's insurance plan, the patient agrees to make payment in full for all such services rendered."

The undersigned certifies that he has read and understands the foregoing, and is the patient or is duly authorized by the patient as the patient's general agent to execute the above and accept its terms.

WITNESS MY HAND AND SEAL THIS ____ DAY OF _____ Year ____ , AT BETHESDA, MD 20814 ____ ☐ AM ☐ PM

_In and Out of Concusness_

Signed (Patient)/Date

Witness to Patient Signature

DONNA ALSTON

Print/Type Name of Patient

Print/Type Name of Witness

Signed (Other Responsible Party) /Date

Witness to Other Responsible Party Signature

DONNA ALSTON / WASHINGTON, DC

Print/Type Name and Address of Other Responsible Party

Print/Type Name of Witness

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

Social Security Number of Other Responsible Party



Date/Time Printed: 10/11/02-1038

105

# EMERGENCY DEPARTMENT
## TRIAGE / ORDER SHEET  3

Alston, Donna

```
027950252   10/11/02    ER
ALSTON,DONNA            37F
06/21/65    DR.ER,PHYSICIA
DR.         PATIENT PLATE 6521
```

**Complete for all Patients**    Date: _____

| MODE OF ARRIVAL: | ESCORTED BY: | LOC: | VISION: | HEARING: | SPEECH: | Vital Signs: | Time | T | P | R | BP |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Ambulatory | ☑ Self | ☑ Alert | ☐ No Problem | ☑ No Problem | ☐ No Problem | | | | | | |
| ☐ Wheelchair | ☐ Family | ☐ Confused | ☑ Glasses/Lenses | ☐ Aid | ☐ Limitations | Allergies: | | | | | |
| ☐ Stretcher | ☐ Friend | ☐ Lethargic | ☐ Impaired | ☐ Hearing Impaired | ☐ Foreign Lang: | | | | | | |
| ☑ Ambulance | ☐ Police | ☐ Combative | ☐ Other | ☐ Form completed | | | | | | | |
| ☑ Air | ☐ Other | ☐ Unresponsive | | | | | WT: | ACTUAL: | | STATED: | |

**CHIEF COMPLAINT:** _____

**PAST MEDICAL HISTORY:** _____

**CURRENT MEDICATIONS:** _____

**TRIAGE CLASSIFICATION:** ☐ Emergent   ☑ Urgent   ☐ Non-Urgent | LMP: _____ | Last Tetanus: _____

Location: ☑ Major  ☐ Mend  ☐ Trauma   Signature of Interviewer: _____   ☑ NONE  PMD NAME

| M.D. | | DIAGNOSTIC ORDERS (LAB, X-RAY, EKG) | ENTERED | | COMPLETED | | RESULTS |
|---|---|---|---|---|---|---|---|
| TIME | INITIAL | | TIME | INITIAL | TIME | INITIAL | |
| | | ☐ CCU  ☐ TRAUMA | | | | | |
| | | ☐ CBC  ☐ COMP MET  ☐ ELR  ☐ i STAT | | | | | |
| | | ☐ UA  ☐ C & S  ☐ DIP  ☐ PREG | | | | | |
| | | ☐ PT, PTT  ☐ AMYLASE  ☐ LIPASE | | | | | |
| | | ☐ OLD RECORDS | | | | | |
| | | ☑ PULSE OX | | | | | |
| | | ☐ EKG  ☐ MONITOR | | | | | |
| | | ☐ CHEST X-RAY  ☐ PORT  ☐ ABD | | | | | |
| | | ☐ C-SPINE Level: _____ | | | | | |

| | ☐  ☐ M/S ☐ ICU ☐ CCU ☐ PSY  ☐ D/C | | | | Dx: | Dr: |
|---|---|---|---|---|---|---|

☐ ADDITIONAL ORDERS

| MEDICATIONS / IV'S | ROUTE SITE RATE | TIME | INITIAL | SIGNATURES | INIT |
|---|---|---|---|---|---|
| T.d. 05.cc | IM | | | | |
| ☐ O2 ___ L/M ☐ MASK | | | | | |
| ☐ CANNULA | | | | | |
| Meclizine 25 mg | PO | | | | |

| CONSULTANTS | CALLED | | TIME | RESPONSE |
|---|---|---|---|---|
| | TIME | INITIAL | | |

**DEPARTURE SUMMARY:** AMA ☐ Y   ☐ NOTE WRITTEN   EXPIRED: TIME _____   MEDICAL EXAMINER CALLED ☐ Y ☐ N

DISCHARGED ☐ Stable ☑ Improved   ADMISSION   TRANSFER TO:

TIME PT LEFT: _____   TIME TAKEN TO ROOM: _____   TIME: _____

ACCOMPANIED BY: _____   ROOM: _____   MODE: ALS ___ BLS ___

INSTRUCTIONS EXPLAINED: ☑ Y ☐ N   VALUABLES LIST: ☐ Y ☐ N   TRANSFER FORM: ☐ Y ☐ N



## ❀ SUBURBAN HOSPITAL
*Healthcare System*
8600 Old Georgetown Road
Bethesda, Maryland 20814

**EMERGENCY DEPARTMENT TRIAGE / ORDER SHEET**
5-1065 (9/00)

**MEDICAL RECORDS**

**General Medical—Adult**                                      #01

Check (✓) for normals, circle positives, slash negatives, note findings

Date: ___  Emergency Physician time: /OU  Age: ___  Weight: ___
Sex: M / F   P: ___   BP: ___   RR: ___   Temp: ___

**Chief Complaint:** Pt states she smelled something at work & got dizzy  No Resp/shortness of breath

027950252   10/11/02   ER
ALSTO Patient Plate NA          37F
Referred by: self / clinic / MD / family / EMS          DR. ER. PHYSICIA
Arrived by: EMS / walk-in / wheelchair          1616521
Historian: patient / family / friend / EMS          JAL3
Hx limited by: Altered LOC / acuity / intoxication

---

**HPI:** *Level 1-3: 1-3 elements; Level 4-5: 4+ elements*

**Onset:** sudden / gradual / undetermined
Began: ___ time ___ date
___ minutes / hours / days PTA

**Severity:** ☐ can't describe
At max (0-10): ___
        mild / moderate / severe
Now  (0-10): ___
        mild / moderate / severe

**Timing:**
SX are present: constant / intermittent

**Context:**

**Quality:** Vertigo

**Associated SX:**
Vertigo
Nausea No V.
⊖ CP ⊖ SOB

**Location:** (drawing of head)

**Exacerbated By:** ☐ nothing
movement

**Relieved By:** ☐ nothing
Rest

Pt states opening eyes (heavy) → dizzy but readily shakes her head others exposed but no c/o

---

**ROS:** *Level 1-3: 1 system/pertinent problem  Level 4: 2-9 systems  Level 5: 10+ systems*

All systems reviewed: ☐ negative  ☐ negative except as marked
☐ **Constitutional:** fever / chills / weight loss
☑ **Eyes:** visual problems / redness
☐ **ENMT:** sore throat / congestion / nosebleed / ear problems
☐ **CV:** chest discomfort / palpitations / orthopnea / PND / ankle swelling
☐ **Resp:** breathing problems / SOB / wheezing / hemoptysis / cough
☐ **GI:** abdominal discomfort / N / V / tarry stools / rectal bleeding / diarrhea / constipation
☑ **GU:** urinary problems / urgency / frequency / hesitation / hematuria / kidney problems
        LMP: ___ nl / ABN    oral contraceptives: ___
☑ **Musculoskeletal:** painful areas:
☑ **Skin:** rash / skin problems
☐ **NEUR:** headache / weakness / blackouts / numbness / tingling / seizures / confusion  dizzy
☑ **PSY:** stress / anxiety / depression / sleeping problems / hallucinations
☑ **Hematological / Lymphatic:** bruising / bleeding
☑ **Endocrine:** polyuria / polydipsia / thyroid problems / adrenal problems
☑ **Immunology / Allergies:** HIV / AIDS: T cell# ___ Viral load ___

---

**Past, Family, Social History:** *Level 1-4: 1 area Level 5: 2 of 3 areas*

**PMH:** ☑ none  ☐ unknown
hypertension / MI / angina / CAD /
high cholesterol / IDD mellitus / NIDD
mellitus / CHF / COPD / CVA /
GERD / pulmonary embolus / peptic
ulcer

**Surgical Hx:** ☑ none  ☐ unknown

**Family Hx:** ☑ none  ☐ unknown
IDD mellitus / NIDD mellitus /
hypertension / heart problems

**Meds:** ☑ none  ☐ see RN note
ASA / NSAID's / acetaminophen

**Social Hx:** ☐ unknown
Tobacco: ___ packs per day ___ years
        current: ☐ no / yes
ETOH: ___ drinks / week
        Recent? ___
Drugs: ___
Occupation: ___
Home situation: lives alone

**Recent Rx, Similar Previous SX:** ☐ none
Description:
Workup, Dx:
Rx:

Allergies: ☐ see RN note
NKDA
Tetanus current: ☐ yes / no

---





✠ **SUBURBAN HOSPITAL** *Healthcare System*

8600 Old Georgetown Road
Bethesda, Maryland  20814
301-896-3880
Emergency Department
General Medical—Adult
Form 5-2001

Copyright © 2000, EvolveMed, ERG

Page 1 of 2

110

General Medical—Adult    #01

## Physical Exam:
*Level 2-3:* 2-4 organ/areas; *Level 4:* 5-7 organ/areas; *Level 5:* 8+ organ/areas

**Gen** ☐ Exam limited by: *urgency of condition / pt. uncooperative*
Anxious: ☐ no / mild / moderate / severe
Distress: ☐ nl ☐ no / mild / moderate / severe    ☑ VS nl
Nutritional status: ☐ nl / ☐ obese    Hydration: ☐ nl / dehydrated

**Eyes:**    Comments:
☑ PERRLA, EOM's full    *E sore Nystagmus*
☐ lids, sclerae nl    *Pt resists opening eyes*

**ENMT, Neck:**
☐ nasal exam nl
☑ TM's nl
☐ pharynx, mucosa nl
☐ neck supple, no bruits or mass

**CV:**
☑ regular rate, rhythm
☑ heart sounds nl, no murmur, rub
☐ pulses = neck & all 4 extremities

**Resp:**
☑ no resp distress
☐ breath sounds nl, clear, equal
☐ breasts nl, no tenderness or masses

**GI / Abd / Back:**
☑ inspection nl, BS nl
☑ soft, non-tender, no masses
☐ rectal nl, heme negative
☐ back nl to inspection, palpation

**GU, Male:**
☐ external genitalia nl    Repeat exam at: _____
☐ testicular nl    Findings:
☐ prostate nl    *NEU pt says she*
**GU, Female:**    *he conflict c worker*
☐ ext. genitalia nl    *Gynecol abnu*
☐ cervix nl, no discharge
☐ uterus, adnexa nl

**Musculoskeletal:**
☑ ROM nl without pain
☑ no tenderness
☐ strength, tone nl

**Skin:**
☑ no rash, no pedal edema
☐ warm, dry

**NEUR:**
☑ alert & oriented x 3
☑ motor, sensory nl
☑ cranial nerves 2-12 intact
☐ reflexes nl

**PSY:**
☐ affect, mood nl
☐ judgment, memory nl

**Lymphatic:**
☐ no adenopathy

## Medical Decision Making:
*Level 1:* straightforward; *Level 2-3:* low/complex; *Level 4:* moderate; *Level 5:* high
Slash box if ordered ☑, check normals √, (circle) and note abnormals

**Lab:**
☐ CBC: ☐ nl ☐ nl except:
Hct _____ Hb _____
WBC _____
Seg ___ Band ___ Monocytes ___
Lymphs ___ Eos ___
other:
☐ Chem: ☐ nl ☐ nl except:
Sodium ___ Potassium ___ Glu ___
Chloride ___ CO2 ___ Anion gap ___
BUN ___ Creatinine ___
☐
☐
☐

☐ **ABG:** on ___ Room air /
O2: _____ % / liter
pH: _____ PaO2 _____
pCO2 _____ bicarbonate _____
☑ P. Oximetry *100*% on *RA*
Room Air / O2: ___ % / liter
☐ nl / hypoxic

☐ **EKG:** ☐ NSR ☐ nl intervals
☐ nl QRS ☐ nl ST-T waves

☐ Compared to: _____
unchanged / changed
Read by: ☐ E.P.
☐ Cardiac monitor: ☐ NSR

---

027950252  10/11/02  ER
ALSTON, DONNA          37F
06/21/65  DR. ER, PHYSICIA
DR.           1616521
DR.           JAL3
        Patient Plate

### Diagnostic Considerations: *circle potential diagnoses*
*Vertigo*
*Toxic exposure*

**X-ray:** (Read by: ☐ Emergency Physician  ☐ Radiologist)
1- ☐ _____    ☐ nl    2- ☐ _____    ☐ nl
3- ☐ _____    ☐ nl    4- ☐ _____    ☐ nl

### Treatment / Management Options / Course:
**Medications / Orders**    **Dose**    **Response**
*Meclizine*

Repeat exam at: _____
Findings:

Procedure:    *see addendum:* _____
Critical Care: _____ minutes

Course: *same / better / worse*

### Consultation / Other data reviewed:
Consulted Dr. _____ (time) _____
Suggests: *admit / discharge / will see:* _____
Case discussed with: *patient / family / other:*
Reviewed / discussed with Radiologist:
Reviewed: *NH / EMS / RN / Old Records / Patient Questionnaire*

### Clinical Impression:
*Possible Toxic inhalation*

### Disposition:
☐ home ☐ admit: *ICU / monitor / medical / surgical*
☐ Transfer to:
Admit physician:

Condition: *better / worse / stable / expired*
Instructions given: ☐ written ☐ verbal
Follow up: ☐ PMD / other:
in ___ days / prn / as scheduled
Restrictions: ☐ off work ☐ immediate duty ☐ gym ☐ school) ___ days
Discharge Rx:

*Kochlen* 851    date *10/11/02*  MD / DO / PA-C / NP
Signature

_____    date _____  MD / DO / PA-C / NP
Signature



---

SUBURBAN HOSPITAL
*Healthcare System*

8600 Old Georgetown Road
Bethesda, Maryland  20814
301-896-3880
Emergency Department
General Medical—Adult
Form 5-2001

Copyright © 2000, EvolveMed, ERG

## Montgomery County Fire And Rescue Service
### Patient Information Sheet

Unit: _AS9_    Date: _10/11/0_    Incident #: _____    Location: _Metro Maintenance_    _Martinelli Rd_

Age: _37_    Sex: _F_    Weight: _200_    Physician: _____

**Complaint:** _Dizzy / weak_

**Onset:** _c/o Smelling_

**History:** _∅_

| Assessment | LOC: _A_    Priority: _3_ | Medications: _∅_ |
|---|---|---|
| Lungs: _Clear/clear_ | Pupils: _PERL_ | |
| | Skin (color/temp/moisture): _Normal_ | |
| | Coma Scale: E _4_ M _6_ V _5_ | Allergies: _NKDA._ |

| Time: _1000_ | Time: | Other Assessment: |
|---|---|---|
| Pulse: _62_ | Pulse: | _Assessed & Transported._ |
| Resp: _20_ O2 Sat: _94_ | Resp:    O2 Sat: | |
| B/P: _124/82_ | B/P: | |
| ECG: | ECG: | |

| Time: | Time: | BLS Treatment: |
|---|---|---|
| Pulse: | Pulse: | _Assessed & Transported._ |
| Resp:    O2 Sat: | Resp:    O2 Sat: | |
| B/P: | B/P: | |
| ECG: | ECG: | |

| ALS | IV: Site    GA    Rate | IV: Site    GA    Rate |
|---|---|---|
| Time: | Rx: | Response: |
| Time: | Rx: | Response: |
| Time: | Rx: | Response: |
| Time: | Rx: | Response: |
| Time: | Rx: | Response: |

Name: _Alston, Donna (6/21/65)_

Address: _724 Langston Terr. NE.    Wash. DC 20002_

**Narrative:** _37 yo F c/o Dizziness and weakness. Pt states that she smelled something at work at the Bus Maintenance facility and that she felt sick and weak afterwards. Pt. has ∅ PMH, takes ∅ Meds, and has NKDA. Vitals are 124/82, P=62, R=20, and O2Sat of 94 in room air. Pt given O2 @ 10 Lpm via NRB for comfort. Pt transported to Sub. ER for evaluation._

| CREW MEMBERS | |
|---|---|
| _Weitzel_ | (A1) |
| _Poon, D_ | (A2) |
| _Waite_ | (A3) |

9/98

_57796 3198_

112

# EMERGENCY DEPARTMENT
## Nursing Assessment

a1950252
Alston.Donna

PATIENT PLATE

TIME IN Tx AREA: _____     PRIMARY NURSE ASSIGNED: _____

## PULMONARY          ☐ NO DEFICIENCIES NOTED

**CHARACTER**  ☒ Regular  ☐ Irregular  ☐ Retractions
☐ Dyspnea  ☐ Accessory Muscle Use
☐ Shallow  ☐ Nasal Flaring

**LUNG SOUNDS**  Clear ☒R ☒L  Abnormal ☐R ☐L
☐ Cough  ☐ Non-Productive  ☐ Productive
Color of sputum: _____
Describe: _____

## CARDIOVASCULAR          ☒ NO DEFICIENCIES NOTED

Chest pain  ☐ Yes ☐ No           ☐ Radiating
ONSET: _____ (1-10)      ☐ Non-Radiating
Describe: _____

RHYTHM: ☐ Regular  ☐ Irregular
EDEMA: ☐ Yes ☐ No   Location: _____
PULSES PRESENT  ☐ Yes ☐ No   If no see N.N.
LOCATION: _____

## GASTROINTESTINAL          ☐ NO DEFICIENCIES NOTED

☐ Appears underweight/malnourished
☒ Nausea         ☐ Vomiting
**BOWEL FUNCTION:** ☐ No Difficulty  ☐ Constipation
☐ Diarrhea       ☐ Incontinent
**BOWEL SOUNDS:** ☐ Normal active  ☐ Absent
☐ Hyperactive  ☐ Hypoactive  Remarks: _____
**ABDOMEN:** ☐ Pain  ☐ Soft
☐ Rigid  ☐ Tender  ☐ Distended _____

## NEUROLOGICAL          ☒ NO DEFICIENCIES NOTED

| TIME | L.O.C. | | | | Pupils | | KEY |
|------|--------|--|--|--|--------|--|-----|
| | E Y E | M O T O R | V R B | T O T A L | L | R | |

**Level of Consciousness**
**Eye Opening**
4. Spontaneous
3. To Speech
2. To Pain
1. No Response

**Best Motor Response**
6. Obeying
5. Localizes
4. Withdraws
3. Abnormal Flexion
2. Extension
1. None

**Best Verbal Response**
5. Oriented
4. Confused
3. Inappropriate
2. Incomprehensible
1. None

**Pupils**
● PIN POINT
● 2 mm
● 4 mm
● 6 mm

## PAIN ASSESSMENT

☐ Absence of pain
If pain is present score on a scale of
0 (No Pain) through 10 (Most Pain)
Location: _____
Intensity _____
Duration _____
Worse c̄ _____
Better c̄ _____

**INITIAL PAIN SCALE**

| 0 | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| least | | | | | |
| 6 | 7 | 8 | 9 | 10 | |
| | | | | most | |

## GENITOURINARY          ☒ NO DEFICIENCIES NOTED

**VOIDING PATTERN:** ☐ N/A  ☐ Nocturia
☐ Burning  ☐ Frequency  ☐ Hematuria
☐ Incontinent  ☐ Retention  ☐ Urgency
**PAIN:** ☐ Yes ☐ No  Location: _____
Describe: _____

**OB/GYN** ☐ N/A  G _____
P _____ Ab _____     Fetal Heart Rate: _____
**VAGINAL BLEEDING:** ☐ Yes  ☐ No
# Pads _____ per hour
**DISCHARGE:**          Describe: _____
☐ Cervical ☐ Urethral  _____

## INTEGUMENTARY

**COLOR:** ☒ Normal  ☐ Cyanotic  ☐ Flushed
☐ Jaundiced  ☐ Mottled  ☐ Pale
**CHARACTER:** ☐ Clammy  ☐ Cool  ☐ Diaphoretic
☒ Dry  ☐ Hot  ☒ Warm
**OTHER:** ☐ Location: _____
☐ Redness  ☐ Rash  ☐ Foreign Body  ☐ Edema
☐ Burn  ☐ Pain  ☐ Abrasion  ☐ Contusion
☐ Laceration  ☐ Ecchymosis  ☐ Amputation
Describe: _____

Initial Wound Care: _____

## MUSCULOSKELETAL          ☒ NO DEFICIENCIES NOTED

Location of Injury: _____  ☐ Swelling ☐ Deformity

| Pulses: | ☐ Present | Capillary Filling: ☐ Brisk |
|---------|-----------|---------------------------|
| Location: | ☐ Absent | ☐ Prolong (72 sec) |

Skin:  Color: _____  Temp: _____
**Range of Motion:** ☐ Full  ☐ Decreased  ☐ None
Comments: _____

## ENT          ☒ NO DEFICIENCIES NOTED

☐ Pain   Location: _____
☐ Nasal Congestion  ☐ Difficult Breathing
☐ Bleeding  ☐ Dysphagia  ☐ Sore Throat

## OPHTHALMOLOGY          ☒ NO DEFICIENCIES NOTED

**Visual Acuity:** _____ OD _____ OS ☐ Corrected ☐ Uncorrected
☐ Drainage  ☐ Tearing  ☐ Reddened  ☐ Pain
Comments: _____



Nurse's Signature _____    10/11/02  Date

## SUBURBAN HOSPITAL
*Healthcare System*
8600 Old Georgetown Road
Bethesda, Maryland 20814
(301) 896-3100
EMERGENCY DEPARTMENT NURSING ASSESSMENT
FORM 5-1070 (10/00)

113

## HEALTH EDUCATION RECORD

PATIENT PLATE

**PART I  Initial Evaluation**

*Readiness to Learn (check all that apply for individuals present)*  ☑ Patient / ☐ Family / ☐ Other

What do you know about your health care problem?  *Suffrage Nadi*

What information do you need to understand your health care problem at this time?

What is your learning preference?  ☐ Written   ☐ Video   ☑ Verbal   ☐ Demo   ☐ Other

---

**PART II  Factors or Barriers Which May Influence Learning: Check Yes or No**

| | | | | | |
|---|---|---|---|---|---|
| Physical (i.e. Impaired Dexterity) | ☐ Yes | ☐ No | Sensory-Visual (i.e. Impaired Vision) | ☐ Yes | ☐ No |
| Reading (i.e. Difficulty with) | ☐ Yes | ☐ No | Sensory-Auditory (i.e. Impaired Hearing) | ☐ Yes | ☐ No |
| Language (i.e. Communication) | ☐ Yes | ☐ No | Motivation (i.e. Affects Learning) | ☐ Yes | ☐ No |
| Age Related (i.e. Tutoring, No Caregiver) | ☐ Yes | ☐ No | Emotional (i.e. Fear/Depression/Abuse) | ☐ Yes | ☐ No |
| Cultural Practices | ☐ Yes | ☐ No | Cognitive (i.e. Difficulty Understanding) | ☐ Yes | ☐ No |
| Religious Practices | ☐ Yes | ☐ No | Financial (i.e. Insurance/Billing) | ☐ Yes | ☑ No |

Signature/Title: _(signature)_                    Date/Time: 10/11/02

---

**PART III  Patient Unable to Be Assessed Because:**                    Signature/Title:                    Date/Time:

---

| PART IV  Consultation / Teaching | Date | Consultation / Teaching | Date |
|---|---|---|---|
| Financial Counselor | | LIFELINE: | |
| Social Service/DP/UM | | Crisis Interventions | |
| Dietary: | | Pharmacy: | |
| PT: ** | | Pastoral Care: | |
| OT: ** | | ET: | |
| ST/Audiology** | | Other: | |
| Other: | | Other: | |

\* See Progress Notes for Treatment Plan                    \*\* See Physical Medicine Section for Treatment Plan



**SUBURBAN HOSPITAL**
*Healthcare System*
8600 Old Georgetown Road
Bethesda, Maryland 20814
**HEALTH EDUCATION RECORD**
FORM I-1660 (6/02)



114

SUBURBAN HOSPITAL
8600 Old Georgetown Road -- Bethesda, MD 20814 -- Phone: 301-896-3880

INSTRUCTIONS FOR << DONNA ALSTON >>

Our doctors and staff appreciate your choosing us for your emergency medical
care needs.  Read these aftercare instructions carefully.  Please call us if
you have any questions about your medical problem. We are here to serve you.
--------------------------------------------------------------------------------
GENERAL DISCHARGE INSTRUCTIONS:
--------------------------------------------------------------------------------
ADDITIONAL INSTRUCTIONS:
YOU MAY HAVE BEEN EXPOSED TO SOME FUMES THAT HAVE WORN OFF. REST TODAY.
FOLLOW UP WITH YOUR DOCTOR OR DR SETHI. RETURN AS NEEDED
--------------------------------------------------------------------------------
FOLLOW-UP CARE:
Your physician today has been DR. ROBERT ROTHSTEIN MD

For follow-up care you have been referred to the following doctor or clinic:

        HARMINDER S SETHI                    Phone: 301-424-1559
        50 WEST EDMONSTON DR. #303

__If not improved in _____days please make an appointment for further
treatment.
__Please make an appointment for further treatment in  3  days.
Be sure to tell your referral doctor or clinic that we have sent you, and bri
medicines and instructions to the office.  If you had x-rays, an EKG, or lab
tests today, they have been reviewed by your doctor.  We will contact you at
once if other important findings are noted after further review by our staff.
If you do not continue to improve or if your condition worsens, please call
your doctor or the emergency department right away so you can be examined.

I acknowledge receipt of these instructions.  I understand that my condition
may require more care and will arrange for further treatment as recommended.

_____        _____
        Staff Signature                 Patient or Representative Signature
        Friday, October 11, 2002 - 12:50 PM

Name:  ALSTON,DONNA                    Age/Sex: 37/F       Attend Dr: ROTHSTEIN,ROBERT J
Acct#: 027950252    Unit#: A616521    Status:               Location: ER
Reg:  10/11/02      Disch:

## LABORATORY RESULTS

| Date<br>Time | Reference | Units | OCT 11<br>1043 |
|---|---|---|---|
| .-STAT/NA | (138-145) | MMOL/L | 142 |
| .-STAT/K | (3.5-4.9) | MMOL/L | 4.0 |
| .-STAT/CHLORIDE | (100-111) | MMOL/L | 108 |
| .-STAT/GLUCOSE | (60-120) | MG/DL | 92 |
| .-STAT/BUN | (6-22) | MG/DL | 13 |
| .-STAT/CALC HGB | (11.6-15.6) | G/DL | 12.0 |
| .-STAT/HCT | (34.0-46.0) | % | 34.0 |

116

THIS INFORMATION IS FO... OFFICIAL USE ONLY AND WILL NOT BE RELEAS... TO UNAUTHORIZED PERSONS

| **M** metro | **Washington Metropolitan Area Transit Authority**<br>**Record of Medical Examination**<br>**Follow-Up/Progress Notes** |
|---|---|

| Name(Last, First, Middle)    Print Clearly<br>Alston  Donna | Date of Birth<br>/    / | Payroll #   001102<br>SS No. | Daytime Tel  (8 am - 5 pm)<br>(    ) |
|---|---|---|---|

| Position    Car Cleaner | ✓ Employee | Applicant |
|---|---|---|

| Date<br>5/5/05 | **Notes**<br>Employee referred for MLO as of RTD 4/7/05<br>she only worked x7 days. she went out so<br>"coled off" and feened she have sensitivity to<br>chemicals at work. stated to allergical attacks<br>swelled. Presents to note from GP to dr pneumonia<br>+ COPD. is to have further evaluation by Pulm + Card.<br>Upon RTD to doctor's note recommending<br>avoidance of exposure to solvents and her termed.<br>was not allowed to work as a result. see |
|---|---|
| Qual ____  Pend ____  RTD ____ | |
| | **Physician Signature** |

| Date<br>/    / | **Notes**<br>appt to Pulm on 5/11/05 and physical the<br>following week. she not make appt. to Card or<br>Occ med MD.<br>will await results of eval by Pulm<br>puts further recommendation. |
|---|---|
| Qual ____  Pend ____  RTD ____ | **Physician Signature** |

| Date<br>/    / | **Notes** |
|---|---|
| | |
| | PLAINTIFF'S<br>EXHIBIT<br>4 |
| Qual ____  Pend ____  RTD ____ | |
| | **Physician Signature** |

 **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**
**MEDICAL OFFICE**
**RETURN TO DUTY NOTICE**

| EMPLOYEE NAME | EMPLOYEE NUMBER | WORK LOCATION |
|---|---|---|
| | | |

| DATE SEEN IN MEDICAL OFFICE | LAST DATE COVERED IN CERTIFICATE OF ATTENDING PHYSICIAN |
|---|---|
| 5/18/05 | |

| TIME REPORTED ___ ☒ a.m. ☐ p.m. <br> TIME EXCUSED ___ ☒ a.m. ☐ p.m. | PURPOSE <br> RTD |
|---|---|

| DATE EMPLOYEE APPROVED FOR RETURN TO DUTY | RESTRICTIONS |
|---|---|
| | |

| _____ | _____ |
|---|---|
| SIGNATURE | DATE |

**THIS NOTICE MUST BE PRESENTED TO YOUR WORK LOCATION OFFICE.**

9.29 (Rev. 10/90)    Original - Employee    Yellow - Medical/Sick Leave    Pink - Medical/Chart



**EXHIBIT**
**7**
Pervall-Walker
1-24-08

THIS INFORMATION IS FOR OFFICIAL USE ONLY AND WILL NOT BE RELEASED TO UNAUTHORIZED PERSONS

**M** metro

## Washington Metropolitan Area Transit Authority
### Record of Periodic Medical Examination/Return to Duty Evaluation

Name(Last, First, Middle)   Print Clearly: Alston, Donna J.
Date of Birth: 06.21.65
Payroll #: 001102
Daytime Tel (8 am - 5 pm): (202) 583-0177

Address: 5017 East Capitol St SE.   Apt No.   City: Wash   State: D.C.   Zip Code: 20019

Date Employed: 6.26.00
Occupation: Prof. Bus Cleaner
Office/Work Location: Southern Ave
Work Phone: 202.635.6794

Last day worked: 05, 17, 05   Mo Day Yr
Doctor's Certificate [] Yes [] No   If yes, give dates of coverage: From 11/29/05 Mo Day Yr   through 05, 1, 05 Mo Day Yr

### COMPLETE HEALTH HISTORY

Have you ever had or do you now have any of the following:

| | Y | N | | Y | N | | Y | N |
|---|---|---|---|---|---|---|---|---|
| Head or spinal injury | [] | N | Fractures | [] | N | Lupus | [] | N |
| Seizures, fainting | [] | N | Carpal Tunnel Syndrome | [] | N | Sarcoidosis | [] | N |
| Cataracts/glaucoma | [] | N | Bursitis/tendinitis | [] | N | TB | [] | N |
| Hearing loss | [] | N | Gonorrhea/syphilis | [] | N | Surgical procedures | [] | N |
| Asthma/Bronchitis/Emphysema | [] | N | Hemorrhoids | [] | N | Hospitalization | [] | N |
| Chest pains/irregular heart beat | [] | N | Cancer | [] | N | Any Drug rehab/counseling | [] | N |
| Heart Problems | [] | N | HIV/AIDS | [] | N | Are you currently taking medications? | [] | N |
| High blood pressure | [] | N | Mental illness | [] | [] | Do you take medications regularly | [] | N |
| Hiatal Hernia/Peptic ulcer | [] | N | Anxiety | [] | [] | Any recent illness since your last visit? | [] | N |
| Diabetes | [] | N | Depression | [] | [] | | | |
| Arthritis | [] | [] | Allergy | [] | [] | History of Low Back Pain | [] | [] |
| Muscle Strain/sprain | [] | [] | Anemia | [] | [] | | | |

If answers to any of the above is yes, please explain in detail below.

_____
_____
_____
_____
_____
_____
_____
_____

The Americans with Disabilities Act enables us to give you the opportunity to voluntarily identify yourself confidentially as disabled and to indicate the nature of such disability in connection with our positive actions to employ disabled persons. If you are disabled, state the nature of your disability and any accommodations required in the space below.

I, the undersigned, do hereby certify that the answers to the above questions are true and give permission for this medical examination.

Patient Signature: Donna J. Alston   Date: 05, 19, 05
Reviewed by: _____   M.D   Date: 5, 19, 05

50.074 (02/97)

**Washington Metropolitan Area Transit Authority**
**Record of Periodic Medical Examination/Return to Duty Evaluation**

| Purpose of Physical Examination  [ ] Med Eval | [ ] DOT | [ ] Periodic. Transit/Special Police |
|---|---|---|
| (Check appropriate box) | (Motor Carrier Safety Regulation) [ ] | [ ] RTD |

General Physical Exam: Height_____   Wt.____lbs   BP_____mm Hg   Pulse____/min   Temp_____
Urinalysis       Sp. Gr. _____   Sugar____   Albumin_____   Blood_____

| Normal (✓) | | Abnormal Findings( describe in detail) |
|---|---|---|
| | General Appearance | Employee presents for RTD. |
| | Skin and Lymphatics | States had cardiology f/u |
| | Head and Neck | which was normal however, has |
| | Eyes, Ears, Nose and Throat | note from Pulm that states |
| | Meets vision/hearing standard for position  [ ] Yes  [ ] No  [ ] with glasses | she should not RTD until additional test completed — has |
| | Chest Heart Lungs | PFT's scheduled for 6/2/05. Med: ∅ |
| | Abdomen Genitourinary | Spoke c̄ Pulm for clarification. He states employee is able |
| | Musculature Bones and Joints | to RTD. Does not need PFTS prior. Will clear for |
| | Neurological | RTD 5/19/05. |
| | Psychiatric | |
| | Social History  Drug ___Yes ___No  Alcohol ___Yes ___No  Smoke ___Yes ___No | |

Overall Findings
[ ] Normal
[ ] Abnormal

Summary of Abnormal Findings

Disposition

[ ] Qualified pending negative drug test result   [ ] Disqualified   [ ] Return to Duty   [ ] Held Off
[ ] Pending        [ ] Re-examine in _____ days.  Give reason below

Appointment date:_____/_____/_____

5/19/05
Date        Examining M.D. Signature

Medical Certification Issued:_____
        Medical Assistant Signature        Date

**\*\*PATIENT FACESHEET\*\*** G W UNIVERSITY HOSPITAL

```
PT NAME:   ALSTON , DONNA JEAN                              12/22/05
NURS STA:                PT TYPE:    T          PT NO:       110954187
ROOM/BED:                HOSP SVC:   EMR        MED REC NO: 3268650
PT STATUS: EA            MARITAL STS: S   RACE: 2  REL:  HOL   BLOODLESS MED IND:
SSN:       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   AGE:  40 SEX F         BIRTHDATE:  06/21/1965
PREV NAME:                                      INFANT AGE:
ADDRESS:   5017 EAST CAPT ST SE                 PHONE: 202 - 583-2177
                                                DISTRICT CD:   28
CITY:      WASHINGTON                     ST: DC  ZIP:  20019-0000
EMPLOYER:  METRO                                CHURCH: GREATR MT CALVARY
ADDRESS:   600 5TH ST NW
CITY:      WASHINGTON                     ST: DC   ZIP: 20001-
OCCUPATION: BUS CLEANER                   PHONE: 202-962-1234
GUARANTOR: ALSTON , DONNA JEAN
ADDRESS:   5017 EAST CAPT ST SE
CITY:      WASHINGTON                     ST: DC ZIP: 20019-0000  REL: S
OCCUPATION:              GUAR SSN: 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    PHONE: 202-583-2177
 GUAR EMPL: METRO                             PHONE: 202-962-1234
 ADDRESS:  600 5TH ST NW
 CITY:     WASHINGTON                     ST: DC   ZIP: 20001-
EMER CONTACT: ALSTON , MARY                                     REL N
 ADDRESS:   1233 HALF ST SW
 CITY:      WASHINGTON                    ST: DC   ZIP: 20024-
        HOME PHONE: 202-484-5414         WORK PHONE:
 NEXT OF KIN: ALSTON , MARY                                    REL: N
 ADDRESS:   1233 HALF ST SW
 CITY:      WASHINGTON                    ST: DC   ZIP: 20024-
        HOME PHONE: 202-484-5414         WORK PHONE:
INSURANCE INFO:   # OF PLANS: 1   FC: H
INS PL 1: N19  CAREFIRST BLUECHOICE  VERIFIED: Y    POLICY #: XIC57796319 8
   COB:   1  PAYOR ID: 080  GROUP #/NAME: PK69           METRO
   MAIL TO:  CAREFIRST BLUECHOICE                        PHONE: 800-296-5555
   ADDRESS:  P.O. 804                               UR PHONE: 202-484-6318
   CITY:     OWINGS MILLS    ST: MD ZIP: 21117    SUBSCRIBER: ALSTON , DONNA JEAN
        AUTH #:                      AUTH BY:
INS PL 2:                          VERIFIED:       POLICY #:
   COB:      PAYOR ID:    GROUP #/NAME:
   MAIL TO:                                           PHONE:
   ADDRESS:                                        UR PHONE:
   CITY:            ST:    ZIP:        SUBSCRIBER:
        AUTH #:                      AUTH BY:
INS PL 3:                          VERIFIED:       POLICY #:
   COB:      PAYOR ID:    GROUP #/NAME:
   MAIL TO:                                           PHONE:
   ADDRESS:                                        UR PHONE:
   CITY:            ST:    ZIP:        SUBSCRIBER:
        AUTH #:                      AUTH BY:
ADM BY: ELIAJO  IP PREADM BY:           OP PREADM BY:          ER REG BY: BOCKEJ
REF SOURCE:                       FAM DR: 647008  SILVER PAUL A.
ACC IND: H   ACC DT/TM: 122205  00:00 JOB   REL: N   ACC LOC:
ADMIT DT/TM: 12/22/05  21:40          ADM SOURCE:    EO   ADM PRI:   X
DSCH DT/TM:              DISP: AHR    ADM DR: 855551 PETINAUX BRUNO
REF DR:   855551 PETINAUX BRUNO       ATN DR: 855551 PETINAUX BRUNO
PROCEDURE:                            DIAGNOSIS: WEEZING/ SHORTNESS OF
CLIN COMM:                            SURGERY DATE:           ISOL IND:
PREV STAY:                            PREV ADM DTE:
PREV HOSP:                            PREV DSCH DTE:
MODE ARRIVAL: SLF SELF                EXT COM: U    EXC: N    SP CAT: N
ORGAN DONOR:      LIV WILL/ADV DIR:   LOCATION:
31CE5256
```

*[handwritten notes in right margin]* 944 78050 8868.2 9449.3

PLAINTIFF'S EXHIBIT 5

# GEORGE WASHINGTON UNIV. HOSPITAL EMERGENCY RECORD

**Name:** Alston, Donna J
**Age:** F40
**MedRec:** 3268650
**AcctNum:** 110954187

━━━━━━━━━━━━━━━━━ TRIAGE DATA ━━━━━━━━━━━━━━━━━

**Complaint:** Wheezing

**Triage Time:** Dec.22 2005 21:53
**Source:**
**By:**
**Urgency:** ESI Level 3 - Require Multiple Testing
**Room:** EMERGENCY WAITING

**Age:** 40  Female

**Kg Weight:**
**Physicians:**
Petinaux Bruno
Petinaux Bruno
Silver Paul A.

**Vital Signs:**
**BP:**120/76          **P:**65          **R:**18          **T:**97.7          **Pn:**0          **Sat:**98/RA

## DISPOSITION
PATIENT (Dec 23 1:16 DMA):  Disposition: **Routine Discharge, Disposition Transport: **Self -
   Patient Responsible, Condition: Stable.
   (Dec 23 1:31 LEUN):  Remove from ER.

## INSTRUCTION (Dec 23 2005 01:22 DMA)
DISCHARGE:  CHEST PAIN (NON-SPECIFIC), CARBON MONOXIDE POISONING.
FOLLOWUP:
SPECIAL:  Reduce exposure to running buses.
   Take 2 puffs of albuterol every 4 hours.
   Rest, increase fluids and and try to decrease prolonged standing.
   Follow up with DR. silva for out patient stress test as soon as possible.

## ORDERS
CHEST (PA/lateral) by DMA for BPP on 12/22/2005 22:29 Status: Active.
CHEM 7 (Basic Metabolic Panel) by DMA for BPP on 12/22/2005 22:29 Status: Done 12/22/2005
   23:41.
CBC and DIFF by DMA for BPP on 12/22/2005 22:29 Status: Done 12/22/2005 23:39.
BNP: B-TYPE NATIURETIC PEPTIDE by DMA for BPP on 12/22/2005 22:29 Status: Done
   12/23/2005 0:15.
EKG by DMA for BPP on 12/22/2005 22:29 Status: Active.
CARBOXYHEMOGLOBIN by DMA for BPP on 12/22/2005 22:30 Status: Done 12/22/2005 23:26.
CPK, CPK-MB, AND TROPONIN I by BPP for BPP on 12/22/2005 23:48 Status: Done 12/23/2005
   1:06.

## MEDICATION SERVICE (Dec 23 2005 01:19 DMA)
Albuterol: Order: Albuterol : 2 puffs : Misc Med Route **
   Concentration: Albuterol : Solution : 0.042% : Inhalation
   Ordered: Dec 23 2005 01:19
   Ordered by: Drew Maurano, PA
   Entered by: Drew Maurano, PA Dec 23 2005 01:19
   Documented as given by: Drew Maurano, PA Dec 23 2005 01:19
   MEDICATION Time given: 0100 Patient tolerated procedure well, .

## EKG INTERPRETATION (Dec 22 2005 23:47 BPP)
12 LEAD EKG INTERPRETATION: 12 lead EKG interpreted by ED Physician, 12 Lead EKG
   Interpretation shows rhythm is Normal Sinus, Rate is normal, normal EKG.

72

# GEORGE WASHINGTON UNIV. HOSPITAL
# EMERGENCY RECORD

Name: Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

## DIAGNOSIS (Dec 23 2005 01:18 DMA)
FINAL:  PRIMARY: 786.50 CHEST PAIN, NONDIAGNOSTIC ADDITIONAL: E868.3 Carbon
Monoxide poisoning (non fire).

## RADIOLOGY INTERPRETATION
CHEST (Dec 23 0:11 DMA): Interpretation of chest X-ray shows, no infiltrates, no pneumothorax, no
hemothorax, no masses, no CHF, no effusion, no free air, Cardiomegaly.
(Dec 23 0:11 DMA): Interpretation of chest X-ray shows, no infiltrates, no pneumothorax, no
hemothorax, no masses, no CHF, no effusion, no free air, Cardiomegaly.

## HPI SHORTNESS OF BREATH
CHIEF COMPLAINT (22:37 DMA): Patient presents for the evaluation of shortness of breath.
HISTORIAN (22:37 DMA): History obtained from patient.
TIME COURSE (22:37 DMA): Onset of symptoms reported as sudden, Onset was 2 months ago ,
Complaint is intermittent.
QUALITY (22:37 DMA): tightness.
ASSOCIATED WITH (22:37 DMA): CHF Symptoms: Peripheral edema, Peripheral edema.
SEVERITY (22:37 DMA): Maximum severity is mild, Currently symptoms are mild.
EXACERBATED BY (22:37 DMA): Patient's condition exacerbated by bus exhaust.
RELIEVED BY (22:37 DMA): Patient's condition relieved by nothing.
NOTES (22:38 DMA):  pt c/o intermitten chest tightness, lightheadedness, wheezing, and ankle
swelling while at work. Resolves after leaving work. Works as a bus cleaning and is around bus
exhaust all day and on her feet. No fevers, URI sx, SOB, CP.

## HISTORY
MEDICAL HISTORY (21:53 DEA):  History of cardiac disease, including cardiomyopathy.
IRON DEFECIENCY
ANEMIA. .
PSYCHIATRIC HISTORY (21:53 DEA):  No previous psychiatric history. .
SURGICAL HISTORY (21:53 DEA):  History of laparotomy.
SOCIAL HISTORY (21:53 DEA):  Denies alcohol abuse, Denies tobacco abuse, Denies drug abuse. .
FAMILY HISTORY (21:53 DEA):  Family history is not contributory to this case.
MEDICATION (21:53 DEA):  Medication Prenatal was removed.
MEDICAL HISTORY (22:40 DMA): History of pulmonary disease, including pulmonary hypertension,
anemia.
PSYCHIATRIC HISTORY (22:40 DMA): No previous psychiatric history.
SURGICAL HISTORY (22:40 DMA): Patient has had no previous surgical history.
SOCIAL HISTORY (22:40 DMA): Denies alcohol abuse, Denies tobacco abuse, Denies drug abuse,
Patient consumes alcohol socially.
FAMILY HISTORY (22:40 DMA):  Family history includes coronary artery disease, Family history
includes hypertension, sister IM at age 45.
NOTES (22:40 DMA): Nursing records reviewed, Agree with nursing records.

## ROS (Dec 22 2005 22:39 DMA)
CONSTITUTIONAL: No fever, No chills, No fatigue, No weakness.
EYES: Negative eye review of systems.

73

# GEORGE WASHINGTON UNIV. HOSPITAL EMERGENCY RECORD

Name: Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

ENT: Negative ENT review of systems.
CARDIOVASCULAR: Historian reports chest pain, Chest pain on the right, Historian reports edema, No exercise intolerance, No diaphoresis, No palpitations, No PND, No orthopnea, No dyspnea on exertion, No syncope.
RESPIRATORY: Historian reports SOB, Historian reports wheezing, No cyanosis, No stridor, No Cough, No sputum.
GI: Negative gastrointestinal review of systems.
GENITOURINARY FEMALE: Negative genitourinary review of systems.
MUSCULOSKELETAL: Negative musculoskeletal review of systems.
SKIN: Negative skin review of systems.
NEUROLOGIC: Historian reports dizziness, No gait changes, No irritability, No vertigo, No lethargy, No headache, No paralysis, No paresthesias, No focal weakness, No sensory changes, No speech changes.
ENDOCRINE: Negative endocrine review of systems.
HEMO/LYMPHATIC: Negative hemo/lymphatic review of systems.
ALLERGIC/IMMUNOLOGIC: Negative Allergic review of systems.
PSYCHIATRIC: Negative psychiatric review of systems.
ALL SYSTEMS NEGATIVE: All systems were reviewed and are negative except as described above.

## PHYSICAL EXAM (Dec 22 2005 22:40 DMA)

CONSTITUTIONAL: Vital signs reviewed, Patient has normal pulse, Patient has normal blood pressure, Patient has normal respiratory rate, Well appearing, Patient appears comfortable, Alert and oriented X 3.
HEAD: Atraumatic, Normocephalic.
EYES: Eyes are normal to inspection, Pupils equal and reactive to light, No discharge from eyes, Extraocular muscles intact, Sclera are normal, Conjunctiva are normal.
ENT: Ears normal to inspection, Nose examination normal, Posterior pharynx normal, Mouth normal to inspection.
NECK: Normal ROM, No jugular venous distention, No meningeal signs, Cervical spine nontender.
RESPIRATORY/CHEST: Chest is nontender, Breath sounds normal, No respiratory distress, Respiratory distress present.
CARDIOVASCULAR: RRR, No murmurs, Normal S1 S2, No rub, No gallop.
ABDOMEN: Abdomen is nontender, No masses, Bowel sounds normal, No distension, No peritoneal signs.
NEURO: GCS is 15, No focal motor deficits, No focal sensory deficits, No cerebellar deficits, Speech normal, Gait normal, Memory normal.
SKIN: Skin is warm, Skin is dry, Skin is normal color.
LYMPHATIC: No adenopathy in neck.
PSYCHIATRIC: Oriented X 3, Normal affect, Normal insight, Normal concentration.

## KNOWN ALLERGIES

nkda.

## DOCTOR NOTES (Dec 23 2005 01:23 MAC)

TEXT: pts symptoms are all related to her work - whenever she is around the buses feels wheezey currently feels okay, labs normal co 1.8. dw patient and note written for airmonitoring to be performed at her work.

74

# GEORGE WASHINGTON UNIV. HOSPITAL EMERGENCY RECORD

Name: Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

## ATTENDING

**CHIEF COMPLAINT (22:38 BPP):** here with chest discomfort and some wheezing when she is at work and cleaning the buses, has more symptoms now than before, the buses are also running, this am noted more swelling in the legs. no n/v/d, has more symptoms at work

cta b/l, nl s1 and s2, nabs, soft, nr, ng, nd, nt, no c/c/ sl edema b/l le, no rashes, a and o x3.

check labs, ekg, cxr.

NOTES (22:38 BPP): I have personally seen and examined this patient. I have fully participated in the care of this patient. I have reviewed all pertinent clinical information, including history, physical exam and plan.

**CHIEF COMPLAINT (22:47 BPP):** pt saw pmd dr. Silva on dec 6th and has outpt echo and stress lined up in january.

## RESULTS

| NAME | VALUE | UNIT | RANGE |
|------|-------|------|-------|
| BASIC MET PLASMA Dec 22 2005 23:41 | | | |
| Sodium Plasma | 141 | mmol/L | 135-145 |
| Potassium Plasma | 4.0 | mmol/L | 3.5-5.0 |
| Chloride Plasma | 106 | mmol/L | 95-105 |
| Carbon Dioxide P | 25.5 | mmol/L | 22.0-30.0 |
| BUN Plasma | 13 | mg/dL | 7-17 |
| Creatinine Plasm | 0.6 | mg/dL | 0.7-1.2 |
| Glucose Plasma | 94 | mg/dL | 75-110 |
| Calcium Plasma | 9.3 | mg/dL | 8.5-10.5 |

| NAME | VALUE | UNIT | RANGE |
|------|-------|------|-------|
| CBC/DIFF Dec 22 2005 23:39 | | | |
| WBC | 7.72 | X10 3/uL | 4.80-10.80 |
| RBC Count Blood | 4.06 | X10 6/uL | 4.20-5.40 |
| Hemoglobin | 11.6 | g/dL | 12.0-16.0 |
| Hematocrit | 36.5 | % | 37.0-47.0 |
| MCV | 89.9 | fL | 80.0-100.0 |
| MCH | 28.6 | pg | 25.4-34.6 |
| MCHC | 31.9 | g/dL | 33.0-37.0 |
| RDW | 16.2 | % | 11.5-14.5 |
| HDW | 2.68 | g/dL | 2.20-3.20 |
| Platelet Count | 371 | X10 3/uL | 130-400 |
| MPV | 7.1 | fL | 7.2-11.1 |
| ASeg% | 59 | % | 40-65 |
| ALym% | 32 | % | 21-44 |
| AMonocyte % | 4 | % | 0-7 |
| AEosinophil % | 2 | % | 0-5 |
| ABasophil % | 0 | % | 0-2 |
| ALUC % | 2 | % | 0-4 |
| Auto Seg # | 4.55 | X10 3/uL | 1.80-7.00 |
| Auto Lym # | 2.45 | X10 3/uL | 1.00-4.80 |
| Auto Mono # | 0.34 | X10 3/uL | 0.00-0.80 |
| Auto Eos # | 0.17 | X10 3/uL | 0.00-0.65 |
| Auto Baso # | 0.03 | X10 3/uL | 0.00-0.20 |
| Auto LUC # | 0.18 | X10 3/uL | 0.00-0.40 |

| NAME | VALUE | UNIT | RANGE |
|------|-------|------|-------|
| Carboxyhgb Dec 22 2005 23:26 | | | |
| Carboxyhgb | 1.8 | % | 0.0-1.4 |
| | | | |
| Non-smokers: <1.5% | | | |
| Smokers: 1.5-5.0% | | | |
| Heavy Smokers: 5.0-9.0% | | | |

| NAME | VALUE | UNIT | RANGE |
|------|-------|------|-------|

75

# GEORGE WASHINGTON UNIV. HOSPITAL EMERGENCY RECORD

Name: Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

| BNP Dec 23 2005 00:15 | | | |
|---|---|---|---|
| BNP | 21 | pg/mL | 0-100 |

A B-type natriuretic peptide (BNP) value
of less than 100 pg/mL is a useful indi-
cator of lack of acute congestive heart
failure in most patients withdyspnea,
with a negative predictive value of 95%
or higher in most studies. BNP values
between 100 pg/mL and 200 pg/mL may be
seen in patients with acute congestive
heart failure, but may also be associ-
ated with other conditions, such as pul-
monary embolus or left ventricular dys-
function without acute exacerbation of
congestive heart failure. TheBNP level
should not be the sole basis for the
diagnosis of congestive heartfailure.

| NAME | VALUE | UNIT | RANGE |
|---|---|---|---|
| CARDIAC ENZYMES Dec 23 2005 01:06 | | | |
| CKMB Plasma | 0.34 | ng/mL | 0.00-2.30 |
| | | | |
| PLEASE NOTE THE NEW REFERENCERANGE. | | | |
| Troponin I Plsma | < 0.038 | ng/mL | |

PLEASE NOTE that this test isnow per-
formed only on PLASMA for technical rea-
sons and the REFERENCE RANGESHAVE BEEN
CHANGED.
THE NEW REFERENCE RANGES:
<0.08 ng/mL: With this trop onin I level
there is no evidence for myocardial in-
jury at this time. If there is clinical
suspicion of evolving acute MI or
ischemic episode, repeat testing in 4-6
hours is recommended.
0.08-0.4 ng/mL: This level oftroponin I
may be seen with minor low level myo-
cardial injury. In a patient with un-
stable angina and this troponin I level,
there is an increased risk ofa signifi-
cant cardiac event in the near future.
>0.4 ng/mL: This level of t roponin I is
typical of classical acute MI.
The troponin I results shouldbe used
and interpreted only in the context of
the overall clinical picture,e.g.,
clinical history, ECG, and other labora-
tory tests such as CK-MB. Thetriage of
patients with chest pain should be based
on serial samples to identifythe tempo-
ral rise and fall of troponinI levels
characteristic of AMI.

## ADDITIONAL TRIAGE Dec 22 2005 21:53 (DEA)

PATIENT: NAME: Donna J Alston, DOB: Jun 21, 1965, TIME OF GREET: Thu, Dec 22 2005
21:40, RACE: Black, MEDICAL RECORD NUMBER: 3268650, ACCOUNT NUMBER:
110954187, Person ID: 110954187, IBEX NUMBER: 20051222215315ADT.
ASSESSMENT: PT REPORTS CENTRAL CHEST TIGHTNESS, WHEEZING AND
DIZZINESS ONSET WHILE CLEANING, USING CHEMICALS. NO CP.

76

# GEORGE WASHINGTON UNIV. HOSPITAL
# EMERGENCY RECORD

Name: Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

ALSO REPORTS BILAT ANKLE SWELLING +1 PITTING. BSCTA BILAT. SPEAKS
FULL SENTENCES.
**GCS: GCS Eye Opening: 4, GCS Verbal Response: 5, GCS Motor Response: 6, The GCS total is 15.**
DOMESTIC VIOLENCE: No suspected abuse, neglect or domestic violence.
LMP: Last menstrual period: 11-25-2005.
TREATMENTS IN PROGRESS: No treatment.
TRIAGE TREATMENTS: No treatments.
PREVIOUS VISIT ALLERGIES: nkda.

## VITAL SIGNS
VITAL SIGNS (21:53 DEA): BP: 120/76, Pulse: 65, Resp: 18, Temp: 97.7, Pain: 0, O2 sat: 98/RA.

## NURSING ASSESSMENT: RESPIRATORY /CHEST (Dec 23 0:38 LEUN)
TIME ASSESSED: Patient was assessed at 0015.
**NOTES: pt c/o audible wheezing, lungs decreased bilat. EKG done, labs sent. Pt c/o fullness feeling mid chest started yest.**
CONSTITUTIONAL: History obtained from patient, Patient appears comfortable, Patient is
cooperative, Patient is alert and oriented x 3, Patient appears in no acute distress, Patients
skin is warm and dry, Patients mucous membranes are moist and pink.
**RESPIRATORY/CHEST: No acute respiratory distress, No intercostal retractions, No
supraclavicular retractions, Equal chest expansion, No nasal flaring, No cough, Pain described
as pressure, Pain is continuous, On a scale 0-10 patient rates pain as 0, Pain is non radiating,
Duration of pain: since yest.**
ENT: Patient denies pain to ears, nose, or throat.

## NURSING PROCEDURE: IV (23:02 SUDJ)
TIME: 20 gauge catheter inserted, into left AC, with 1 attempt, Labs drawn at time of placement,
After placement no swelling noted at site, no drainage noted at site, Sterile dressing applied.

## NURSING PROCEDURE: DISCHARGE NOTE (Dec 23 1:31 LEUN)
TIME: Procedure was performed at 0133, Patient discharged to home, Patient ambulates without
assistance, Transported via friend/family driving, Accompanied by family member, IV
discontinued with catheter intact. Dressing placed to IV site, Discharge instructions given to
patient, Simple/moderate discharge teaching performed, Prescription given and additional
instructions on side effects of same given, Above Person(s) verbalized understanding of
discharge instructions and follow-up care.

## ADMIN
PATIENT DATA CHANGE (22:06 DMA): Resident changed from (none) to Drew Maurano, PA.
(22:08 ): A08 CHPFQP02 by Interface, SSN: 577963198, Payment: N19, Zip code: 20019, Phone
number: (202)583-2177.
(22:08 ): A08 CHPFQP02 by Interface.
(22:11 SUDJ): Extender changed from (none) to Joshua Sudec, RN.
(22:14 BPP): Attending changed from (none) to Bruno Petinaux, MD.
(22:20 LEUN): Primary Nurse changed from (none) to Lailor Leung, RN.
(22:30 ): A08 by Interface.
DIGITAL SIGNATURE Dec 22 2005 21:53 DEA Dennis, RN, Alyssa

77

# GEORGE WASHINGTON UNIV. HOSPITAL EMERGENCY RECORD

**Name:** Alston, Donna J
Age: F40
MedRec: 3268650
AcctNum: 110954187

DIGITAL SIGNATURE Dec 23 2005 01:23 MAC Macintyre, MD, Anthony
DIGITAL SIGNATURE Dec 23 2005 01:31 LEUN Leung, RN, Lailor

## IMAGING

## IMAGING

EKG (22:53 DMA): Image captured from scanner.
(23:43 SUDJ): Image captured from scanner.
WORK NOTE (Dec 23 1:29 LEUN): Image captured from scanner.
DISCHARGE RECEIPT (Dec 23 1:31 SUDJ): Image captured from scanner.

KEY:
BPP=Petinaux, MD, Bruno  DEA=Dennis, RN, Alyssa  DMA=Maurano, PA, Drew  LEUN=Leung, RN, Lailor
MAC=Macintyre, MD, Anthony  SUDJ=Sudec, RN, Joshua  THB=Threat, Brenda

# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:  DONNA JEAN ALSTON
MRN: 3268650
DOB: Jun 21, 1965

Jan 28 2006 12:00AM

To Whom it May Concern:

Re: Donna Alston

The patient is suffering from a pulmonary condition which is exacerbated by fumes.  She needs to be placed in a work enviroment which is free from noxious fumes.

Please do not hesitate to contact me if you require further information.

Sincerely,

Paul A. Silver, M.D., F.A.C.P.
Associate Professor of Medicine
Assistant Director, Division of General Internal Medicine

Electronically signed by:PAUL  SILVER M.D.,F.A.C.P.  Jan 30 2006  6:07PM EST Author

PLAINTIFF'S
EXHIBIT
6

**WASHINGTON HOSPITAL CENTER**
0 Irving Street, N.W. Washington, D.C. 20010
Telephone  877-7000

2479476
ALSTON
DONNA
BOLAD, ALADDIN   06/21/1965     F
19558147
02/03/06
2D05-B

℞  Not Valid for Controlled Substances

0300110

Ms. Donna Alston was an inpatient @ WHC on 2/3/06 (Friday) and needs to abstain from work for one week, to return 2/14/06. If possible, She needs to avoid chemicals & fumes as these are likely the cause of many of the symptoms that require admission.

FEB 6'06 PM 2:41

LABEL CONTENTS

Refill ___ Xs

| Physician's Signature | | M.D., D.D.S. | DEA No. |
|---|---|---|---|
| Printed Signature | N BUSHAW, NP | | Date 2/9/06 |



# MEDICAL FACULTY ASSOCIATES

## THE GEORGE WASHINGTON UNIVERSITY

RE:   DONNA JEAN ALSTON
MRN: 3268650
DOB: Jun 21, 1965

May 3 2006 1:00PM

Mr. Kenneth G Macleay

Dear Mr. Macleay,

Re:  Donna Alston

I am writing to inform you that the above named patient is suffering from a pulmonary condition secondary to fume exposure in her work place.  She must be placed in an area free of toxic fumes, cleaning chemicals, etc.

Please do not hesitate to contact me if you have any questions.

Sincerely,

Paul A. Silver, MD, FACP
Associate Professor of Medicine
Assistant Director, Division of General Internal Medicine

1 (Pages 1 to 4)

**Page 1**

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF COLUMBIA
3
4    - - - - - - - - - - - - - x
5    DONNA J. ALSTON,        :
6        Plaintiff,        :
7        v.        :Civil Action No.:
8    WASHINGTON METROPOLITAN,  :1:07cv 00122(ESH)
9    AREA TRANSIT AUTHORITY,  :
10       Defendant.    :
11   - - - - - - - - - - - - - x
12
13
14       Deposition of DONNA J. ALSTON
15         Washington, D.C.
16       Thursday, October 25, 2007
17         10:14 a.m.
18
19
20   Job No.: 1-114351
21   Pages: 1 - 141
22   Reported by: Lisa Kirk

**Page 2**

1       Deposition of DONNA ALSTON, held
2    at the offices of:
3    WASHINGTON METROPOLITAN
4    AREA TRANSIT AUTHORITY
5    600 5th Street, Northwest
6    Washington, D.C. 20001
7    (202) 962-1013
8
9
10
11
12
13
14
15       Pursuant to agreement, before Lisa Kirk,
16   Court Reporter and Notary Public in and for the
17   District of Columbia.
18
19
20
21
22

**Page 3**

1       A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3    BRUCE M. BENDER, ESQ.
4    Van Grack, Axelson, Williamowsky,
5    Bender & Fishman, P.C.
6    401 North Washington Street
7    Suite 550
8    Rockville, Maryland 20850
9
10
11
12
13
14   ON BEHALF OF THE DEFENDANT:
15   KATHLEEN CAREY, ESQ.
16   Washinton Metropolitan
17   Area Transit Authority
18   600 5th Street, Northwest
19   2nd Floor, General Counsel's Office
20   Washington, D.C. 20001
21   (202) 962-1013
22

**Page 4**

1       C O N T E N T S
2    EXAMINATION OF DONNA ALSTON       PAGE
3    By Ms. Carey        5
4
5
6
7
8       E X H I B I T S
8       (Retained by Counsel.)
9
10   ALSTON DEPOSITION EXHIBITS       PAGE
11   Nos. 1 - 16        5
12   No. 17        19
13   No. 18        106
14   No. 19        107
15
16
17
18
19
20
21
22

PLAINTIFF'S
EXHIBIT
tabbies
7

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

24 (Pages 93 to 96)

93
1    lift weight up to 75 pounds?
2        **A  In 2003?**
3        Q  Yes, October of 2003 when you applied for
4    this stockroom job?
5        **A  Yes.**
6        Q  You were.  Were you able to climb or stand
7    for approximately 80 percent of the workday?
8        **A  Yes.**
9        Q  Was your experience in the warehouse
10   previously two years or more or was that the summer
11   position that you held?
12       **A  The summer.**
13       Q  And did you understand that this was a 689
14   position --
15       **A  Yes.**
16       Q  -- storeroom clerk, okay.  You also
17   applied for the police communications specialist
18   position in 2003, correct?
19       **A  Correct.**
20       Q  Let me ask you before I go on about the
21   jobs in 2003 that you applied for.  Had the employer,
22   had anyone for Metro been provided with any other

94
1    documents regarding your medical condition other than
2    the discharge papers that you got from Suburban?
3        **A  Repeat that please.**
4        Q  Yes.  In 2003 when you were applying for
5    the jobs of police communication specialist,
6    storeroom clerk and garage clerk and I guess, I don't
7    know, facilities maintenance clerk was among the
8    group, but you applied for that job also in 2003?
9        **A  Correct.**
10       Q  Had anybody at Metro, anyone within the
11   employer company, been provided with any medical
12   information, documents, records, bills, anything
13   other than the discharge papers from Suburban?
14       **A  Who would these people be?**
15       Q  Anybody?
16       **A  Can you rephrase it?**
17       Q  Sure.  When you were discharged from
18   Suburban Hospital in October of 2002 in order to come
19   back to work you had to show some documentation that
20   you'd been treated for someone, correct?
21       **A  Correct.**
22       Q  What you showed your supervisor, I forget

95
1    his name, were the papers that Suburban gave you,
2    your discharge papers when you left the emergency
3    room that day, okay.  For any time during the year of
4    2003 did you produce to the employer any other
5    medical information regarding your condition?
6        **A  Yes.**
7        Q  What was that?
8        **A  Let's see, for insurance purposes, like
9    Aflac, they would want to know why was I ill, what
10   was the illness and then my supervisor would have to
11   sign the paper.**
12       Q  When did that happen?
13       **A  Was October 11, '02, when I was at
14   Suburban Hospital.**
15       Q  Was there any other time during 2003 when
16   you had to provide that information, for example to
17   Aflac?
18       **A  No.**
19       Q  Was there any other time when you provided
20   any other medical information during 2003?
21       **A  No.**
22       Q  And you weren't under active treatment at

96
1    that time for asthma, correct?
2        **A  Correct.**
3        Q  When you applied for the police
4    communications specialist job --
5        **A  Yes.**
6        Q  Were you given an interview?
7        **A  No.**
8        Q  You applied for the facilities maintenance
9    clerk position also, correct?
10       **A  Correct.**
11       MR. BENDER:  You're still talking about
12   2003?
13       MS. CAREY:  Yes.
14       BY MS. CAREY:
15       Q  Were you given an interview for that
16   position?
17       **A  No.**
18       Q  Did you have to take a test for that
19   position?
20       **A  If you did have to take a test, let me
21   see, I wasn't given a test.**
22       Q  So you did not test for that job?

190

1   breath.  That's what I can think of.

2       Q   Do you have any -- do you have any

3   explanation for why your note -- your records only

4   indicate or appear to only indicate headache and pain

5   in neck?

6       A   I have no idea.  I know December the --

7   December '05 I know that I did go to the emergency

8   room and it was shortness of breath.  And I remember a

9   doctor had taken me off of the position for about two

10  weeks in '05.

11      Q   Okay.  You know what, I have to apologize

12  because I was reading from the wrong record.  Is it in

13  December 22nd that you were taken off work for two

14  weeks; is that what your recollection is?

15      A   Yes.

16      Q   By whom?

17      A   I believe it was Dr. Buzzy.

18      Q   And was that doctor in the emergency room or

19  was that the doctor you saw privately?

20      A   In the emergency room.

21      Q   Is that the first time you were held off of

22  work --

191

1       A   No.

2       Q   -- by a physician?

3       A   No.

4       Q   Was that the first time you were held off of

5   work by a physician because of your complaints of

6   light-headedness, dizziness and problems around bus

7   fumes?

8       A   No.  Every time I went to the emergency room

9   about three or four times, they held me off.

10      Q   Well, are you saying a different emergency

11  room than George Washington?

12      A   Same emergency room, GW.

13      Q   So is it your -- are you telling me that in

14  June of '04 and July of '04, that doctors there at the

15  emergency room held you off work each time?

16      A   No, it seemed like in '05, '06, that's when

17  my recollection, when they held me off.

18      Q   So let me reask my question.  July -- I'm

19  sorry, December 22nd of 2005, that's the only visit I

20  have a record of that you made to the George

21  Washington University Hospital Emergency Room.  Is

22  that correct, or are there other records that I don't

192

1   have?

2       A   I think you don't have them all.

3       Q   Do you remember when else you went to the

4   George Washington University Emergency Room between

5   July of 2004 and December of 2005?

6       A   There were several times in '05 --

7       Q   No, no -- I'm sorry, go ahead.  I apologize.

8       A   Let's see.  December '05, I believe the

9   22nd, December the 22nd, I believe I was held off on

10  that day.

11      Q   Listen to my question, though, okay?  You've

12  already told me that.

13          My question is, you just indicated to me

14  that I may not have all the emergency room records.

15  My specific question is, between July 3rd of 2004 when

16  you went to the emergency room at GW and December 22nd

17  of 2005, 17 months later, you made another visit to

18  the George Washington University Emergency Room,

19  correct?

20      A   Correct.

21      Q   Were there any other visits in between those

22  two dates to the GW Emergency Room?

193

1       A   I don't recall.

2           MR. BENDER:  We'll have to check the medical

3   records over there and try to find whatever there is

4   and provide them to you.  I don't have an answer to

5   that.

6       Q   Is it your recollection that on the December

7   22nd, '05 visit, the doctors in the emergency room

8   held you out of work for two weeks?

9       A   Yes.

10      Q   Were you admitted to the hospital during

11  that time?

12      A   Yes.

13      Q   You were admitted, not just --

14      A   One second.  Let me make sure I understand.

15  Was I admitted.  Let me see.  When they -- no.  They

16  held me off.

17      Q   So you were treated and released from the

18  emergency room?

19      A   Correct.

20      Q   Were you -- during this -- the time that --

21  well, let me ask it this way.  At any point during

22  your active employment here from 2000 to 2006, were

**202**

1    Q   I'm just clarifying that that's when it was
2    given to you, in '02.
3        A   Let me see.  When I was over at Southern
4    Avenue, I worked there for two years.  And I would ask
5    for masks.
6        Q   Is that the first location you were at that
7    you asked for a mask?
8        A   All locations.
9        Q   I'm just asking you is that the first
10   location that you were at that you asked for a mask?
11       A   No.
12       Q   Where were you the first time you asked for
13   a mask?
14       A   Let me see, which garage.  I was at
15   Bladensburg and we're supposed to be given masks.  And
16   sometimes they would run out.
17       Q   When you say we're supposed to be given
18   masks, is that --
19       A   All of the cleaners.
20       Q   All of the cleaners.
21           Were you ever denied a mask?
22       A   Yes.

**203**

1    Q   When was that?
2    A   '06.
3    Q   Who denied you that mask?
4    A   Mr. Shelton.
5    Q   Do you know why?
6    A   Because I would fight legally about, you
7    know, trying to get another position.  I would legally
8    talk to Eric Hebron, the employer of relations
9    gentleman.  And so I went to the office and asked for
10   a mask, and he wouldn't give it to me.  So I saw two
11   telephone numbers on the desk, the superintendent, and
12   I called him.
13           And the superintendent said just go back and
14   ask him.  He will call him and tell him to give it to
15   me.  And so I told him that I was afraid to go ask
16   that supervisor for a mask because how that
17   supervisor, you know, have treated me.  So the
18   supervisor came back and he gave me the mask, but he
19   had denied me the mask, and I had to work a long time
20   without the mask, and then he brought it to me.
21       Q   Any other accommodation that you asked for
22   at any time during your employment here besides the

**204**

1    mask and a transfer?
2    A   That's it.
3    Q   That's it, okay.
4        Is Dr. Silver continuing to treat you today?
5    A   Yes.
6    Q   Currently?
7    A   Yes.
8    Q   I noticed you came in with a walker today.
9    A   Yes.
10       Q   What is the medical condition as you
11   understand it that requires you to use a walker?
12       A   I felt that it could help me with the
13   shortness of breath.  My body begins to shake if I
14   stand a long time.  But if I have something that I can
15   prop myself on, it helps just a little bit.
16       Q   Has any doctor prescribed the use of a
17   walker for you?
18       A   No.  I have to speak with a doctor on that.
19       Q   Is it your feeling that your asthma is now
20   under control?
21       A   No.  It has worsened.
22       Q   Have you -- and Dr. Silver is your ongoing

**205**

1    physician for this condition, correct?
2    A   Correct.
3    Q   Have you told Dr. Silver that you feel like
4    it is getting worse?
5    A   I have.
6    Q   What's his response?
7    A   Just continue to use my inhaler.
8    Q   Did he prescribe anything more for you?
9    A   That was it.
10       Q   How often do you see Dr. Silver currently?
11       A   On an as needed basis.
12       Q   And what does that turn out to be on an as
13   needed basis?  How often do you go, say in a year's
14   period?
15       A   Every month.  And if my symptoms, you know,
16   get increasingly worse, then I will call and try to
17   get an appointment, you know, for that.
18       Q   And when you go to see him, does he give you
19   anything additional in terms of attempting to better
20   control your asthma?
21       A   He just said take my time, you know, when I
22   walk.

Case 1:07-cv-00122-ESH    Document 17-11    Filed 06/11/2008    Page 5 of 7
DEPOSITION OF DONNA J. ALSTON, VOLUME II
CONDUCTED ON FRIDAY, NOVEMBER 9, 2007

17 (Pages 206 to 209)

206

1    Q   What do you do now during the day?  What are
2    your normal activities?  You're not working, correct?
3    A   I'm not working.
4    Q   What are your normal activities?
5    A   Well, everything that I do is with great
6    difficulty.  When I do go to the Safeway and shop, I
7    have to lean on the cart.  When I wash my clothes,
8    it's only -- it's only a few steps, you know, into the
9    basement, and I breathe so hard just to get downstairs
10   and just to come back up.  So I will sit down until I
11   get a lot of air in my lungs and then I will proceed.
12   Everything is more planning if I'm -- whatever I need
13   to do, I have to plan it like two or four hours in
14   advance.
15   Q   How about -- do you live alone?
16   A   Yes.
17   Q   What's the size of your home, is it an
18   apartment or is it --
19   A   It's a small single home.
20   Q   How many rooms do you have?
21   A   I have two bedrooms.
22   Q   What's the total number of rooms in your

207

1    house?
2    A   I have two bedrooms.  I have a kitchen.  I
3    have a basement.  I have a living room.  It's a very
4    small home.
5    Q   Two bedrooms, kitchen, basement and living
6    room.  Is there any other room besides bathrooms in
7    your house?
8    A   That's it.
9    Q   Do you clean on a regular basis?
10   A   No.
11   Q   What do you do in lieu of cleaning on a
12   regular basis, anything?
13   A   Everything that I do is with great
14   difficulty.
15   Q   Right.  I understand that.
16   A   Things have to be done.  If I'm hungry.  I
17   have a microwave and I can use the microwave.  But I
18   can't stand long, you know, for the food, you know, to
19   get ready.  So I have a chair in the kitchen.  So I do
20   a lot of things from the chair.
21   Q   Are you saying you're unable to prepare your
22   own food?

208

1    A   No, I can prepare, but I prepare it from the
2    chair.  So I have entrees that I buy and stick in the
3    microwave.
4    Q   With respect to cleaning your apartment, do
5    you have anyone come in to assist you in that regard?
6    A   I don't.  But if a relative come by or a
7    friend come and I say, well, I would like that chair
8    to be over there or that, I might get help like that.
9    Q   Are the bedrooms -- what floors are the
10   bedrooms on?
11   A   Everything is on one level.
12   Q   So you don't have to go -- you need not
13   climb stairs to get to a bedroom.
14   A   Correct.
15   Q   Church, do you attend church on a regular
16   basis?
17   A   I love church, but not on a regular basis.
18   Q   What church do you attend?
19   A   I attend Greater Mount Calvary Holiness
20   Church.
21   Q   Is that here in the city?
22   A   Correct.

209

1    Q   How do you get there?
2    A   I drive.
3    Q   Do they have a bus that picks people up if
4    necessary?
5    A   I know they have a bus that if you get there
6    it will take you across the street, but I'm sure that
7    they would have that particular service as well.
8    Q   Have you ever asked for transportation from
9    your home to church and back?
10   A   I never.
11   Q   But you're able to drive there, correct?
12   A   Correct.
13   Q   What kind of a car do you drive?
14   A   A Pacifica 2005.
15   Q   Do you have any trouble driving?
16   A   I don't have any trouble driving because I'm
17   sitting down.  But by the time I get to my vehicle,
18   I'm slumped over because I have just walked a few
19   feet.
20   Q   Any other -- strike that.
21       Do you sing in the choir?
22   A   I do not.

Case 1:07-cv-00122-ESH    Document 17-11    Filed 06/11/2008    Page 6 of 7
DEPOSITION OF DONNA J. ALSTON - VOLUME II
CONDUCTED ON FRIDAY, NOVEMBER 9, 2007

21 (Pages 222 to 225)

222

1    A    Because I applied for the position, I felt
2 that I could do it.
3    Q    How about janitor, did you apply for a
4 position of janitor in 2005?
5    A    Yes.
6    Q    That's the very last page of that document
7 -- of the exhibit, 21. And did you feel as -- why did
8 you apply for that job?
9    A    Let's see, I felt that I could do the job.
10    Q    What was your understanding of what the job
11 required?
12    A    Kept supplies stocked and kept the building
13 clean.
14    Q    Did you know what types of cleaning
15 materials and other items you'd be working with?
16    A    There would be an array of chemicals for
17 different things.
18    Q    Why did you apply for a job that would
19 expose you to other chemicals given the complaints
20 that you had?
21        MR. BENDER:  In which year was this?
22        MS. CAREY:  In 2005.

223

1    A    You said it was '05?
2    Q    Yes, it's the -- I'm sorry, '02. I
3 apologize. 2002.
4    A    Because I was not diagnosed in '02.
5    Q    Right. That's not my question, though.
6        My question is, given the complaints that
7 you were having, why did you apply for a job as a
8 janitor that would expose you to chemical ingredients
9 that you were being exposed to as a cleaner?
10    A    All right, well, I just can't say it any
11 clearer that the doctor that I had, I wanted her to
12 indicate this in the records how sick I was getting,
13 how I wanted to be placed in another position. So I
14 would apply for different positions that I could do
15 that was in my scope. But me being a bus cleaner, I
16 understand your point, if it's chemicals that's making
17 you sick, why would you choose that position.
18    Q    Correct.
19    A    But I have to keep repeating myself, that
20 the doctor that I had, I kept getting sick, so I would
21 go to this doctor who misdiagnosed me. Dr. Mrkoci was
22 afraid to indicate. So in her documents she said this

224

1 woman wants me to write a letter for her to be
2 transferred to another position. If Dr. Mrkoci would
3 not have misdiagnosed me, I would not have applied for
4 these positions. So I was going beyond the way, you
5 know, how I felt. I felt that I could do the job
6 because if I could do a bus cleaner position and I got
7 sick, but guess what, if she would have caught that in
8 the beginning, it would not have taken all these
9 years, you know, up until '04, '05 where doctors in
10 the emergency room, you know, had taken me off of the
11 position. So after the doctor took me off of the
12 position, when I made it up to Dr. Mrkoci, she was
13 upset that that was documented.
14    Q    Did any doctor tell you that you have had
15 asthma since 2002?
16    A    No. They told me in '05 and in '06.
17    Q    But in '05 when they told you you had
18 asthma, did they say "and you've had it since 2002 and
19 it's been misdiagnosed since then"?
20    A    No.
21    Q    Not even Dr. Silver, correct?
22    A    Let's see, what did Dr. Silver say.

225

1    Q    What all I want to know is, did Dr. Silver
2 tell you that you have asthma and that that asthma
3 existed from 2002 and that it was misdiagnosed from
4 2002 to 2005 when he diagnosed it?
5    A    No, he just was angry because Dr. Mrkoci had
6 misdiagnosed me and for GW Hospital Emergency Room,
7 when they picked it up, then Dr. Mrkoci, she left.
8 She went to the Veterans Hospital.
9    Q    That's not my question. My question only
10 is, did Dr. Silver tell you you have had asthma since
11 2002?
12    A    No.
13    Q    You referred to a Mr. Mills in your last
14 deposition. Do you recall what his first name is?
15    A    I believe it was Milton.
16    Q    You've described in response to a question
17 that I asked about activities, normal daily activities
18 that you have trouble doing, you said you're having
19 difficulty with everything. Is there anything
20 specifically other than what you've already indicated
21 with --
22    A    With crowds, perfume, cleaning.

**226**

Q   What kind of problems do you have with perfume?

A   It's so irritating.

Q   What are the symptoms that you experience? When you say it's irritating, what specifically happens?

A   It causes me to be dizzy. I get off balance. My whole life has been turned upside down. I have to stop about 20 times before I get to the elevator. Anything that I do, my whole body is just out of whack.

Q   But that also happens when you're exposed to perfume, is that what you're -- is that correct?

A   With perfume, on a daily basis, you know, with crowds, a daily basis, if I have to go outside and -- my body begin to shake. If you have to go to the elevator, before you get to the elevator, I stop a lot of times.

Q   Okay. But my question I guess is, what other, either substances or smells or other things, cause you to feel the symptoms that you're describing?

A   Everything. I was recently baptized and I

**227**

felt that I was going to drown. I can't hold my breath long.

Q   So you were baptized, total submersion baptism, total emersion?

A   Correct.

Q   Anything else?

A   It's like different triggers come on.

MR. BENDER: That's what she's interested in, what triggers you.

A   Well, the different triggers that come on, it's every day. Like when the crowds, like when I have to walk to my car, walk up and down the street. I can't stay in the house, you know, all the time. So I walk to my car. And then if it's a crowd of people, I try to look down because I know these triggers are going to come on me. Like with the perfume, I can smell that like a mile.

Q   What happens to you when you smell perfume?

A   I have to sit down. My head becomes so light. My body begin to quiver. And so I'll look down when I'm walking and it's just -- it's just terrible since I've gotten this asthma and my whole --

**228**

like I say, my whole body is out of whack. I can't go to malls. I'm 42 years old. I can't do the things that a woman of my age or younger. And it's just -- it's awful. I have to sit down a lot.

Q   What other -- what are the other triggers, though, that affect you besides perfume? I'm assuming men's cologne is the same thing.

A   Correct. Detergents.

Q   You mean like laundry detergents?

A   Yes.

Q   Dish washing detergents?

A   Yes.

Q   Anything else?

A   Like the air fresheners in the home. Anything can set it off. When I cook, when I put things in the microwave, if I pop popcorn, just everything is an irritant to me. Folk can't even talk loud around me.

Q   What does that -- what happens to you when people talk loudly around you?

A   I like folk to talk at a calm.

Q   I understand that's what you want. I'm

**229**

asking what happens when people don't do that.

A   I have to sit down because, again, I feel like a tremor coming on. I become tense. And my eyes begin to, you know, dot back and forth and they become, you know, larger, you know, than they are normally. And like I said, I do have to shop and get my groceries. But the whole time I'm bent over and I'm gasping for air. I say, "My god, I just walked from the car to the Safeway, what is this."

Q   Any other -- anything else trigger those --

A   Cigarette smoke, if anybody in a crowd is smoking a cigarette.

Q   Anything else?

A   Let's see. I believe that's about it.

Q   I just have a couple more questions that I want to ask you and I'm going to go back a little bit.

After you were disqualified from your position and you were put on Section 124, did you ever speak with Mary Bailey?

A   The name rings a bell. Is that -- she works in human resources?

Q   I believe so.

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-----------------------------------+
DONNA J. ALSTON,                    +   Civil Action

            Plaintiff,             +   No. 1:07CV 00122

        v.                          +

WASHINGTON METROPOLITAN AREA        +

TRANSIT AUTHORITY,                  +

            Defendant.             +

-----------------------------------+
```

Deposition of GINA PERVALL-WALKER, M.D.

Washington, D.C.

Thursday, January 24, 2008

10:11 A.M.

Job No.:  1-120326

Pages 1 - 96

Reported by:  Denice Z. Lombard, CSR

PLAINTIFF'S
EXHIBIT
8

1 and tell me when you -- keep that out, that document

2 out, because I will want to make a copy of it at some

3 point.

4   A   The first encounter was May 5th, 2005.

5   Q   Relative to a pulmonary condition?

6   A   Yes.

7   Q   And on that date what was reported to you?

8   A   What my note says is:

9     "She was referred for medical evaluation

10      after returning to duty on -- or being

11      cleared to return to duty on April 7th,

12      2005 and only working one day.  Went out

13      secondary to quote, unquote, cold symptoms

14      and found to have sensitivity to chemicals

15      at work.

16      "Treated with various medications.

17      Presented with note from emergency room

18      with diagnosis of pneumonia and chronic

19      lung disease.  Is to have further

20      evaluation by pulmonary and cardiology.

21      "Upon return to duty with doctor's note,

22      recommending avoidance of exposure to

1    solvents and bus fumes.  Was not allowed to

2    work as you result.

3    "Has appointment with pulmonology May 11th,

4    2005 and physical the following week.  Has

5    not made an appointment with cardiology or

6    occupational medicine.  Will await results

7    of evaluation by pulmonologist prior

8    further recommendations."

9         MR. BENDER:  All right, I'm going to want a

10 copy of that one too, so you may want to pull that

11 out of the chart.

12        MS. CAREY:  Do you want to mark or at lest

13 on the record indicate which so it's . . .

14        MR. BENDER:  Yeah, why don't we do that.  Do

15 you mind marking these original documents and copying

16 them later, or do you want to copy them now?

17        MS. CAREY:  No, let me copy them now.  It

18 will just take a second.

19        MR. BENDER:  All right, fine.  We can take a

20 break for a moment.

21        (Off the record.)

22        (Whereupon, Plaintiff's Exhibits 5 - 7 were

Page 26

1 came into the office --

2    A    May 19th.

3    Q    May 19th?

4    A    Um-hm.

5    Q    Okay.  Why don't we start with Exhibit 6,

6 then, the notes of May 5, '05.  At that point you

7 said Ms. Alston was complaining of what symptoms?

8    A    Cold symptoms.

9    Q    And what did she tell you about any

10 pulmonary problems?

11    A    That she had gone for an evaluation and she

12 was told that she was sensitive to the chemical

13 exposure at work.

14    Q    So was she working at that point?

15    A    She was not.

16    Q    And what was the purpose of you examining

17 her?

18    A    She was referred because she had been

19 cleared to return to duty April 7th, 2005 but she

20 only worked for a day.  So before the division

21 allowed her to work, they wanted her to come here

22 first.

1    Q    All right.  So did you clear her to return

2 to work on that day?

3    A    I did not.

4    Q    All right.  And so what was your plan of

5 action?

6    A    She was to follow up with the cardiologist

7 and pulmonologist as recommended and provide me with

8 results of those evaluations.

9    Q    And did she?

10    A    She did -- yes, she did.

11    Q    And that was when she came in on May 19th?

12    A    Yes.

13    Q    And tell me what happened on May 19th.

14    A    She presented to return to duty.  She stated

15 she had a cardiology workup which was normal.  She

16 had a note from the pulmonologist which stated she

17 should not return to duty until additional tests

18 completed.  And she was scheduled to have pulmonary

19 function tests done June 3rd, 2005.

20         And I spoke with the pulmonologist for

21 clarification and at that time was told that she was

22 able to return to duty and she did not need to wait

1  for her pulmonary function tests before working.  And

2  I cleared her to return that day.

3     Q    So on May 19, '05 she was cleared to return

4  to duty.

5     A    Yes.

6     Q    And so she did return to duty as far as you

7  know.

8     A    Yes, um-hm.

9     Q    And so Exhibit 7, this Medical Office Return

10 To Duty Notice, that's what you would have filled out

11 to return her to duty?

12    A    Correct.

13    Q    And did she have those additional tests that

14 you were mentioning in June, or do you know?

15    A    She did.  I can't say it was done in June,

16 but she eventually had those tests done.

17    Q    Do you have any documents relating to those

18 tests?

19    A    I do.  Let me see.

20         Yes.

21    Q    What do you have?

22    A    I have a statement received from the

Page 56

1 occupational-medicine report and just disqualify her

2 from being a bus cleaner at that point?

3          MS. CAREY:  Objection; asked and answered.

4          Go ahead, Doctor.

5          THE WITNESS:  I did not give her any more

6 time because she had been given several deadlines and

7 not complied with them, and I didn't feel another

8 extension was warranted.

9 BY MR. BENDER:

10     Q    Okay.  So based on the medical information

11 you had that we've gone over today, you disqualified

12 her medically from being a bus cleaner.  Is that

13 accurate?

14     A    Yes.

15     Q    And tell me what that means when somebody's

16 medically disqualified from being -- from doing a

17 particular job.

18     A    It simply means that they, for some reason,

19 were determined to be unfit for that particular

20 position, and they are referred for an alternate job.

21     Q    Okay.  So based upon all of the exams, the

22 medical records that you reviewed, you felt

Page 57

1 Ms. Alston, as of April 25, 2006, was unfit for

2 performing the duty of -- job of a bus cleaner on a

3 permanent basis; is that correct?

4        MS. CAREY:  I'll note an objection, that's a

5 mischaracterization of this morning's testimony.

6        But go ahead and answer, Doctor, if you can.

7        THE WITNESS:  Correct.

8        MR. BENDER:  So we had marked these other

9 documents in the Hamilton deposition, but we can mark

10 them again here as Exhibit 16 I guess.

11        (Whereupon, Plaintiff's Exhibit 16 was

12 marked for identification and retained by

13 Mr. Bender.)

14 BY MR. BENDER:

15    Q    So Exhibit 16 that we marked is a memo you

16 issued to HRMS Roslyn Rikard -- that's R-o-s-l-y-n,

17 last name R-i-k-a-r-d -- that Donna Alston was

18 medically disqualified effective April 25, 2006 from

19 the position of bus cleaner, correct?

20    A    Yes.

21    Q    And the second page of Exhibit 16, is that

22 the medical displacement form that you signed on

Page 60

1 BY MR. BENDER:

2    Q    After April 25, '06.

3    A    Not that I am aware of.

4    Q    Okay.  Just a few more things that I wanted

5 to mark then, and a few more questions.  Why don't we

6 mark this next -- these next three documents as

7 Exhibit 17, Exhibit 18 and Exhibit 19.

8         (Whereupon, Plaintiff's Exhibits 17 - 19

9 were marked for identification and retained by

10 Mr. Bender.)

11        MR. BENDER:  Before we go to these documents

12 I just wanted to ask one or two other questions about

13 that medical disqualification.

14    Q    Given that you have no other medical

15 documentation after April 25, '06 that Ms. Alston's

16 pulmonary condition has changed in any way, do you

17 believe that Ms. Alston is permanently precluded from

18 performing the job of bus cleaner?

19    A    At this point I believe she still is

20 precluded from performing that job.

21    Q    Right.

22    A    Yes.

Page 61

1    Q    So would you agree with me that from

2 April 25, 2006 Ms. Alston -- to the present date,

3 Ms. Alston has been temporarily disabled from

4 performing the job as a bus cleaner?

5    A    Yes.

6    Q    Okay.  And would you agree with me that

7 since that date Ms. Alston was referred to the

8 human-resources people here at Metro to see if a job

9 transfer or an alternative job could be found for

10 her?

11          MR. BENDER:  Objection to form.

12          Go ahead, Doctor.

13          THE WITNESS:  Yes.

14 BY MR. BENDER:

15    Q    And do you know what efforts were made by

16 the human-resources people to assist Ms. Alston?

17    A    I don't.

18    Q    And do you know if there was any type of

19 reasonable-accommodation panel that ever was convened

20 for Ms. Alston?

21    A    I don't -- I don't recall the panel

22 convening to discuss Ms. Alston.

Page 66

1    A    On the panel as a physician, my role is not

2 to determine if there's a disability.  The panel as a

3 whole determines that.  My role in the panel is more

4 so to interpret medical records.

5    Q    Okay.  So the panel as a whole determines if

6 someone has a disability when there's a medical --

7 when there's an ADA panel convened, correct?

8    A    Yes.

9    Q    And I know that there wasn't medical -- I'm

10 sorry, an ADA panel convened for Ms. Alston's

11 pulmonary condition, but nonetheless what I'd like

12 you to answer is do you believe, based on the facts

13 that you know of Ms. Alston's pulmonary condition,

14 whether she was a quote, unquote, disabled individual

15 under Metro's policy, which defines disability as

16 somebody having "a physical or a mental impairment

17 that substantially limits the condition, manner or

18 duration in which the individual can perform one or

19 more major life activities"?

20         I know that was as long question, but what

21 I'm asking you to respond to is, based upon Metro's

22 definition of disability, do you believe Ms. Alston's

1 pulmonary condition meets it?

2          MS. CAREY:  Objection.  The problem with the

3 question is it's both a question of law and a

4 question asking the doctor to interpret Metro policy.

5          MR. BENDER:  Well, I think it's a fair

6 question for the doctor.

7     Q    Assuming that -- I know there wasn't panel,

8 but assuming that you were asked to comment on that

9 question per Metro's definition of disability, do you

10 believe Ms. Alston is disabled under that definition?

11          MS. CAREY:  Well, based on her incomplete

12 file or based on what?

13          MR. BENDER:  Based on her file, her review

14 of medical records, any physical exam she did of

15 Ms. Alston or any other discussions with any other

16 health care providers regarding Ms. Alston's

17 pulmonary condition.

18          MS. CAREY:  Still I object to the question.

19          You can answer it, Doctor, over my

20 objection.

21          THE WITNESS:  I don't -- I can't say whether

22 or not I feel Ms. Alston has a disability or not,

Page 68

1 because I don't feel that I have enough information

2 to make that judgment.

3 BY MR. BENDER:

4    Q    Okay.  What information are you missing to

5 make that judgment?

6    A    It would be helpful to have the information

7 from the occupational-medicine specialist, it would

8 be helpful to have perhaps the carboxyhemoglobin

9 level.  Those are two things I can think of.

10    Q    Okay.  I want to now go to these last three

11 exhibits, Exhibit 17, Exhibit 18 and Exhibit 19.

12         Okay.  Exhibit 17, we marked an e-mail from

13 someone named Teresa, T-e-r-e-s-a, Bailey,

14 B-a-i-l-e-y, to Rhonda Ferguson dated August 31, '06

15 with a cc to Tracye, Tracye, L. King.  And it has a

16 handwritten note signed by Rhonda at the bottom.

17         Do you see that in front of you, Doctor?

18    A    I do.

19    Q    Is that part of your medical file.  That's

20 where I got it from.

21    A    Yes.

22    Q    Okay.  And I take it, then, Rhonda Ferguson

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DONNA J. ALSTON                          :

       Plaintiff                    :

v.                                       :        Civil No. 07-00122 (ESH)

WASHINGTON METROPOLITAN                  :
AREA TRANSIT AUTHORITY

                              :

       Defendant

### AFFIDAVIT OF DONNA ALSTON

1.    I, Donna Alston give this affidavit upon my personal knowledge and state that I am over 18 years of age and competent to testify herein.

2.    I have suffered from breathing problems since October 11, 2002 when I went to the Emergency room at Suburban hospital. Since 2005 I have had major problems with breathing including shortness of breath, lightheadedness, dizziness and an inability to walk more than a few steps without having shortness of breath and becoming slumped over. I also cannot perform tasks such as grocery shopping, cooking and washing clothes without great difficulty

3.    When I got out of the hospital in 2002, I provided my medical diagnosis to my supervisor and other paperwork from the hospital documenting my illness so I could return to work.

4.    Thereafter, I repeatedly asked for a mask as a reasonable accommodation because of my breathing problems.

5.    In May 2005 I had pneumonia and other breathing problems and was off work. I saw Dr. Pervall Walker at WMATA and requested that I be  given reasonable



PLAINTIFF'S EXHIBIT 9

accommodation by transferring me to a job that did not require exposure to fumes. Despite the fact my doctor said I should avoid fumes, Dr. Pervall Walker sent me back to work full duty on May 19, 2005.

6.    Thereafter on December 22, 2005, I was hospitalized again because of breathing problems at George Washington University. I provided my supervisor again notice of my medical condition and diagnosis in late December of 2005 or early January 2006. At that time I requested reasonable accommodation to transfer me to a vacant position that did not require me to be exposed to fumes.

7.    On January 28, 2006, my doctor, Dr. Silver wrote a note that I should be placed in a work environment free of fumes. I hand delivered this note to WMATA on January 28, 2006 and reiterated my request for a reasonable accommodation that is, a job transfer to a job whereby I would not be exposed to fumes.

8.    I was not sent vacancy announcements for jobs between May 2007 and December 2007. I did not know that a receptionist job was available because I was not sent the vacancy announcement. If I had known of this vacancy, I definitely would have applied for it because I was qualified for it and it was an indoor job that I could physically perform.

I SOLEMNLY SWEAR AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE MATTERS AND FACTS CONTAINED IN THE FOREGOING ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Donna J. Alston

-2-

# M E M O R A N D U M



SUBJECT: Medical Disqualification
**Donna Alston, #001102**

DATE: April 25, 2006

FROM: HRMS/MSBR - Gina C. Pervall, M.D.

TO: HRMS - Roslyn Rikard

Please be advised that **Donna Alston** who was medically disqualified effective **April 25, 2006**, from the position of **Bus Cleaner** has been approved and being referred to the Office of Human Resource Management Services for Section 124 placement.

Should you have further questions, you can reach me at (202) 636-7141.

cc:   BMNT/SATR - Stephen Edwards
      FILE

**Washington
Metropolitan Area
Transit Authority**



PLAINTIFF'S
EXHIBIT
10

T:\Medical Disqualifications\124 Emp\Alston,Donna-JPFORM+MEMO.wpd

# AGREEMENT

between

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

and

## LOCAL UNION 689

of the

## AMALGAMATED TRANSIT UNION AFL-CIO

Effective from May 1, 2004

to

June 30, 2008





PLAINTIFF'S
EXHIBIT
11
tabbies

notice for renegotiation of the affected provision. If the parties are unable to resolve the matter by negotiation within thirty (30) days following such reopening, the dispute on the reopener may be submitted to final and binding arbitration hereunder by either party.

### Sec. 124 - Physically Disqualified Employees

An employee who becomes physically disqualified (other than temporarily) from performing the work of the employee's class shall be offered the first permanent vacancy or new job in the bargaining unit which pays not less than seventy-eight percent (78%) of the rate of the employee's job class for which the employee is qualified. No such job offer shall be made until after other bidding rights under the contract are exhausted. (e.g., Sec. 301, 506).

If such disqualified employee refuses to accept a job offer, which pays ninety-two percent (92%) or more of the employees job class, the employee will not be considered "physically or mentally disabled from performing his/her duties" as defined in Section 8 (c), Appendix A.

If no bargaining unit job is available, the Authority will make every reasonable effort to place such employee in a non-bargaining unit job for which the employee is qualified at the established rate for that job. Further, if no bargaining unit job is available, or if the employee refuses a job offer, the employee will remain on the entitlement list for three (3) years from the date of disability or until retirement if sooner. Such employee may, however, refuse job offers which pay seventy-eight percent (78%) but less than ninety-two percent (92%) without loss of retirement or re-employment rights.

Physically disqualified employees who, as a result of this provision, transfer from one seniority district to another

37

shall carry accrued seniority with them and continue to accrue seniority in the district from which the employee was transferred. It is understood, however, that such total Authority seniority will be exercised for purposes of vacation picks, work selection, etc. but not for bidding out of the job class awarded in accordance with this provision.

Employees accepting employment under this Section shall continue to accrue service for all benefit purposes.

An employee who becomes disqualified from performing the work of his/her job for reasons other than physical shall be given reasonable opportunity to fill any new job or permanent vacancy in the bargaining unit for which the employee is qualified, at the established rate for that job. An employee shall not be considered "disqualified" as that term is used in this paragraph if the employee is or has been dismissed for sufficient cause.

Employees who are declared permanently physically disqualified from performing the work of their classification, but who, if actively employed would hold a bidding right into a classification, within their current seniority district, for which they are qualified, physically and otherwise, will be permitted to exercise that bidding right notwithstanding any other provision of this Agreement to the contrary. Employees who are declared temporarily disqualified from performing the work of their classification will, upon return to work, be permitted to bump into their classification (on the run, shift, location, etc.) in accordance with their seniority.

### Sec. 125 - Wages

(a) The base rates in effect from April 30, 2004 through June 30, 2004 shall be as specified under the terms of the arbitration award rendered on December 17, 2004 by the arbitration panel chaired by Robert O. Harris.

## Section 11 - Term of Agreement

This Agreement, originally effective June 16, 1954, as amended, shall remain in effect through June 30, 2008, and from ~~ar~~ to year thereafter unless change is requested by either of ~~e~~ parties hereto by written notice ninety (90) calendar days ~~ior~~ to June 30, 2008, or ninety (90) calendar days prior to June ~~t~~ of any year thereafter.

## Section 12 - Arbitration of Disputes Concerning Changes

The parties hereto specifically agree that disputes concerning ~~anges~~ in this Health and Welfare Fund Agreement are subject ~~the~~ provisions of Section 106 of the collective bargaining ~~reement~~ of which this Agreement is a part.

Executed this 10th day of July 2006.

~~ASHINGTON~~ METROPOLITAN AREA TRANSIT AUTHORITY

| | |
|---|---|
| Dan Tangherlini, CEO and General Manager | 7/10/06 (Date) |
| D. Richard Froelke, Director of Labor Relations | 7/10/06 (Date) |

~~)CAL~~ 689, AMALGAMATED TRANSIT UNION, AFL-CIO

7/10/06

1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF COLUMBIA

3   ---------------------------------------X

4   DONNA J. ALSTON,                      : ORIGINAL

5                  Plaintiff              :

6          v.                            : Case No.:

7   WASHINGTON METROPOLITAN AREA          : 07-00122 (ESH)

8   TRANSIT AUTHORITY,                    :

9                  Defendant              :

10  ---------------------------------------X

11

12          Deposition of ROSLYN RIKARD

13               Washington, D.C.

14          Friday, January 11, 2008

15                  11:20 a.m.

16  Job No.:  1-118388

17  Pages 1 - 47

18  Reported by:  Lynn Schindler

19

20

21

22


PLAINTIFF'S
EXHIBIT
12

L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Was
Tel: 202.861.3410 • 800.292.4789 • Fax:
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

8

1    A    Employment program specialist.

2    Q    And what does that job entail?

3    A    I am responsible for sitting on the panel

4    for ADA for Metro employees.  I'm responsible for the

5    Family Medical Leave Act.  At that time, I was

6    responsible for unemployment issues.  I am responsible

7    for Section 124 and 16-L of our two contracts for

8    medically disqualified employees, and I'm responsible

9    for the reduction in force.

10    Q    So you're currently the employment program

11    specialist?

12    A    Yes.

13    Q    So you've had that job since 1992 then?

14    A    Yes.

15    Q    And you told me that part of your job is to

16    sit on the panel for the ADA here at Metro; correct?

17    A    Yes.  For our employees.

18    Q    And we went over briefly in Ms. Rikard's

19    deposition that Metro has a policy on the ADA;

20    correct?

21    A    Yes.

22         MS. CAREY:  Ms. Hamilton's deposition.

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

14

1    recruitment, to assist them in finding another

2    position.

3            During the time when Ms. Alston was

4    originally medically disqualified, we were also

5    sending out postings for vacant positions, and I

6    advised the employee that that would be occurring.  I

7    advised my telephone number, my e-mail address.  If

8    they needed to make contact with me, they were told

9    that they should contact me when they're making

10   appointment -- applying for positions and also if they

11   have a change of address, that they needed to notify

12   change of address.

13           That -- their name and address is given to

14   an employment person.  Goes on a list and as the

15   vacancies would come open, they would be sent out to

16   the employees.  It is then the employee's

17   responsibility to apply for those positions that they

18   feel that they are qualified for.

19       Q    So do you recall having any meetings or

20   discussions with Ms. Alston about applying for vacant

21   positions?

22       A    Ms. Alston and I spoke on the phone on

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

15

1    numerous occasions about her applying for positions.

2        Q    Can you recall the specifics of any of those

3    discussions?

4        A    Well, basically, one of the things I said to

5    her was that I should be advised when she applies for

6    positions, because if for some reason she doesn't get

7    a response in a timely manner or the response isn't

8    what she was expecting, I would then have knowledge

9    that she had applied for it, what the position was

10   for, who was handling it, and from my end I could find

11   out what was going on with the job application.  I

12   also advised her, because she indicated that it was

13   her understanding she was to be placed, that there is

14   no placement in this.  These are union positions.

15   They have to apply for them, be qualified for them,

16   have a seniority to hold the job and then be

17   considered for that position.

18       Q    So do you recall then if Ms. Alston

19   contacted you and advised you about jobs -- specific

20   jobs she applied for?

21       A    She did not.

22       Q    And just so I'm clear, this Section 124, the

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

16

1    way it works at Metro is that if an employee is

2    medically disqualified, then they have to apply for a

3    job and compete with whoever else applies for the job

4    and have the proper seniority and be qualified for the

5    job to be selected for the job; is that accurate?

6          A     That's correct.

7          Q     So they're not given any preference if

8    they're medically disqualified under -- as compared to

9    any person who doesn't have a medical issue.  They

10   compete with the world, whoever applies for this job;

11   correct?

12         A     They compete with other 689 employees.  The

13   only -- the only thing different for the 124 people

14   that would be outside of the norm, in particular for

15   Ms. Alston's case, we have station manager positions.

16   A -- in order to be a station manager under normal

17   activity, you have to be in operations.  You have to

18   be a bus operator or a train operator or a station

19   supply runner.  Maintenance employees do not go down

20   into the rail on a normal.  When we have new work, the

21   new work belongs to my office for my 124 people.

22   That's the only time I can take nonops down into

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

20

1      A    Ms. Alston was in my office sometime this

2  summer.  She came to see us about vacancies, and we

3  sat there and we talked, and she had numerous pieces

4  of paper where she was telling us she had applied for

5  certain positions.  She give me a copy of her resume.

6  I went over her resume with her.  Ms. Hamilton and I

7  spoke with her together.  I again said to her when you

8  apply for these positions, you need to let me know.

9  Two or three months after the fact is difficult to

10  find the postings that she applied under, and without

11  the actual posting number, it has initials attached to

12  it, which tells me who the recruiter is for the

13  position.  I know ahead of time, then I can track her

14  applications, and I couldn't do it at that point.

15      Q    But she did tell you a number of positions

16  she had applied for?

17      A    She said numerous positions she applied for.

18      Q    Did she give the specific names of any of

19  them?

20      A    I don't remember.  That was some time ago,

21  and an extremely long meeting that we had with

22  Ms. Alston.

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

21

1     Q    So did you take any action after that

2  meeting to assist her with finding out about the

3  status of her applications?

4     A   No.  She couldn't give us anything

5  definitive on it.  She said there were, you know,

6  various jobs, and she gives me the job title or part

7  of the job title.  It's difficult for me to go back

8  and look for what she's asking for at that point, and

9  this was way after the fact according to the

10  information she was giving us.

11     Q    Why was it difficult to look for the

12  information?  I'm confused.

13     A   I don't have a listing of jobs that's

14  posted.  I'm not in recruitment so I don't keep that

15  information.  In order to look for a position, I need

16  to know what the position is.  I need to know when it

17  was posted.  I need to know the job spec number.

18  There're various things I need to know in order to

19  hunt down whether or not someone applied for a

20  position.  That's outside of the realm of what I do on

21  a daily basis, so I don't -- because I don't do

22  recruitment, I don't keep that kind of information.

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

22

1      Q     So at any point in this meeting or any other

2  meeting, did you sit down with Ms. Alston and make

3  recommendations as to what vacancies she might apply

4  for once you had received her resume?

5      A     No.  I advised her on how to complete her

6  applications, but no.

7      Q     Why didn't you advise her as to what

8  potential jobs she may want to apply for, if you knew

9  her resume and knew what her skills were?

10     A     Okay.  I indicated to you initially that

11 there are two of us who assist the 124 people.

12 There's a person who is from the human resource side

13 who is generalist.  Her name is given to the employees

14 as well as mine.

15     Q     And who is that person?

16     A     At the particular time, I think the name

17 that was on it was Mary Bailey.

18     Q     And so what was Ms. Bailey's duties

19 regarding this Section 124 process?

20     A     Just to assist.  We -- there are no specific

21 duties.  If you look at the contract how it was

22 written, there are no specific duties attached to it.

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

24

1    first, what positions she had ownership to.  Secondly

2    for positions that are outside of her union

3    environment and outside of her area in her union, the

4    competitiveness and what she has to do in order to

5    compete for those positions.  We did sit down and talk

6    with her about that.

7        Q    So I guess my question a few moments ago was

8    why didn't you sit down with her and make

9    recommendations about specific jobs she applied for,

10   and your answer was that Ms. Alston didn't ask you to

11   do that?

12       A    No, she did not.  She didn't make that

13   request.  And according to her, these was positions

14   she had already applied for.  It was not like she had

15   a vacancy list in front of her and said I'm thinking

16   about applying for this and this and this.  And where

17   we could have given her constructive advice on

18   applying for those positions, these are things that

19   she had already done on her own.

20       Q    Right.  So did you ever give her any

21   recommendations for any jobs to apply to?

22       A    No.

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

26

1    Metro.  It's part of the contract.  The program

2    itself, the way it is developed today, is how I put it

3    together, when I became the employment program

4    specialist.  The contract simply states that an

5    employee can be medically disqualified up to three

6    years.

7        Q    So what exactly did you put in place when

8    you became -- came into your job?

9        A    To notify the employee by way of a memo, to

10   find someone on the employment side to be there to

11   assist the employee, to send the postings out to the

12   employee.

13       Q    And do you know if there were any problems

14   in Ms. Alston receiving vacancy announcements?

15       A    Yes.

16       Q    And what do you know about that?

17       A    Not so very long ago, we changed our system

18   on how we put postings out.  The employment people

19   did.  It's now online completely.  Without my knowing,

20   the personnel people stopped sending postings to all

21   of my employees, all the 124 employees.  When I found

22   out because I received several phone calls from the

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

27

1    employees, and then I got calls from the union, I put

2    together a letter or actually a memo and pulled up all

3    the directions for using what is now called the HEARTS

4    system, on how the employee can go online and apply

5    for positions, and I sent that out to the employees to

6    advise them.

7         Q    So how long was there when employees weren't

8    sent vacancy announcements?

9         A    I don't know when it started, because, like

10   I said, the employment people didn't tell me that they

11   had stopped putting postings out, but I would have to

12   say it was around summertime.

13        Q    Of '07?

14        A    Yes.

15        Q    And when did you send letters out about this

16   new HEARTS system?

17        A    Around Christmas.

18        Q    So just recently.

19        A    Yeah, just recently.

20        Q    So there may have been about a six-month

21   period of time when employees weren't getting vacancy

22   announcements?

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

28

1    A    Correct. We were trying to put together a

2  computer program where they could access from their

3  homes. That didn't -- that didn't work. We tried for

4  two months to get that together. So I sent out the

5  notice of the HEARTS system. Other divisions, bus

6  garages that had the computer where the employees

7  could have access to and sent that package out to them

8  during the Christmas holidays.

9    Q    So how does this HEARTS system work?

10    A    I've never really tried it myself, but from

11  my understanding of it, is you have to be online on

12  WMATA's Intranet, which is why they have to go to our

13  facilities in order to use it, and you to have an

14  e-mail address. When you put your payroll number in,

15  it populates your information, and you can then apply

16  for in-house positions, which are different from the

17  ones that we put on the outside. And it stores and

18  saves your information, and the applications from the

19  computer system then go to the specific generalist

20  who's handling the job.

21    Q    Can you recall any other specifics regarding

22  any other meetings you had with Ms. Alston other than

DEPOSITION OF ROSLYN RIKARD
CONDUCTED ON FRIDAY, JANUARY 11, 2008

37

1   me and said they weren't getting the announcements.   I

2   go back in the system, check and see if the address is

3   correct, and once I confirmed that it's the correct

4   address, go back to the employment people, and again,

5   they were not disclosing the fact that they were not

6   sending them out.   They said the address is fine.

7   It's the one that we're using.   But, in fact, my

8   employees were not getting the postings.

9        Q    And just so I'm clear, when you took over in

10  charge of Section 124 in 1992, at that point, the

11  policy of Metro was that people who were medically

12  disqualified under this section had to compete with

13  everyone else for vacant positions; correct?

14       A    That's correct.

15       Q    And that stayed the same to the present

16  date; correct?

17       A    Correct.

18       Q    And do you know why that policy of not

19  giving any priority to medically disqualified people

20  exists here at Metro?

21            MS. CAREY:  Objection.  Go ahead.  If you

22  know.

1A

| ID | Title | Status | Spec Code | Grade Code | Actioned Document | Effective Document | Branch | Office | Division | Grade | Re | F | Used | Used | Action | Name | Date | Date | Date | Init | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03-0039 | ESCALATOR/ELEVATOR TECH AA (PLNT) | Open | 5419 | 03 | 003377 | | | | | U | Re | F | 0069 | No | New | Kelly Johnson | 1/14/2003 | 1/27/2003 | 2/7/2003 | MJB | Mary J. Bailey |
| 03-0068 | CLEANER | Filled | 3582 | 06 | 000551 | Rail Operations | Rail Car Maintenance | Administration | | U | Re | F | 0068 | No | Replace | | 2/8/2003 | 2/11/2003 | 2/27/2003 | FL | Flora Lemonson |
| 03-0106 | EEO & DISPUTE RESOLUTION OFFICER | Filled | 1127 | | 008979 | Administration & Services | Human Resource | Human Resources | | U | Re | F | 0000 | No | Replace | Janet Mudd | 2/14/2003 | 2/24/2003 | 3/7/2003 | CGR | Cassandra G. Reed |
| 03-0122 | GARDENER AA (PLNT) | Withdrawn | 5427 | 08 | 003248 | Operations Support | Plant Maintenance | Facilities & Grounds | | U | Re | F | 0069 | No | New | Gerald Stedace | 2/19/2003 | | | MJB | Mary J. Bailey |
| 03-0135 | PARALEGAL | Filled | 0969 | 05 | 009033 | 1 | | | | 12 | Re | F | 0002 | No | New | | 2/24/2003 | 2/27/2003 | 3/12/2003 | EEJ | Ellen J. Jackson |
| 03-0145 | ASSISTANT SUPERINTENDENT-TRACK/STRUCTURE | Withdrawn | 5321 | 02 | 001519 | Rail Operations | Rail Track & Structure | Special Projects | | 17 | Re | F | 0000 | No | Replace | Homan Cobbs | 2/28/2003 | 3/6/2003 | 3/19/2003 | MJB | Mary J. Bailey |
| 03-0147 | RIDERSHIP INFORMATION SUPERVISOR | Filled | 5727 | 02 | 002226 | 1 | | | | 16 | Re | F | 0000 | No | Replace | Roberts Brooks | 3/3/2003 | 3/10/2003 | 3/21/2003 | EEJ | Ellen E. Jackson |
| 03-0190 | MECHANIC AA (ELECTRICAL - RAIL) | Withdrawn | 4852 | 07 | 008370 | Rail Operations | Rail Car Maintenance | Administration | | U | Re | F | 0069 | No | New | Ronald Parrik | 3/19/2003 | 4/24/2003 | 5/7/2003 | FL | Flora Lemonson |
| 03-0285 | Police Communications Specialist | Filled | 1759 | | 000551 | Independent Offices | Transit Police & Security | Field Services Bureau | | 14 | Re | F | 0002 | No | Replace | | 4/23/2003 | 4/24/2003 | 5/7/2003 | EEJ | Ellen J. Jackson |
| 03-0316 | MAIL CLERK/DRIVER | Cancelled | 1330 | 06 | 008511 | | | | | U | Re | F | 0069 | No | Replace | Rodriguez Wingfield | 5/9/2003 | 5/12/2003 | 5/23/2003 | JJW | Jamal Willard |
| 03-0324 | Office Manager Section | Filled | 2217 | | 000245 | 1 | | | | 10 | Re | F | 0000 | No | Replace | Elvis Spitt | 5/9/2003 | 5/12/2003 | 5/23/2003 | LAW | Lora A. Wright |
| 03-0325 | STOREROOM CLERK A | Filled | 1250 | 06 | 000591 | | | | | U | Re | F | 0069 | No | Replace | Paul Alcala | 5/9/2003 | 5/22/2003 | 6/5/2003 | LAW | Lora A. Wright |





PLAINTIFF'S EXHIBIT
13

| Name | Remarks | Date | Name | Type | Date | Date |
|---|---|---|---|---|---|---|
| Cedric Watson | No Remarks | | | | | |
| Benjamin Baker | Please use class code 1901 for Car Cleaner position. | 2/22/2001 | Samuel Harrison | External | 7/2/2003 | 6/22/2003 |
| Cynthia Myers | No Remarks | 7/6/2001 | Janet Mudd | Promotion | 6/12/2003 | 6/2/2003 |
| Linwood West | No Remarks | 2/6/2003 | | | | |
| Marlena McGuirt | No Remarks | | Nora Yeland | External | 6/27/2003 | 6/2/2003 |
| Anthony Adams | No Remarks | 3/1/2003 | | | | |
| Kenneth Edmonson | No Remarks | 3/1/2003 | Dorothy Walker | External | 6/7/2003 | 7/29/2003 |
| Benjamin Baker | No Remarks | | | | | |
| David Shaw | No Remarks | 5/1/2003 | Kenneth Nickerson | External | 6/4/2003 | 8/4/2003 |
| Ralph Lusher | No Remarks | 5/2/2003 | | | | |
| Pamela Wilkins | No Remarks | 6/31/2003 | Cassandra Bern | Promotion | 6/17/2003 | 6/16/2003 |
| Barbara Strong | Location is Metro Supply Facility & various | 5/31/2003 | Christine Curry | Promotion | 10/21/2003 | 10/26/2003 |



| Req # | Title | Status | # | Gr | Emp # | Division | Department | Section | Code | | Sex | Code2 | | Action | Incumbent | Date1 | Date2 | Date3 | Init | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03-0448 | SUPERVISOR, CUSTODIAL MAINTENANCE | Filled | 5407 | 02 | 001098 | Operations Support | Plant Maintenance | Facilities & Grounds | T2 | Re | F | 0000 | No | Replace | Charles Evans | 6/25/2003 | 6/30/2003 | 7/14/2003 | MJB | Mary J. Bailey |
| 03-0527 | MECHANIC AA (ELECTRICAL-POWER) TECHNICIAN | Filled | 5052 | 07 | 011505 | Rail Operations | Rail Systems Maintenance | Power | U | Ra | F | 0698 | No | New | | 7/11/2003 | 7/24/2003 | 8/9/2003 | FL | Flora Lawson |
| 03-0585 | Cleaner-Shifter | Open | 1901 | | 012245 | Bus Operations | Bus Maintenance | Administration | 06 | Re | F | 0698 | No | New | | 7/31/2003 | 8/7/2003 | 8/20/2003 | LAW | Lora A. Wright |
| 03-0618 | GARAGE CLERK | Filled | 5683 | 06 | 005674 | Bus Operations | Bus Maintenance | Administration | U | Re | F | 0696 | No | Replace | Roy Tiele | 8/13/2003 | 9/11/2003 | 9/24/2003 | LAW | Lora A. Wright |
| 03-0644 | GARAGE CLERK | Filled | 5683 | 06 | 002506 | Bus Operations | Bus Maintenance | Administration | U | Re | F | 0698 | No | Replace | Rhoda Twyman | 8/21/2003 | 9/11/2003 | 9/24/2003 | LAW | Lora A. Wright |
| 03-0660 | COMPENSATION AND BENEFITS ASSISTANT | Cancelled | 1539 | 06 | 012147 | Administrative Services | Materials | Stores 400 | 11 | Re | F | 0000 | No | Replace | Twila Poindexter | 9/4/2003 | 9/9/2003 | 9/19/2003 | JDW | James D. Williams |
| 03-0693 | k | Filled | 6752 | 02 | 011611 | Rail Operations | Rail Transportation | Greenbelt | T5 | Re | F | 0000 | No | New | | 9/5/2003 | 9/15/2003 | 9/26/2003 | WM | Wayne Namow |
| 03-0700 | FACILITIES MAINTENANCE CLERK | Filled | 5331 | 06 | 003092 | Operations Support | Plant Maintenance | Facilities & Grounds | U | Re | F | 0696 | No | Replace | Nora Poteat | 9/9/2003 | 9/25/2003 | 10/8/2003 | MJB | Mary J. Bailey |



| | | | | | | |
|---|---|---|---|---|---|---|
| Linwood West | | 6/29/2003 | Nora Potest | Promotion | 9/10/2003 | 9/22/2003 |
| Donald Harris | Charles Evans has been voluntary reassigned and demoted to the janitor | | Robert Dorsby | Promotion | 7/21/2003 | 7/21/2003 |
| Richard Elliott | INCUMBENT TRANSFERRED | | | | | |
| | Class Code 1901 Trick # SA-1224-C | | | | | |
| Richard Elliott | Mr. Tate will transfer to another location on 8-24-03 Trick No. SA-58 | 8/24/2003 | Christopher Smurff | Promotion | 12/17/2003 | 12/26/2003 |
| Richard Elliott | Ms. Oromons will transfer out of her position on August 10, 2003. Trt | 8/10/2003 | Nana Scledga | Promotion | 12/17/2003 | 12/26/2003 |
| James Davis | No Remarks | 8/6/2003 | | | | |
| Rita Davis | No Remarks | | Marshall Ruffner | Promotion | 1/5/2004 | 1/12/2004 |
| Linwood West | No Remarks | 9/22/2003 | James Randolph | Promotion | 12/16/2003 | 12/21/2003 |



| ID | Job Title | Status | Sol Class | EEO Coord | Position Number | Department | Office | Branch | Grade | Emp | Emp | Union | Exempt | New/Repl | Replaced | Date | Date | Final Date | Selecting Official | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 03-0726 | GARDENER D (PLNT) | Filed | 5431 | 00 | 003235 | Operations Support | Plant Maintenance | Facilities & Grounds | U | Re | F | 0689 | No | Replace | Adelberto Donato | 9/16/2003 | 9/25/2003 | 10/6/2003 | MJB | Mary P. Bak... |
| 03-0745 | MANAGERIAL & PROFESSIONAL TRNG SPEC | Cancelled | 1557 | 02 | 008923 | Administrative Services | Procurement | Procurement | 20 | Re | F | 0000 | No | Replace | Patsy Jones | 9/24/2003 | 9/29/2003 | 10/10/2003 | JDW | James D. Williams |
| 04-0146 | EMPLOYEE ASSISTANCE COUNSELOR | Filed | 1637 | 02 | 002169 | Administrative Services | Materials | Satellite Stores | BO-09 | Re | F | 0000 | No | New | | 2/13/2004 | 3/29/2004 | 4/7/2004 | JDW | James D. Williams |
| 04-0176 | ENCODING MACHINE OPERATOR | Filed | 3609 | 07 | 000813 | | | | 06 | Re | F | 0002 | No | New | | 3/3/2004 | 3/6/2004 | 3/19/2004 | EEJ | Elizabeth E. Jackson |
| 04-0205 | SAFETY OFFICER | Filed | 6069 | 02 | 002311 | Independent Offices | Safety | Safety Officer | 22 | Re | F | 0000 | No | New | | 3/10/2004 | 3/12/2004 | 3/26/2004 | CGR | Casandra G. Reid |
| 04-0316 | EMPLOYMENT ASSISTANCE SPECIALIST | Filed | 1541 | 02 | 002161 | Administrative Services | Materials | Satellite Stores | BO-09 | Re | F | 0000 | No | New | | 4/22/2004 | 10/28/2004 | 11/10/2004 | JDW | James D. Williams |
| 04-0444 | SHIFT SUPERVISOR, COMMUNICATION & SYS MNT | Filed | 5105 | 02 | 000244 | Rail Operations | Rail Systems Maintenance | Communications | T5 | Re | F | 0000 | No | New | | 8/14/2004 | 11/12/2004 | 11/26/2004 | SM | Sofia Meco |
| 04-0431 | SUPERVISOR, CAR MAINTENANCE | Open | 4814 | 02 | 008757 | Rail Operations | Rail Car Maintenance | Administration | T6 | Re | F | 0000 | No | New | | 7/30/2004 | 9/9/2004 | 9/22/2004 | FL | Ford Lane |
| 04-0358 | Loc Engineer | Filed | 1759 | | 000856 | Independent Offices | Transit Police & Security | Field Services Bureau | 18 | Re | F | 0002 | No | Replace | Carol Scanner | 8/5/2004 | 8/25/2004 | 9/9/2004 | CGR | Casandra G. Reid |



| | | | | | | | Start Date |
|---|---|---|---|---|---|---|---|
| Linwood West | Adalberto Donato has been promoted to Supervisor, Landscape MNTN. Eff | 9/22/2003 | Ronnie Norris | Promotion | 10/27/2003 | | 11/3/2003 |
| Stanley Jones | Please do not post internally. The advertisement needs to state, in ad | 10/9/2003 | | | | | |
| Robin Henry | No Remarks | | Nicole Barber | External | 5/20/2004 | | 9/28/2004 |
| Angel Cabrera | No Remarks | | Staff Washington | Promotion | 10/1/2004 | | 9/20/2004 |
| Fred Goodine | No Remarks | | Tracy Glover | External | 7/27/2004 | | 7/28/2004 |
| Robin Henry | No Remarks | | Linda Jones | External | 5/11/2005 | | 5/9/1952 |
| Alan Nabb | CONVERTED POSITION | | Winifred Northington | External | 3/5/2005 | | 3/14/2005 |
| William Pavlus | No Remarks | | | | | | |
| David Shaw | No Remarks | 8/2/2004 | Jay Semen | External | 12/6/2004 | | 12/6/2004 |



| Number | Title | Status | Job Code | Sub Code | Number | Dept | Department | Section | Sub Section | Emp Type | Emp Type | | Spec | New/Replace | Selected | Date | Date | Date | Date | Initials | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 04-0672 | Field Supervisor | Filled | 8345 | 02 | 001132 | Operations Support | Planning | Schedules & Traffic | 11 | Re | F | 0000 | No | Replace | Jose Ortiz | 5/24/2004 | 9/7/2004 | 9/20/2004 | CGR | | Cassandra G. Reed |
| 04-0672A | Field Supervisor | Open | 8345 | 02 | 001132 | | Planning | Schedules & Traffic | 11 | Re | F | 0000 | No | Replace | Jose Ortiz | 5/24/2004 | 9/7/2004 | 9/20/2004 | CGR | | Cassandra G. Reed |
| 04-0673 | Manager, Crime Analyst/Police Records | Filled | 1710 | | 000555 | Independent Offices | Transit Police & Security Bureau | Field Services Bureau | U | Re | F | 0000 | No | Replace | Edwin Watson | 8/25/2004 | 8/26/2004 | 9/9/2004 | CGR | | Cassandra G. Reed |
| 04-0674 | RAIL DIVISION CLERK | Filled | 4872 | 06 | 007013 | Rail Operations | Rail Transportation | Administration | U | Re | F | 0689 | No | New | | 8/26/2004 | | | MJB | | Mary J. Bailey |
| 04-0561 | MAIL CLERK/DRIVER | Filled | 1320 | 08 | 008513 | | Rail Transportation | Administration | U | Re | F | 0689 | No | Replace | Felix Laboy | 9/22/2004 | 9/27/2004 | 10/5/2004 | JDW | | James D. Williams |
| 04-0775 | SENIOR COMPILER | Withdrawn | 8335 | 06 | 003461 | Operations Support | Planning | Administration | U | Re | F | 0689 | No | Replace | Garnice Martin | 10/19/2004 | 10/21/2004 | 11/2/2004 | CGR | | Cassandra G. Reed |
| 04-0867 | SUPERVISOR, CAR SERVICE & INSPECTION | Filled | 4824 | 02 | 001321 | Rail Operations | Rail Car Maintenance | Administration | T8 | Re | F | 0000 | No | New | | 10/22/2004 | 11/29/2004 | 12/9/2004 | SM | | Sofia Meco |
| 04-0900 | CLEANER | Open | 3362 | 08 | 006862 | Rail Operations | Rail Car Maintenance | Administration | U | Re | F | 0680 | No | New | | 10/22/2004 | 11/29/2004 | 12/9/2004 | LAW | | Lura A. Wright |
| 04-0941 | MANAGER, SPECIAL PROJECTS-PARATRANSIT MNTN | Filled | 5822 | 02 | 011808 | | | | L5-11 | Re | F | 0000 | No | New | | 11/2/2004 | 11/12/2004 | 11/25/2004 | TS | | Tracy Social |
| 04-0957 | WORKERS' COMPENSATION SPECIALIST | Filled | 1027 | 02 | 000827 | Independent Offices | Safety | Safety Officer | 16 | Re | F | 0000 | No | Replace | Nsemners Abba | 11/0/2004 | | | CGR | | Cassandra G. Reed |
| 04-0962 | PUBLIC RELATIONS OFFICER | Filled | 0509 | 02 | 000706 | External Affairs | Customer Service | Administration | 13 | Re | F | 0000 | No | New | | 11/8/2004 | 11/12/2004 | 11/24/2004 | KJ | | Kelsha J. Jones |
| 04-1019 | BUS COMMUNICATIONS SPECIALIST | Filled | 6450 | 02 | 012172 | Bus Operations | Bus Transportation | Administration | T5 | Re | F | 0002 | No | New | | 11/29/2004 | 12/13/2004 | 12/24/2004 | VT | | Vickie Timbertaki |
| 04-0674 | Garage Mechanic D | Open | 1614 | 07 | 009556 | Bus Operations | Bus Maintenance | Administration | U | | F | 0689 | No | New | | 8/10/2004 | | | | | Lora Wright |



| Name | Special Remarks | Sel Date | Name | Action | Effective | Sel Date/Oct |
|---|---|---|---|---|---|---|
| Ronald Saunders | | 8/1/2004 | Zorian Baptiste | Promotion | 2/23/2005 | 10/31/2004 |
| Ronald Saunders | No Remarks | 8/1/2004 | | | | |
| David Shaw | No Remarks | 9/3/2004 | Edwin Wallace | Re-Hire | 11/10/2004 | 11/1/2004 |
| Rita Davis | No Remarks | | Donald Rush | Promotion | 9/24/2004 | 9/25/2004 |
| James Maykris | Applicant must possess a valid MD, DC or VA. | 11/1/2004 | Christopher Barnett | Promotion | 11/24/2004 | 11/20/2004 |
| James Hughes | Withdrawn on 11/6/04 | 11/7/2004 | | | | |
| William Paulus | CLASS CODE #4024 | | Daniel White | Transfer | 4/21/2005 | 3/21/2005 |
| William Paulus | GMNT POSTING #2004-082, CLASS CODE #3092 | | | | | |
| Randall Groomen | No Remarks | | Paul Paterson | Promotion | 1/21/2005 | 2/7/2005 |
| Fred Goodine | No Remarks | 11/19/2004 | Maleah Irby | External | 1/25/2005 | 1/24/2005 |
| Raymond Feldmann | No Remarks | | Candiess Smith | External | 2/15/2005 | 2/22/2005 |
| Tangee Coble | No Remarks | | Carolyn White | Promotion | 7/13/2005 | 3/21/2005 |
| Richard Elliot | No Remarks | | | | | |



5A

| Req No. | Title | Status | | | | Operations Support | Planning | Administration | | | | | Replace / New | Tina Smith-Jones | | | | Initials | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-0353 | COMPILER | Filled | 6336 | 06 | 003459 | | | Administration | U | | 0036 | No | Replace | Tina Smith-Jones | 4/5/2005 | | | CGR | Cassandra G. Reed |
| 05-0509A | ASST SUPT CONTROL CENTER OPERATIONS | Open | 6734 | 02 | 011612 | | Rail Transport Planning | Administration | T8 | | 0000 | No | New | | 5/25/2005 | | | VT | Vickie Timberlake |
| 05-0663 | Technical Skills Training Instructor | Open | 3717 | | 001150 | Operations Support | | Administration | T5 | FT | 0002 | No | New | | 6/23/2005 | | | CGR | Cassandra G. Reed |
| 05-07008 | RAIL OPERATIONS SUPERVISOR | Open | 6749 | 02 | 016159 | | Rail Transport Planning | Administration | T3 | | 0000 | No | New | | 1/3/2006 | | | IAJB | Mary J. Bailey |
| 05-0701 | CENTRAL CONTROL SUPERVISOR | Open | 6750 | 02 | 001383 | Rail Operations | | Administration | T5 | | 0002 | No | New | | 7/7/2005 | | | VT | Vickie Timberlake |
| 05-0900 | CLEANER | Open | 3882 | 06 | 000089 | | | Operations Support | U | FT | 0009 | No | New | | 5/31/2005 | | | SM | Sofia Maco |
| 05-0954 | Job Access Information Assistant | Filled | 3751 | | 009034 | | | Operations Support | 10 | | 0000 | No | New | | 9/12/2005 | | | IAJB | Mary J. Bailey |
| 05-1008 | SECRETARY | Filled | 9994 | 04 | 008816 | 1 | | | 12 | FT | 0000 | No | New | | 9/20/2005 | 9/20/2005 | | SWG | Steve W. Godbey |
| 05-1095 | STOREROOM CLERK A | Filled | 1290 | 06 | 006577 | 1 | | | U | FT | 0069 | No | New | | 10/5/2005 | 12/19/2005 | 1/2/2006 | LAW | Lora A. Wright |
| 05-1090 | Administrative Assistant II | Filled | 5952 | | 009456 | 1 | | | | FT | 0000 | No | New | | 10/18/2005 | 10/20/2005 | 11/2/2005 | LAW | Lora A. Wright |
| 06-1127 | MEDICAL SERVICES ASSISTANT | Withdrawn | 1621 | 06 | 002163 | | | | 06 | FT | 0000 | No | New | | 10/27/2005 | 11/21/2005 | 11/22/2005 | MNC | Marie Clarose |
| 06-1173 | QUALITY ASSURANCE TECHNICIAN | Filled | 2141 | 02 | 002112 | 1 | | | U | FT | 0002 | No | New | | 11/9/2005 | 12/19/2005 | 10/2/2005 | LAW | Lora A. Wright |
| 05-1216 | Special Police Series | Filled | 8733 | | 000050 | | | | | FT | 2246 | No | Replace | Francine Bowie Williams | 11/21/2005 | | | CGR | Cassandra G. Reed |
| 05-1262 | Systems Training Instructor | Open | 3713 | 02 | 008223 | | | | T5 | FT | 0002 | Na | New | | 12/15/2005 | | | IAJB | Mary J. Bailey |





| Name | Remarks | | Name | Type | | |
|---|---|---|---|---|---|---|
| James Hughes | No Remarks | 4/5/2005 | Wilbur McDougal | Promotion | 6/30/2005 | 5/9/2005 |
| Rita Davis | No Remarks | | | | | |
| James Hughes | No Remarks | | | | | |
| Rita Davis | No Remarks | | | | | |
| Rita Davis William Paulos | No Remarks Fill as Car Cleaner, CC-3862, West Falls Church, 2:00pm - 10:30pm, RH | | | | | |
| Glenn Mills | | | Keisha White | External | 1/20/2006 | 1/17/2006 |
| Murray Bond | No Remarks | | Sandra Adams-Morely | External | 3/24/2006 | 3/27/2006 |
| Barbara Strong | see 05-1053, | | Yolanda Gee | Promotion | 5/28/2006 | 5/9/2006 |
| Gregory Boykin | The actual title for this position is: Administrative Assistant II (B | | Shelia Kelly | External | 1/23/2006 | 1/23/2006 |
| Robin Henry | No Remarks | | | | | |
| Barbara Strong | No Remarks | | Deleon Santiago | Promotion | 9/11/2006 | 7/2/2006 |
| David Shaw | No Remarks | 11/30/2005 | Ellis Claude | | 3/15/2006 | 2/13/2006 |
| James Hughes | Recruiter to be C. Estevos | | | | | |



| ID | Title | Status | No | | | | | | | | | | | | Action | Name | Date | Date | Code | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 05-1299 | SUPERVISOR, METRICAL REVENUE SERVICES | Withdrawn | 02 | 3598 | | | 000796 | | T4 | FT | | 0000 | No | Replace | John Stokes? | 12/16/2005 | | CGR | Cassandra G. Reed |
| 05-1301 | WARRANTY MANAGEMENT SPECIALIST | Open | 02 | 5624 | | | 000657 | Workforce Diversity 1 Admin | 18 | FT | | 0002 | No | Replace | Joseph Cassell Jr | 12/21/2005 | 12/29/2005 | LAW | Lora A. Wright |
| 06-0337 | Employee Assistance Counselor | Filled | 06 | 1470 | | | 022169 | | BO-10 | Ra | F | 0000 | No | Replace | Nicole Barber | 4/10/2006 | 5/2/2006 | LAW | Lora A. Wright |
| 06-0372 | MANAGEMENT ASSISTANT | Filled | 06 | 5963 | | 1 | 009679 | | 15 | FT | | 0002 | No | Replace | Hope Mizelle | 4/21/2006 | | OP | Donne Pak |
| 06-0395 | | Filled | | 567302 | | 1 | 009443 | | | | | 0089 | No | Replace | Horace Jones | 5/1/2006 | | MJB | Mary J. Bailey |
| 06-0576 | SIGN FABRICATOR D (PLNT) | Open | 07 | 5367 | | | 017139 | | U | Ra | F | 0089 | No | New | | 7/10/2006 | | MJB | Mary J. Bailey |
| 06-1305 | DIRECTOR, OFFICE OF CIVIL RIGHTS | Open | 01 | 0148 | | | 002181 | | 26 | FT | | 0000 | No | Replace | Teresa Bailey | 12/12/2006 | 12/29/2006 | CGR | Cassandra G. Reed |
| 06-1316 | FACILITIES MAINTENANCE CLERK | Filled | 06 | 5331 | | 1 | 003002 | | U | | | 0089 | No | New | | 12/15/2006 | | MJB | Mary J. Bailey |
| 06-1332 | | Filled | | 6336C | | 1 | 003459 | | | | | 0089 | No | New | | 12/29/2006 | | DM | Donne Michel |
| 07-0011A | COMPUTER OPERATOR SERIES | Active | 03 | 6549 | | | 002002 | | 10 | FT | | 0002 | No | Replace | Richard Foster | 1/2/2007 | | T6 | Tracy Scott |
| 07-0022A | MAINTENANCE SUPERVISOR-ESCALATE/ELEVAT | Open | 02 | 5513 | | | 001107 | | T5 | Ra | F | 0000 | No | Replace | Anthony Mendes | 1/5/2007 | | DM | Donne Michel |
| 07-0079 | Board Secretary | Open | | 0031 | | | 000716 | | | FT | | 0000 | No | Replace | Debra Johnson | 1/23/2007 | 2/7/2007 | LAW | Lora A. Wright |
| 07-0099A | SUPERVISOR, CAR CLEANING | Open | 02 | 4846 | | | 001365 | | T2 | FT | | 0000 | No | Replace | Michelle Roberts-Taylor | 1/23/2007 | 1/25/2007 | SM | Sofia Maceo |
| 07-0083 | SUPERVISOR, MATERIAL (CONTROL) | Open | 02 | 5640 | | | 001562 | | 16 | FT | | 0000 | No | New | | 1/29/2007 | | SM | Sofia Maceo |



| Name | Remarks | Date | Name | Type | Date | Date |
|---|---|---|---|---|---|---|
| Angel Cabrera | Work location is the RCF (Alexandria) | 1/31/2006 | | | | |
| Richard Elliott | Post internal only. | 1/1/2006 | | | | |
| | No Remarks | 5/12/2006 | Alda Arroyo | External | 8/21/2006 | 7/24/2006 |
| Joyce Jones | No Remarks | 6/1/2006 | Michelle Bellamy | Promotion | 2/8/2007 | 1/8/2007 |
| Linwood West | No Remarks | 5/1/2005 | David Lewis | Promotion | 6/26/2006 | 6/25/2006 |
| Bruce Wallace | No Remarks | | | | | |
| Teresa Bailey | T. Bailey asked T. King to modalition and prepare the posting for thi | 1/27/2007 | | | | |
| Paul Gilkum Jr | This position is located in Office Code 31550 – EDMT. | | Jody Grey | Promotion | 3/15/2007 | 3/15/2007 |
| Robert Orr | Hiring Manager Lynda Kinder on x 1964 | | Jacqueline Clark | Promotion | 3/1/2007 | 2/5/2007 |
| | Shift is midnight with days off Tue/Wed must be able to rotate through | 12/11/2006 | | | | |
| Cedric Watson | Hiring Manager, Dwyte Brown | 1/22/2007 | | | | |
| Debra Johnson | Post internally and externally | 2/19/2007 | | | | |
| Eugene Garzone | Fill as Supervisor, Car Cleaning, L505, CC-6750, various locations, va | 1/20/2007 | | | | |
| Emerson Watts Jr | Converted position | | | | | |



7A

| Position | Status | No. | | Cost Center | Dept | Branch | Empl Type | Empl Status | Exempt | New/Replace | Candidate | Date | Date | Date | Cat. | Name |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Contract Administrator | Open | 1041 | 02 | 002095 | | 22 | FT | 0002 | No | New | | 2/2/2007 | 2/6/2007 | 2/22/2007 | CGR | Cassandra G. Reed |
| Accounting Supervisor | PAR Received | 2990 | 06 | 000726 | | BO-12 | FT | 0000 | No | New | | 2/9/2007 | | | CGR | Cassandra G. Reed |
| | Open | 1320C | | 002257 | | | FT | 0689 | No | Replace | Rita Teneyck | 2/13/2007 | | | TS | Tracie Boost |
| Labor Relations Officer | Open | 1133 | | 000769 | | | FT | 0000 | No | Replace | Cromer David | 2/23/2007 | 3/1/2007 | 3/14/2007 | LAW | Lora A Wright |
| | Open | 8335C | | 003473 | | | FT | 0889 | No | Replace | Dilworth Thomas | 2/28/2007 | | | DM | Denal Michel |
| SHIFT SUPERVISOR, CAR MAINTENANCE | Open | 4615 | 02 | 011452 | | T5 | FT | 0000 | No | New | | 3/12/2007 | | | SM | Sofia Macco |
| | Open | 4457 | | 000159 | | | FT | 0000 | No | Replace | Wilmer Enpard | 3/15/2007 | | | CGR | Cassandra G. Reed |
| SENIOR RAIL OPERATIONS SUPERVISOR | Open | 6748 | 02 | 004982 | | T4 | FT | 0000 | No | New | | 3/20/2007 | | | SM | Sofia Macco |
| RAIL OPERATIONS SUPERVISOR | Open | 6749 | 02 | 016160 | | T3 | FT | 0000 | No | Replace | Orlando King | 3/20/2007 | | | DM | Denal Michel |
| OFFICE ADMINISTRATOR | Active | 2236 | | 017055 | Independent Offices | General Manager / General Manager | FT | 0000 | No | New | | 3/26/2007 | 3/26/2007 | 4/9/2007 | LAW | Lora A Wright |

7B

| Name | Remarks | Date |
|---|---|---|
| Barbara Strong | No Remarks | |
| Karla Sumpter | Please ensure that the posting states Payroll Supervisor, not Account | |
| Gregory Boykin | Internal posting only | 3/16/2007 |
| Donald Fineike, Jr | No Remarks | 1/2/1900 |
| Robert Orr | Please contact Hiring Manager, Linda Kinder, x1964 | 3/30/2007 |
| Eugene Garcone | Fill as Shift Supv, Car Maintenance, various locations, various shifts | |
| Fred Goodine | No Remarks | 4/1/2007 |
| Rita Davis | No Remarks | |
| Rita Davis | No Remarks | 2/17/2007 |
| Gerald Francis | No Remarks | |

# MINTZ & ASSOCIATES

## VOCATIONAL CONSULTING

TO:
Bruce M. Bender, Esquire
Van Grack, Axelson, Williamowsky, Bender & Fishman
401 N. Washington Avenue, Suite 550
Rockville, Maryland 20850

DATE: 8/31/07
CASE: Alston v. WMATA

FROM: Lee R. Mintz, M.Ed., CRC, CDMS, CCM, ABDA

### EMPLOYABILITY ASSESSMENT

The case of Diane Alston v. WMATA was referred to Mintz & Associates to perform Vocational
Assessment in order to determine the employability and earning capacity of Ms. Diane Alston.
This Consultant met with Ms. Alston on 7/17/07 .

## MEDICAL

Ms. Alston originally began working as a Bus Cleaner for Washington Metropolitan Area Transit
Authority (WMATA) in 2000 with responsibilities at her first assignment in Montgomery County of
cleaning the interior and exterior of buses. Shortly thereafter she was assigned to the District of
Columbia where she was responsible for cleaning the interior of two buses including windows,
ceilings, rails and graffiti. She mainly worked in a garage setting and experienced recurrent episodes of
becoming ill from exhaust fumes. Per medical records and Ms. Alston's account she developed
shortness of breath and dizziness. She has been seen at Suburban and George Washington University
Emergency Rooms on several occasions with complaints of chest discomfort, wheezing, dizziness
and/or difficulty breathing. A pulmonary function test of 2/10/06 revealed "This pattern is most
consistent with a combined mild obstructive and mild restrictive ventilatory defect."

A letter written on 1/28/06, by Dr. Paul A. Silver, M.D., F.A.C.P., Associate Professor of Medicine,
Assistant Director, Division of General Internal Medicine of The George Washington University
Medical Faculty Associates wrote in reference to Ms. Alston, "The patient is suffering from a
pulmonary condition which is exacerbated by fumes. She needs to be placed in a work environment
which is free from noxious fumes." On 5/3/06 Dr. Silver wrote, "I am writing to inform you that the
above named patient is suffering from a pulmonary condition secondary to fume exposure in her work
place. She must be placed in an area free of toxic fumes, cleaning chemicals, etc." On 5/26/06 Dr.
Silver wrote, "The above named patient can only work in an environment where there are no noxious
fumes. This would include fumes from cleaning materials and vehicle exhaust."





PLAINTIFF'S
EXHIBIT
14

-3-

## SOCIAL/EDUCATIONAL/VOCATIONAL

Ms. Alston is 42 years old (DOB 6/21/65). She is single and lives in Washington D.C. She reports she has no criminal record, has excellent credit, a clear driving licenses and has transportation. She enjoys solving problems, helping people to get their credit together and working as and activist for the elderly and her church.

Ms. Alston is a 1984 graduate of Anacostia High School's academic program. She attended University of D.C. for one year, attended Howard University's ROTC program, completed a B.S. degree at a non-accredited college. She attends Southeastern University and earned an A.A. Degree in Business in 2003 and has only two courses left to earn her Bachelor's Degree in Business Management. Per Ms. Alston she has earned mainly A's and B's and occasional C's. She enrolled in a funded program MOUSE through (Opportunities Industrialized Center) OIC which teaches Microsoft Office Suite including Microsoft Word, Excel, Access, PowerPoint and a knowledge of and proficiency in standard office practices. She indicates she types approximately 30 wpm. Ms. Alston has taken a public speaking class and some gospel singing courses.

In addition to her employment with WMATA, Ms. Alston was employed as a Day Care Worker at Peace Baptist and United Planning Organization from 1997-1999. She reports she held a Clerk Typist position at Walter Reed in the 1990's and Ms. Alston was employed as a Secretary at the V.A. Hospital in 1993, with responsibilities for typing filing and answering phones. Additionally she held a Clerk Typist position at Walter Reed in the 1990's through a work study program. She was a Counselor Aide for drug offenders in 1990 though a Howard University summer program. In the summer of 1970 she worked in a clerical position during the summer.

Ms. Alston has been very active in community organizations and from 1990-1999 assisting citizens with health awareness and insurance issues and as well as representing the community in public forums. Ms. Alston has volunteered as a Staff Writer for Southwestern Community Newspaper in D.C., interviewing citizens and researching information for articles.

## TESTING

In order to assess Ms. Alston's academic and intellectual competencies, a battery of tests was administered. The results will be used to assist in judging ability to adapt to a new vocation, use transferable skills in a related vocation, or undergo training to learn a new skill.

-2-

In an Independent Medical Evaluation of Ms. Alston performed by Dr. Jeff B. Hales of Pulmonary and Medical Associates his review of prior medical history "includes morbid obesity, laparoscopic surgery for gynecologic issues, asthma since at least February of 2005, and one episode of carbon monoxide poisoning when her CO2 level measured 1.8%, the normal range for nonsmokers being less than 1.5%. Dr. Hales noted that Ms. Alston was a lifelong nonsmoker, has had no pets and had no evidence of lung problems in her family's medical history. He wrote that "Pulmonary function tests reveal a combined obstructive and restrictive defect with a diminished gas transfer and significant improvement to bronchodilators." "A polysomnography report dated 10/18/06 from George Washington University Sleep Disorder Center reveals mild obstructive sleep apnea with an AHI index of 10.8 events per hour, and moderate oxygen desaturation. This was markedly worse in REM sleep."

Dr. Hales assessed the following in response to questions put before him by Bruce M. Bender, Esquire; that Ms. Alston has asthma and mild obstructive sleep apnea, that based on her history there are several irritating chemicals that cause exacerbation of her symptoms and worsening of her asthma and he would recommend that she avoid working in enclosed spaces without proper ventilation and in particular avoid working as a bus cleaner.

In response to Mr. Bender's question about being substantially limited in the majority of her life activity in regards to breathing Dr. Hales stated "I believe Ms. Alston does indeed have some pulmonary limitations. This is combined from her obesity and her asthma." Mr. Bender asks whether exposure to bus fumes from her job as a bus cleaner over the years caused permanent pulmonary condition and/or sleep apnea to a reasonable degree of medical certainty to which Dr. Hales replied in reference to Ms. Alston's pulmonary condition, "I believe the bus fumes acted as an airway irritant and exacerbated an underlying predisposed condition of asthma. Recurrent exposure over time to airway irritants can cause persistent inflammation and damage, and I would recommend she avoid this in the future." When asked for a permanent partial disability rating per AMA Guidelines Fourth Edition regarding her pulmonary condition Dr. Alston stated "I believe that Ms. Alston is class II approximately 25% impairment of the whole person based on her diminished vital capacity of 69% predicted, which is only partially reversible with bronchodilators. She also has a mildly diminished diffusing capacity."

Ms. Alston reported to this Consultant that she was recently hospitalized from 7/2-7/4/07. She continues to experience difficulty breathing and limited ability to walk and go up steps or any strenuous activity because of shortness of breath. She reports she must sleep in an elevated position and that her asthmatic condition makes her urinate more frequently. Ms. Alston relays that she has recently gained additional weight due to stress and medications which is now Albuterol Inhaler 3 time daily.

-4-

## Pictorial Reasoning Test

Ms. Alston demonstrated a Low Average nonverbal reasoning ability. This test measures general learning ability independent of language and reading skills and provides an assessment of an individual's conceptual and reasoning ability as well as the ability to discover interrelating principles.

## Wide Range Achievement Test III

Ms. Alston's word reading, spelling and arithmetic levels were tested. Ms. Alston's word reading was rated at the High School level, which would place her in the 30th percentile of people in that age range. Ms. Alston's spelling was rated at the High School grade level, which would place her in the 39th percentile of people in that age range. Her arithmetic score was rated at the 5th grade level, which would place her in the 5th percentile of people in that age range. Ms. Alston was able to complete simple addition, subtraction, multiplication, division and fractions, however she has taken and passed accounting courses and as well as other requiring these skills.

## LABOR MARKET SURVEY

Aside from her consistent work history working as a Bus Cleaner for WMATA, Ms. Alston has had other work experience, much of a clerical nature as well as a daycare worker in the late 1990's. She types approximately 30 wpm and is currently learning Microsoft Word at OIC.

## Clerical

Recently advertised positions for which Ms. Alston might qualify would include:

| Howard University | Front Desk Receptionist | $8.00/hour |
| Trak Companies | Receptionist | $12.00/hour |
| Level One Personnel | Medical Receptionist | $11-13.00/hour |
| Field School | Receptionist | $10.00/hour |
| Ronco Consulting | Office Clerk | $10.00/hour |
| Carlos Rosario Public Charter School | Office Assistant | $11.00/hour |
| American University | Office Assistant | $8-10.00/hour |

Additional consideration was given for Sedentary to Light level Cashiering positions:

| CVS | Cashier | $8.00/hour |
| Natural Food Café | Cashier | $9-11.00/hour |
| Firehook Bakery | Cashier | $8-10.00/hour |

-5-

## Washington Metropolitan Area Transit Authority Jobs

As stated earlier in this report there was a letter dated 5/3/06, from Dr. Paul A. Silver to Mr. Kenneth G. Macleay stating re Ms. Alston, "I am writing to inform you that the above named patient is suffering from a pulmonary condition secondary to fume exposure in her work place. She must be placed in an area free of toxic fumes, cleaning chemicals, etc."

Subsequent to the receipt of that letter, Ms. Alston received a letter dated 5/15/06, from R.E. Rikard, Employment Program Specialist, Office of Human Resource Services of the Washington Metropolitan Area Transit Authority. Ms. Rikard wrote that their office (HRMS) had been advised by the Medical Services Branch that Ms. Alston had "been permanently medically disqualified from the position of Cleaner, effective April 25, 2006. In accordance with the agreement between the Washington metropolitan Area Transit Authority and Local Union 689, Section 124, you were referred to HRMS for assistance in a job change." Ms. Alston was referred to Mary Bailey as her contact person and it was stated by Ms. Rikard "For you information, your Section 124 entitlement will expire of April 25, 2009, three years from the date you were medically disqualified." A copy of the most recent position vacancy listing was enclosed as well as in-house application forms to assist her in applying for vacant positions. Ms. Aston signed off that she had received notification of the 5/15/06 letter, on 5/16/06.

This Consultant is in possession of all but three of the 55 job descriptions for jobs for which Ms. Alston has applied in the past, as supplied by Kathleen A. Carey, Assistant General counsel for WMATA. Given her educational level, skills and work experience this Consultant believes that Ms. Alston is able to perform the substantial functions and meets the minimal qualifications and experience for the following listed positions at the listed salaries:

| | |
|---|---|
| Garage Clerk | $55,562-59,692 |
| Facilities Maintenance Clerk | $55,562-59,692 |
| Mail Clerk/Driver | $29,910-40,192 |
| Bus Communications Specialist, TS-5 | $58,272-80,120 |
| Job Access Information Assistant, TA-10 | $32,039-48,403 |

Reportedly Ms. Alston has not been given an interview for any of the above listed positions.

-6-

## CONCLUSION

It is therefore the opinion of this Consultant, within a reasonable degree of vocational certainty and probability, that Ms. Donna Aston, a 42 year old woman who is suffering from a pulmonary condition secondary to fume exposure in her workplace and can no longer be exposed to toxic fumes and cleaning chemicals and can no longer work in her position as a Bus Cleaner for WMATA, a position in which she was employed for approximately six years, would qualify for positions as listed above with the WMATA ranging in salary from $29,910-80,120. If she were to go to work in the private sector, using the skills she has developed thus far over her career she would qualify for positions earning from $8-13.00/hour, at an average range of $10.50/hour. At the time of her injury Ms. Alston was earning $18.00/hour. Ms. Alston has therefore incurred a loss of earning capacity of at least $7.50/hour ($18.00 prior as a Bus Cleaner as compared to $10.50/hour currently) to as much as $28.02/hour (which is $38.52/hour or $80,120 at 40 hours a week, 52 weeks a year minus $10.50/hour). In yearly salaries this would mean a loss of earning capacity of $15,600 up to $58,282.


Lee R. Mintz, M.Ed., CRC, CDMS, CCM, ABDA
Vocational Consultant (MCRSP #G0299)

# MINTZ & ASSOCIATES

## VOCATIONAL CONSULTING

TO:
Bruce M. Bender, Esquire
Van Grack, Axelson, Williamowsky, Bender & Fishman
401 N. Washington Avenue, Suite 550
Rockville, Maryland 20850

DATE: 1/28/08
CASE: Alston v. WMATA

FROM:  Lee R. Mintz, M.Ed., CRC, CDMS, CCM, ABDA

### EMPLOYABILITY ASSESSMENT ADDENDUM

This Consultant was asked to review additional WMATA job postings, listed subsequent to those previously reviewed. Additionally I spoke with Ms. Alston to clarify further her work experience. She reports that in addition to listed secretarial/clerical experience, she worked for one year in a clerical position at the Washington Navy yard performing phone, filing and typing duties.

Of those postings reviewed the positions of Receptionist-06-0441-CE and Customer Information Agent I-06-0071-EY, would be positions of which Ms. Alston is able to perform the substantial functions and meets the minimal qualifications and experience.  No salaries were listed.

Additionally this Consultant is deleting Mail Clerk/Driver from the list of positions Ms. Alston would be able to perform as stated in my report of 8/31/07.

Lee R. Mintz, M.Ed., CRC, CDMS,CCM,ABDA
Vocational Consultant (MCRSP #G0299)



DEPOSITION
EXHIBIT
2-B



DEFENDANT
EXHIBIT
10

Code No.: 5728

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

### JOB DESCRIPTION

POSITION: Customer Information Agent I, Local 689  DATE: 5-24-03
This position is the First of a Two level Career Ladder Series

DEPT/OFFICE: .COM/CSVC

REPORTS TO: Customer Information Agent
Supervisor

APPROV
.COM: 2 5/2/03
HRMP: P 05-15-03
LABR: ____ Rep
BChess

## POSITION SUMMARY:

This is an In-bound (ACD) Call Center operation and regional transit information customer service position. An employee in this class is responsible for providing public transit routing and scheduling information throughout the Washington Metropolitan area, by utilizing both manual and automated resources. In addition, the employee is required to respond to customer inquiries regarding Bus/Rail fares, hours of operation, connection with public/private transit operations and other miscellaneous transit information within the region.

The employee should demonstrate the ability to efficiently handle multiple inquiries calmly and efficiently in a fast paced work environment. The employee is responsible for handling a high volume of in-bound customer calls. The employee in this position must be able to quickly recognize the nature of the customer inquiry and use interpersonal skills to handle inquiries to the point of complete customer satisfaction. The employee must use judgment with minimal latitude to answer customer inquiries within the prescribed guidelines. There are two levels of Information Agents. The classification series may progress to the II level dependent upon successfully completing assignments and meeting the minimum qualifications at each level of progression. At intervals of not more than twelve months, employee performance evaluations shall be conducted.

## DUTIES:

Operates manual and automated computerized equipment to assist customers in obtaining optimum routing and scheduling information.

Effectively utilizes and understands transit related resource materials, to include but not limited to, area maps, fare matrix, transit information binders, published literature/brochures, headway sheets, service changes. etc.



PLAINTIFF'S
EXHIBIT
15

Code No.: 5728

Maintains a working knowledge of and demonstrates effective use of the on-line ARTS system.

Responds to telephone inquiries from customers regarding bus/rail schedules, service changes, fares and routes, and other miscellaneous transit information.

Demonstrates ability to provide consistently courteous and concise information to customers, in a timely and complete manner.

Completely and/or accurately and efficiently answers all customer inquiries regarding transit operations or refers customers as necessary.

Accepts customer requests for bus/rail published schedules and fulfills as appropriate.

Maintains route books, maps, and related materials and updates as required.

Required to work during inclement weather conditions and/or other emergencies.

Effectively operates the TTY/TDD system and performs associated duties as required.

Maintains an acceptable attendance record as outlined in the Attendance Reporting Procedures and the Absentee Policy Instruction.

Performs related tasks/duties as required.

## KNOWLEDGE, SKILLS AND ABILITIES:

Demonstrates ability to proficiently operate keyboard controlled equipment, used in the customer information section to provide transit routing, scheduling, and/or miscellaneous information in a timely, accurate and complete manner.

Must be self-motivated and enjoys working with the public.

Ability to provide timely, accurate, complete and courteous responses to public inquiries.

Ability to rapidly become familiar with the operational and organizational structure of the Authority.

Demonstrate ability to successfully complete all required training programs, within specified time frames.

Demonstrate ability to and knowledge required for maintaining satisfactory performance levels, as outlined in the Performance Evaluation Standards.

Code No.: 5728

Displays a professional manner and the ability to communicate effectively, in a clear and concise manner.

## MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate. A minimum of 2 years customer service, inbound marketing (ACD) and/or telephone experience required. Typing at a minimum of 25 words per minute.   Excellent communication skills, attention to detail and articulate phone skills a must.

## MEDICAL GROUP:

Ability to complete satisfactorily the medical examination for this job. The employee must be able to perform the essential functions of this job either with or without reasonable accommodations.

FLSA: Non-Exempt

0819/10

Code No. 5331

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

CLASS SPECIFICATION

Facilities Maintenance Clerk
(Local 689)

DEFINITON OF CLASS:

This is administrative and clerical support maintenance work involving the provision of technical and administrative assistance to the FMNT facility to which assigned. Employee is responsible for preparing and maintaining reports and records, and for utilizing designated office equipment such as personal computers, visual data terminals, data processors, electronic typewriters, calculators and reproduction machines. Employee has limited latitude for independent judgment and action. Employee reports to the designated supervisor.

EXAMPLES OF DUTIES:

Prepares, establishes and/or maintains files, records and reports required of the maintenance facility operation.

Operates standard office equipment to include personal computers, visual data terminals, data processors, electronic typewriters, calculators and reproduction machines.

Assists in the development and compilation of statistical maintenance operating data; performs mathematical calculations.

Maintains weekly and monthly work schedules for all shifts as assigned.

Reviews or verifies information contained on data processing reports and other documents pertinent to the maintenance facility.

Responds to inquiries made by Authority organizations effectively and in a timely manner; maintains effective work relationships with other Authority facilities and offices.

Maintains and distributes maintenance work clothes, tools, equipment, etc. for the assigned facility as required.

May operate an Authority motor vehicle.

May work variable hours and at various locations.

Performs related duties as required.


DEFENDANT'S EXHIBIT
12

-2-                                          Code No. 5331

## KNOWLEDGE, SKILLS AND ABILITIES:

Knowledge of the Authority's maintenance administrative support procedures, rules and regulations.

Knowledge of, or the ability to rapidly acquire a knowledge of, the FMNT operations of the function to which assigned.

Ability to effectively prepare assigned reports and to maintain related files and records.

Ability to effectively utilize standard office equipment, and data display equipment or the ability to rapidly acquire knowledge of the latter.

Ability to effectively compile data and to review reports.

Ability to establish and maintain effective working relationships with those individuals and organizations with whom interface is required.

Ability to work variable hours and at various Authority locations.

Ability to type twenty-five words per minute.

## MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate. Responsible technical and administrative support or related experience in a plant maintenance activity.

Or, an equivalent combination of education and experience.

## LICENSE:

Possession of a valid District of Columbia, Maryland or Virginia motor vehicle operator's permit issued from jurisdiction of residence or the ability to acquire one on a timely basis.

## MEDICAL GROUP:

Ability to complete satisfactorily the medical examination for this class.

Approvals:

Dept/Office: _____ Date 1 Mar. 88

PERS/Comp: _____ Date 9 March 1988

LABR: Local 689 Represented 9K Date: 3/28/88

Class Established: 04/
        Revised: 02/1 Refer to the current **Union Contract** for the
                 12/1 current **Progression Rates** for this position.

Code No.: 3751

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

### JOB DESCRIPTION

POSITION:     Job Access Information Assistant, TA-10        Date: *06-06-00*

DEPT/OFFICE: BUSV/ATJ

REVIEWED
BUSV: *4/1/00*
HRMP: *AC-11 5-23-00*
LAB.:

REPORTS TO: Manager, Access to Jobs and
Reverse Commute Program

*DCPers 5/26/00*

### POSITION SUMMARY:

This is paraprofessional administrative work to support operation and implementation of the Job Access and Reverse Commute Program. Responsibilities include coordinating the business and assisting in the daily operation of the Job Access and Reverse Commute Call Center. Answers phone calls and processing requests for assistance and information. Provides assistance with planning trip itineraries and brokering trips. Collects and compiles data and assists in the preparation of various reports and documents. Establishes and maintains official files for the Call Center and provides general support for the Job Access and Reverse Commute Program.

### DUTIES:

Coordinates and disseminates Job Access information and actions among partners, staff, clients, and other entities.

Answers Call Center telephone inquiries. Expedites and processes requests for Job Access and Reverse Commute services within established deadlines. Maintains required detailed documentation.

Assists with the preparation of weekly, monthly and quarterly reports to include Federally required reports for continued funding.

Acts as a resource to provide information regarding Job Access and Reverse Commute Program.

DEFENDANT'S
EXHIBIT
13

Code No.: 3751

Maintains and updates database for determining eligibility and tracking clients served by the One Stop Call Center. Initiates development of improved computerized tracking and reporting systems.

Assists program manager with development and implementation of the Access to Jobs/Call Center marketing plan.

Assists manager with development of program promotions to include preparation of written materials, brochures, visuals, and other outreach materials.

Assists in the design, development and update of the Web-site. Initiates modifications as required.

Performs other related duties as required.

KNOWLEDGE, SKILLS, AND ABILITIES:

Thorough knowledge of business English, spelling, punctuation, arithmetic, and general office practices and procedures.

Considerable knowledge of the Washington Metropolitan Area, its roadways, public transit, and other transportation options.

Ability to create and maintain a database, spreadsheets and word processing applications on a personal computer and to use Authority standard display devices and office equipment.

Ability to effectively learn, or utilize existing computer systems such as ARTS and GIS to plan trips and itineraries.

Ability to exercise good judgement and discretion.

Ability to work both independently and as a team member on a variety of assignments and tasks.

Ability to establish and maintain effective working relationships with individuals and organizations inside the Authority, other agencies and the general public.

Ability to properly establish and maintain complex file systems.

Ability to communicate effectively.

## MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate with some college level or formal administrative or secretarial training. Considerable progressively responsible administrative support experience.

## MEDICAL GROUP:

Ability to satisfactorily complete the medical examination for this job. The employee must be able to perform the essential functions of this job either with or without reasonable accommodation(s)

This is a full-time temporary position to be funded for the duration of the TEA 21 grant program.

3202h

Code No. 6450

## WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

### CLASS SPECIFICATION

### Bus Communications Specialist, TS-5

#### DEFINITION OF CLASS:

This is professional traffic management work. Employee in this class is responsible for coordination of communications between the Central Control Office and operating units within the Metropolitan area. Employee receives information by radio/telephone relative to breakdowns, accidents, occurrences, etc., and contacts the proper department or person for action. Additional duties include writing and producing detailed reports and maintaining precise records. Employee has latitude for independent judgment and action within established guidelines. Employee is supervised by the Supervisor of Central Communications.

#### EXAMPLES OF DUTIES:

Maintains two-way communication with supervisors and Metrobus Operators in revenue/non-revenue operation, road service/snow crews and other radio-equipped vehicles. Dispatches and directs service trucks in the effort to respond to disabled buses. Maintains immediate communications with divisional and mechanical departments relative to operating requirements.

Maintains current files of various operating records; completes daily report of Metrobus operations. Maintains to ensure clocks are correct, an hourly record of temperature, humidity and weather conditions obtained by phone, observation and daily time checks with all divisions.

Receives detention reports from operators on accidents, disabled buses, sick or injured passengers, toxicated and/or disorderly passengers, fare disputes, robberies and other occurrences. Notifies a supervisor as required and requests police, fire department and other assistance as needed in accordance with operating procedures.

Records detours of routes as described by Street Supervisors caused by construction, fires, weather conditions, etc. Coordinates with divisions involved as to effective date and time when service is returned to regular route. Maintains communications with D.C. Highway Department, jurisdictional police departments, construction firms and other organizations as appropriate.

Maintains radio contact with sand and salt trucks during snow operations. Receives information relative to street conditions; relays information and dispatches trucks to route or location needed most in an effort to keep buses moving. Maintains records of entire operation.

Provides instructions to bus operators in the absence of a Street Supervisor.

Works variable shifts as required.

Performs related duties as required.


DEFENDANT EXHIBIT
14

3202                                                      Code No. 6450

-2-

KNOWLEDGE, SKILLS AND ABILITIES:

Thorough knowledge of Transportation Department safety rules and regulations and Federal Communications Regulations, U.S. Department of Transportation, Federal Highway Administration, Bureau of Motor Carrier safety rules and regulations.

Working knowledge of current routes, fares and transfer points.

Ability to attain knowledge of two-way radio communication procedures.

Ability to communicate effectively orally and in writing including ability to type reports at 25 words per minute.

Ability to work variable shifts.

Ability to exercise good judgment and follow through and to document actions effectively.

Ability to maintain composure during stressful situations.

Ability to establish and to maintain successful working relationships with co-workers and the public.

MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate with extensive experience in bus operation work, preferably with experience or training as an Operator Training and Safety Instructor, Street Supervisor or Utility Street Supervisor.

Or, an equivalent combination of education and experience.

LICENSE:

Possession of a valid District of Columbia, Maryland or Virginia motor vehicle operator's permit issued from the jurisdiction of residence and appropriately classed to operate a passenger bus.

MEDICAL GROUP:

Ability to complete satisfactorily the medical examination for this class.

Approvals:
Dept/Office: _LeRoy L. Bailey Jr._ Date: 1-24-89

PERS/Comp: _Susan K Borton_ Date: 30 January 198

LABR: _Local 2 Represented Jr K_ Date: 1/30/89

Class Established:  02/12/75
          Revised:  11/16/76
                    03/01/83
                    04/15/88
                    11/22/88

*Code: 5975*

# WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

## JOB DESCRIPTION

POSITION: Receptionist

DEPT/OFFICE: .COM/CSVC

REPORTS TO: Supervisor, Facilities Services

DATE: *July 30, 2002*

REVIEWED:
.COM : *MB 7/30/02*
LABR : *[signature] 7-30-02 member*
HRMP: *[signature] 7-6-02*

### POSITION SUMMARY:

Clerical and receptionist work, responsible for greeting and assisting visitors, vendors, and patrons to the Jackson Graham Building and/or public service facilities . Employee has some latitude for independent judgment and action within established guidelines.

### DUTIES:

Greets visitors at the designated reception area, and ascertains nature of their business.

Maintains schedule Authority Special Activity Meetings to enable contacts with appropriate office, department or employee escorts.

Contacts proper office and, after verifying visitor can be received, checks visitor's identification and issues visitor badge.

Coordinates preauthorization of visitors and meetings via Group Wise E-Mail and telephone maintaining an up-to-date list of contacts.

Responds to walk-in queries relative to WMATA employment and distributes employment applications as necessary.

Responds to walk-in employment Inquiries for work on construction projects referring applicants to appropriate employing agencies.

Receives hand-delivered mail/packages from carriers and takes prompt disposition action.



DEPOSITION EXHIBIT

DEFENDANT'S EXHIBIT 15

Page 1 of 2

Reception Desk.
Provides relief in areas such as PABX as required.

Provides daily reports of work to supervisor, reporting any problem as they occur.

Maintain supplies, including application forms, materials in hand-out rack for distribution.

Furnishes visitors departing the Authority facility general information on bus routes and other related information as requested.

Maintain an accurate count of all WMATA's Senior Citizen applications.

Performs related duties as required.

## KNOWLEDGE, SKILLS, AND ABILITIES:

Knowledge of or the ability to rapidly attain a working knowledge of the general operation of the Authority and the location of offices and employees.

Knowledge of office practices, procedures and standard office equipment and photographic equipment.

Ability to speak clearly and distinctly and In a well modulated and pleasant voice.

Ability to rapidly associate names with offices and locations.

Ability to obtain and furnish information with utmost tact and courtesy.

Ability to control emotions at all times when under stress of a difficult situation.

Ability to maintain proper pass control of visitors access/egress.

Ability to deal courteously and effectively with others.

## MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate with two (2) years of experience as a receptionist in a busy office where inquiries are varied and numerous.

## MEDICAL GROUP:

Ability to satisfactorily complete the medical examination for this job. The employee must be able to perform the essential functions of this job either with or without reasonable accommodation(s).

**FLSA NON-EXEMPT**

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY          Code No. 5683

CLASS SPECIFICATION

Garage Clerk

## DEFINITION OF CLASS:

This is administrative and clerical support maintenance work of a moderately difficult nature. Employee in this class is responsible for providing technical and administrative assistance to the operating maintenance facility to which assigned, including preparing and maintaining reports and records and for utilizing designated office equipment. Employee has limited latitude for independent judgment and action. Employee reports to the designated supervisor at the assigned bus maintenance facility.

## EXAMPLES OF DUTIES:

Prepares, establishes and/or maintains files, records and reports required of the maintenance facility operation.

Operates standard office equipment to include typewriter, calculator and reproduction machinery.

Assists in the development and compilation of statistical maintenance operating data; performs mathematical calculations.

Reviews or verifies information contained on data processing reports and other documents pertinent to the maintenance facility; operates data display equipment as necessary.

Responds to inquiries made by Authority organizations effectively and in a timely manner; maintains effective work relationships with other Authority facilities and offices.

May operate an Authority vehicle.

May work variable hours and at various locations.

Performs related duties as required.

## MINIMUM QUALIFICATIONS AND EXPERIENCE:

Graduation from high school or possession of a high school equivalency certificate with responsible technical and administrative support or related experience in a maintenance operation. An equivalent combination of education and experience may be acceptable.

Knowledge of the Authority's maintenance administrative support procedures, rules and regulations.

Knowledge of, or the ability to rapidly acquire a knowledge of the designated maintenance operation.

Ability to effectively prepare assigned reports and to maintain related files and records.

DEFENDANT'S
EXHIBIT

16

Ability to accurately type 25 wpm and to effectively utilize standard office equipment, and data display equipment or the ability to rapidly acquire knowledge of the latter.

Ability to effectively compile data and to review reports.

Ability to communicate effectively both orally and in writing.

Ability to deal courteously and effectively with others.

Ability to work variable hours and at various Authority locations.

LICENSE:

Possession of or ability to rapidly obtain a District of Columbia, Maryland or Virginia motor vehicle operator's permit issued from the jurisdiction of residence.

MEDICAL GROUP:

Ability to satisfactorily complete the medical examination for this class.

Refer to the current **Union Contract** for the current **Progression Rates** for this position.

Approved by: _____

Date: _4/6/78_

Amended : 2/82

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


- - - - - - - - - - - - - - x

DONNA J. ALSTON,                 :

      Plaintiff,              :

   vs.                           : Civil No.:

WASHINGTON METROPOLITAN AREA: 07-00122 (ESH)

TRANSIT AUTHORITY,               :

      Defendant.              :

- - - - - - - - - - - - - - x

Corporate Deposition of

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY

By and through its corporate designee,

STEVEN GODBEY

Washington, D.C.

Thursday, May 1, 2008

3:37 p.m.


Job No.:  1-128454

Pages:  1 - 50

Reporting by:  Sarah M. Bickel



PLAINTIFF'S
EXHIBIT
16

1 minute?

2          (Discussion off the record.)

3          BY MR. BENDER:

4      Q  The first thing I thought we could do,

5 these two particular jobs, the facility maintenance

6 clerk, job access information assistant, those are

7 two of the six jobs that we were talking about,

8 correct?

9      A  Correct.

10          MR. BENDER:  Why don't you mark those as

11 Exhibits 1 and 2.

12          (Godbey Exhibits 1 - 2 were marked for

13 identification and retained by counsel.)

14          BY MR. BENDER:

15      Q  So you've given me some information about

16 those two particular jobs, a facility maintenance

17 clerk job, we'll start with that, Exhibit 1.  What is

18 that document?

19      A  This is a screenshot from our electronic

20 tracking system known as Greentree.  We note in the

21 upper left-hand corner a little tree -- it's actually

22 green on the screen -- but what it does, it gives us

1 a snapshot of all information, you know, that went on

2 with that particular requisition.

3           In this case, the facilities maintenance

4 clerk, it indicates when the job was received in HR,

5 when the job was posted, when the job closed, when

6 the applications were all sent to the hiring manager,

7 how many applicants applied, and the list of all the

8 applicants that applied for this particular position.

9           In addition, it provides relevant

10 information about the job for candidates to determine

11 whether they're interested in applying or not,

12 information such as the shift, days off, who the job

13 reports to, and then subsequent links to when jobs

14 are offered and salaries and any other information

15 related to each candidate that applied for the

16 position.  So it's a pretty complicated package.

17          Q   So Ms. Alston applied for this one --

18          A   That is correct, absolutely.

19          Q   What date does it say she applied?

20          A   This -- well, again, this indicates

21 1/3/2006, however, this list is -- the important

22 information that is drawn from this list is the name

1          Do you have any knowledge of Ms. Alston's

2 qualifications and whether she met the minimum

3 qualifications for this job in WMATA's opinion?

4          A  Again, I have not viewed Ms. Alston's

5 qualifications based on this.  The facilities

6 maintenance clerk is a rather senior level position

7 within the union, Local 689.  It has very specific

8 guidelines as to how it is filled.  We do not fill

9 union positions as from the most qualified.  We fill

10 union positions according to the contract by

11 qualified most senior.

12          Q  Right.  But my simple question is, do you

13 have any knowledge of Ms. Alston's qualifications,

14 putting aside the union business, as to whether she

15 was qualified for this job?

16          A  No.

17          Q  So you don't know, one way or the other,

18 if she was qualified or not qualified based on the

19 job application, is that what you're telling me?

20          A  That's correct.  I mean, it would take me

21 about two seconds to look and see if she was

22 qualified.  But as far as we're concerned, from an HR

1      Q   Okay.  So do you know, based upon her

2 seniority, as we're sitting here today, or her

3 qualifications, whether her seniority --

4      A   Her seniority would not have allowed her

5 to even be in the first cut.

6      Q   Let's assume that the job didn't require

7 seniority.  Would she have met the minimum

8 qualifications for the job or you just don't know?

9      A   We have her application.

10      Q   I didn't see it in there, but maybe it's

11 in there and I missed it.

12          MS. CAREY:  Off the record for a minute.

13          (Discussion off the record.)

14          THE WITNESS:  When we spoke of the

15 facilities maintenance clerk and the applicant list

16 at the time, because it is time-sensitive and the

17 list is generated at the time of, you know, back in

18 2003, which was when this was generated, on

19 10/14/2003, it does reflect these are your candidates

20 that applied for the position.  It also indicates

21 that they all applied from an internal posting, and

22 it actually indicates the actual date that the

Page 23

1        Q   Okay.  Let's move onto this next one that

2 we marked as Exhibit 2, the job access information

3 assistant.  You have that job description?

4        A   Yes, I do.

5        Q   This one also shows Ms. Alston applied for

6 it --

7        A   Right.

8        Q   Do you know when?

9        A   The position was received in human

10 resources on September 12th.

11        Q   Of what year?

12        A   2005, excuse me.  It was posted on or

13 about that date.  The positions are posted for ten

14 days.  If Ms. Alston is on the list, she applied

15 within that ten-day period.  We had 441 applicants

16 apply.  The position was posted both internally to

17 the Authority, as well as externally through either

18 the Washington Post or another -- or put on our Web

19 site.

20        Q   So do you know when a person was selected?

21        A   Yes.  This looks like it was

22 approximately -- again, about a three-month

Page 24

1 recruiting cycle.  The position was filled in January

2 of 2006 by a Keisha White who was an external

3 candidate to the Authority.

4         Q  And do you know, did Ms. Alston meet the

5 minimum qualifications for this job?

6         A  Minimum qualifications, again, required

7 graduation from high school or a GED with some

8 college level or formal administrative or secretarial

9 training and considerable

10 responsible -- progressively responsible

11 administrative support experience.  Again, it was my

12 understanding that she had some clerical -- had

13 clerical or administrative experience in a previous

14 job, previous life.

15         Q  So she would have met that minimum on the

16 paper?

17         A  Minimum on the paper, yes.

18         Q  So do you know if she was interviewed or

19 considered for this job?

20         A  I do not have that information.

21         Q  So there's not a file for this particular

22 job?

1      A   That's correct.

2      Q   To determine who was interviewed and who

3 made the cut and who didn't?

4      A   That's correct.

5      Q   But the bottom line is she met the minimum

6 qualifications on the job description for this job;

7 is that correct?

8      A   I would say, based on my knowledge of her

9 background, she would have.

10      Q   The answer is "yes," correct?

11      A   Yes, that's correct.

12      Q   We're talking about the job access

13 information assistant that was filled in January '06?

14      A   Correct.

15      Q   What does "updated January 30, '06" mean?

16      A   That was the date that indicated when the

17 position was entered into the system as filled.

18      Q   Okay.

19      A   So E. Young, Erica Young, changed the

20 status from posted to filled and also indicated the

21 successful candidate, and that's noted at the bottom

22 of the screen.

Page 26

1          Q    The successful candidate you said was this

2   Ms. Keisha White?

3          A    Correct.

4          Q    I think somehow her application was

5   attached to some of the papers you gave me.

6               MS. CAREY:  Right.  We were providing it.

7               THE WITNESS:  Yes, that is correct.  This

8   is it.

9               MR. BENDER:  We'll mark that as Exhibit 3.

10              (Godbey Exhibit 3 was marked for

11  identification and retained by counsel.)

12              BY MR. BENDER:

13         Q    I guess I was just curious, if you didn't

14  have a file for this job, how did you find this

15  application?

16         A    Again, by reasoning the position number

17  itself, 009934, I then looked up Ms. White's file in

18  the employment records section and found that this

19  was -- she has only worked in one job since she began

20  in 2006.  This was the application that was in her

21  personnel record.

22         Q    So was there any type of union seniority

1 that applied to this job, job access information

2 assistant?

3          A   This position was a Local 2 position.

4 There was a union seniority pecking order with this.

5 However, in this case, the position was posted

6 outside for the -- one of the reasons was that the

7 job description itself indicated that this was a

8 full-time temporary position, to be funded for the

9 duration of the TEA 21 grant program, which was

10 capitally funded.  This was not to be considered a

11 permanent position with the Authority, so it was

12 posted outside to attract candidates.

13          Again, when the discussions were held with

14 the hiring manager, this was a new program to the

15 Authority, the access jobs and reverse commute

16 program.  So it was a new position and it

17 was -- again, we wanted to show out the largest,

18 widest possible net to get qualified candidates for

19 the position.  So while it did -- while it was

20 subject to the salary administration collective

21 bargaining rules of Local 2, we did, in fact, find

22 the candidate selected was an outside candidate.

Page 28

1          Q   Who didn't have any seniority?

2          A   Who had zero seniority.

3          Q   Right.   What I'm saying is the seniority

4 or lack thereof didn't play a part in the ultimate

5 hiring decision?

6          A   No.

7          Q   Because somebody who had no seniority was

8 hired, correct?

9          A   Correct.

10          Q   Ms. Alston obviously had more seniority

11 than this lady who was hired --

12          A   No, she did not.

13          Q   She didn't?

14          A   No, she had no seniority as well because

15 this was a Local 2 position.

16          Q   It was in the other union.

17          A   Correct.

18          Q   Got it.   Okay.   So we can put the whole

19 union thing aside for this job?

20          A   For this particular job.

21          Q   Ms. Alston didn't have any seniority, nor

22 did the person who was hired?

Page 29

1     A  Correct.

2     Q  Got it.  So do you have any way, as we're

3 sitting here today, to tell me the relative

4 qualifications of Ms. Alston versus this person who

5 was hired in terms of their qualifications for this

6 job?

7     A  Yes.  A document in with the

8 applicant's -- what we refer to as the compensation

9 memo, what are we going to pay this individual,

10 indicated that the reason that Ms. White was selected

11 was that she had relevant experience to working with

12 disabled personnel or customers at another transit

13 authority.  So I believe that in the course of her

14 interview, she probably was selected one of the

15 qualifying -- or one of the reasons she was selected

16 was she had experience specific to this job.

17     Q  You want to look and tell me what

18 experience you're talking about on her --

19     A  Yes.

20     Q  -- application?

21     A  Sure.  In November of 2003 to March of

22 2004, she had indicated that she was a mobility

1  intern, that she assisted and supported the director

2  of paratransit and mobility management with the

3  implementation of a new taxi voucher transportation

4  service.  She conducted quality research on

5  neighboring transit authorities and other major

6  transportation services.  She also gathered pertinent

7  data through telephone interviews, e-mail

8  correspondence and monthly governance board meetings.

9  She analyzed and documented information into reports

10  and presented the information to the director.

11          The job description indicated that this

12  was a paraprofessional administrative work to support

13  the operation and the implementation of a job access

14  and reverse commute program.  Again, this was within

15  the department of access services, again, dealing

16  with and assisting in the daily operation, answering

17  phone calls, processing requests for assistance and

18  information.  So she had direct related experience to

19  the job as posted.

20          Q  With respect to this lady -- what's her

21  name, Ms. White?

22          A  Yes, Keisha White.

1        Q   Do you know if she had any disabilities or

2   medical conditions?

3        A   I do not know.

4        Q   Thank you.

5        A   Sorry, this was --

6        Q   Yeah, that went in the other file.

7        A   Thank you.   This goes with that

8   (indicating).

9        Q   That's the third page of the job

10  description.

11            MR. BENDER:   Why don't we mark these as

12  the next two then.

13            (Godbey Exhibits 4 - 5 were marked for

14  identification and retained by counsel.)

15            BY MR. BENDER:

16       Q   So the next one we've marked is the

17  receptionist position.   It looks like you pulled the

18  record of the applicants who applied, and it looks

19  like Ms. Alston didn't apply, according to this list

20  that you pulled, correct?

21       A   Correct.

22       Q   Do you have the actual job description for

1 this job?  You handed me a whole bunch of them.

2          MS. CAREY:  I handed you a complete set.

3          MR. BENDER:  Let me see if I can find it.

4          MS. CAREY:  It's Mintz Exhibit 4.

5          MR. BENDER:  You want to just use that

6 one?

7          MS. CAREY:  Yeah.  It's the same one.

8          BY MR. BENDER:

9      Q  So what I want to know is, on this

10 particular receptionist position, when was it posted

11 and when was the hiring done?

12     A  Okay.  On this particular one, the

13 position was actually posted twice.  The first time

14 it was posted was when it was vacated in 2006.

15     Q  In what month, do you know?

16     A  I want to say September, but I wouldn't

17 bet my life on it.  In fact, I know it was posted in

18 September of '06.

19     Q  Okay.

20     A  The position -- several months pasted, the

21 position had not been filled.  I think it was filled

22 with a combination of temporaries while they were

1 deciding what to do.  I believe the department, in

2 fact, was going through some leadership and

3 management changes, so the job was subsequently

4 posted a second time in May of 2007.  So when I went

5 in search of the applicant list, I looked at both

6 when the position was filled, because normally we

7 don't leave a position vacant for, you know, eight to

8 nine months, especially a receptionist position in

9 the JGB building.

10       Q  Looking at the job description, did

11 Ms. Alston meet the minimum qualifications?

12       A  Again, having not looked because she had

13 not applied.

14       Q  Right.  I understand.  But I'm just asking

15 you to tell me if she had applied, would she have met

16 the minimum qualifications?

17       A  That I cannot answer because the minimum

18 qualifications requires two years of experience as a

19 receptionist in a busy office whereas inquiries were

20 varied and numerous.  I do not have direct knowledge

21 if she has the two years of experience as a

22 receptionist.  I believe she has some administrative

Page 34

1 and clerical but not specifically as a receptionist,

2 so I cannot answer.

3        Q   Okay.  So you're just not sure?

4        A   I'm not sure.

5        Q   So do you have any idea if the people in

6 the office who assisted people to try to -- people

7 who were disabled to try to get a job transfer,

8 what's that section of the union contract that

9 Ms. Alston fell under because she got a -- was placed

10 in a leave of absence status --

11       A   Section 124.

12       Q   Yeah, section 124.  That's what I was

13 thinking, but it's been a long day.  Section 124.

14       A   Right.

15       Q   Do you know if any of the people who

16 assisted section 124 individuals, including

17 Ms. Alston, whether anyone suggested to Ms. Alston

18 that she apply for a receptionist position?

19       A   The individual who handles our 124 sends

20 out all job postings internally, including this one,

21 to all individuals who are on section 124.  So she

22 did, in fact, unless, you know -- she would have

Page 35

1 gotten this posting and would have had the

2 opportunity to apply.

3      Q   Then who was selected for this job, do you

4 know?

5      A   Yes, the successful candidate was

6 Darlene -- Darlene Gorman-Seldon.

7      Q   Who are you looking at?

8      A   This (indicating) --

9      Q   That one page thing?

10         MS. CAREY:  Yes.

11         MR. BENDER:  Why don't we mark this as the

12 next exhibit.

13         (Godbey Exhibit 6 was marked for

14 identification and retained by counsel.)

15         BY MR. BENDER:

16      Q   So you were looking at this one page we

17 marked as Exhibit 6 that indicated who the selectee

18 was?

19      A   Yes.  The position was filled in

20 November -- excuse me, October of 2007.

21      Q   And do you know anything about the

22 qualifications of this person who is selected

1 would have been had she been selected.

2          BY MR. BENDER:

3          Q  You mean you could do a calculation?

4          A  Sure.

5          Q  How do you do the calculation?

6          A  I would look at her salary, first of all,

7 determine if it is a promotion.  We would look at the

8 midpoint of the range to determine whether it was a

9 7 percent variance.  Then the individual would, in

10 fact, get a 5 percent increase or to the minimum of

11 the grade, whichever was greater.

12          Q  And the receptionist position, that was a

13 full-time, permanent position?

14          A  Correct, yes.

15          Q  What's the salary level for that one?

16          A  Receptionist is a B06.  B06 starts around

17 30,000 and goes as high as 50,000.

18          MR. BENDER:  That's all the questions I

19 have.  I appreciate your time and pulling all these

20 documents.

21          THE WITNESS:  No problem.

22          MS. CAREY:  Do you want to read or do you